# EXHIBIT 4

1          IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
2                EASTERN DIVISION

3  PECO PALLET, INC.,         )

4            Plaintiff,      )

5         -vs-           ) No. 15 C 6811

6  NORTHWEST PALLET SUPPLY CO.,  ) Chicago, Illinois
                        ) May 10, 2016
7          Defendants.      ) 10:30 a.m.

8

              TRANSCRIPT OF PROCEEDINGS
9       BEFORE THE HONORABLE ANDREA R. WOOD

10  APPEARANCES:

11  For the Plaintiff:     WINSTON & STRAWN LLP
                        35 West Wacker Drive
12                     Chicago, Illinois  60601
                        BY:  MR. DANIEL D. RUBINSTEIN
13                           MS. KATHRYN A. BAYER
                           MR. WILLIAM CHARLES O'NEIL
14

15  For the Defendant:     TARPEY WIX LLC
                        225 West Wacker Drive
16                     Chicago, Illinois  60606
                        BY:  MR. DAVID G. WIX
17

18

19

20        COLETTE M. KUEMMETH, CSR, RMR, FCRR
               OFFICIAL COURT REPORTER
21           219 South Dearborn Street
                   Room 1928
22           Chicago, Illinois  60604
                 (312) 554-8931
23

24

25

1    passed.

2          THE COURT:  Okay.  So Mr. Wix, did Allen County

3    indicate that they were going to file something, seek a

4    protective order, something along those lines?

5          MR. WIX:  I had a voicemail this morning, your

6    Honor, I didn't have time to call them back.  The voicemail

7    was that they wanted to -- they were aware of the fact that

8    we had filed a motion to quash and that they wanted to be a

9    part of that because they considered the documents being

10   requested in the subpoena to be confidential and propriety

11   to them.  But I haven't had that actual conversation.

12         THE COURT:  Okay.  Well, obviously I can't rule on

13   any objection that they don't actually come in and raise.  So

14   on the issue of at least PECO's subpoenas, I don't at this

15   point have any record of any objection from a party, or at

16   least that's gotten to the level where they're seeking a

17   protective order.

18         I did have some of my own concerns about the scope

19   of the subpoenas.  I don't recall if I touched on this last

20   time before we ended up continuing things to this hearing.

21   But the subpoenas, as I recall, requesting documents relating

22   to the third parties' relationships with other recyclers

23   other than Northwest, I think it was generally about any such

24   arrangements that they had in place.  Let me see if I can

25   pull up my note.  But that was my recollection.

1          Is that what PECO is seeking here, or is your

2     request intended to be just limited to the third parties'

3     business relationships with either PECO or Northwest?

4          MR. O'NEIL:  We are limiting it to the latter.

5     Their business relationship with us or them.  We're only

6     concerned with what these parties have done with our pallets

7     when they have come into possession with our pallets, how

8     much cost they are incurring to handle them, to stack, sort,

9     and load them, and how much -- what the economics are like

10    vis-à-vis them and Northwest.

11          This is very important to our damages, the damages

12    for both sides in this case.  The central issue is these two

13    parties can't agree on what a fair price is to do the work,

14    the effort that they do when they get our pallets.  And these

15    are the subcontractors that they've hired around the country.

16    This is a sampling of the subcontractors that handle our

17    pallets.

18          So Northwest has national contracts, with Target as

19    one example, but they don't have employees around the country

20    to handle those pallets themselves, so they have to

21    subcontract that work to other pallet recyclers throughout

22    the country.  These are 11 pallet recyclers which they've

23    identified in their own Rule 26(a) disclosures as people

24    having knowledge about the case.  So we've asked their

25    subcontractors:  To the extent you come into contact with

1    PECO pallets, tell us about your correspondence with

2    Northwest about it and what the economics are of how much are

3    they paying you to do the stack, sort, and load, because

4    that's central to figuring out the key issue in this case,

5    which is what's the right price.  Because that's really what

6    this case is largely coming down to, and what the parties

7    fundamentally, if you set aside all the causes of action,

8    can't agree on.

9              THE COURT:  Am I correct, though, that the subpoena

10   would call for production of information relating to any

11   arrangement they have with a business partner other than

12   Northwest to recycle PECO pallets?

13             MR. O'NEIL:  That's not our intention, your Honor,

14   and we're glad to -- I mean, we've made it clear to these

15   folks we're glad to work with them to narrow the burden.

16   We've issued seven requests.  We are not trying to unfairly

17   burden these people or get into their business affairs.  We

18   really want to know issues related to their business

19   relationship with Northwest and specifically their handling

20   of these red PECO pallets.  Anything else they do we're not

21   concerned with getting into.  So we will gladly constrict the

22   subpoena to those confines with these third parties.

23             THE COURT:  Give me a moment here.

24             So I think the subpoena that was attached to the

25   motion to quash is directed to the Pallet Factory?

1          MR. O'NEIL:  In fact, I have that one in my hand,

2     your Honor.

3          THE COURT:  Okay.  So --

4          MR. WIX:  I believe they're all the same.

5          MR. O'NEIL:  They are all the same.

6          THE COURT:  They're all the same.  Good.  That

7     makes it simpler.

8          So for example, item No. 4 says:  "All documents

9     and communications relating to any fees Pallet Factory may

10    have paid to Northwest, any retailer, or any other party as

11    it relates to PECO pallets."

12         So I guess my question is for these requests that

13    refer to any retailer or any other parties, is that intended

14    to capture if they had a relationship with somebody other

15    than Northwest or performed the same services, are you asking

16    them to provide that information, or only with Northwest?

17         MR. O'NEIL:  Northwest.  And the retailer is not

18    Northwest.  The retailer is Target, in my hypothetical

19    example.  Because what we've learned in this case or have

20    been told by Northwest is that they're sometimes paying

21    concession fees to get our pallets.  So to get our red

22    pallets they're paying -- I'll give you 10 cents, 20 cents in

23    issue to get the pallet, and then they're doing their labor

24    on top of it.

25         So part of their damages they're claiming in this

1   case is not just the actual effort of stack, sort, and load

2   our pallet, but also this concession fee they're basically

3   paying to buy our property and get the opportunity to handle

4   it and sell it -- in their mind sell it back to us, in our

5   mind return our property to us.

6          So part of their damages is that concession fee,

7   and so we're trying to get to the financial economics of if

8   that subcontractor is paying concession to Target to get

9   their hands on the red pallets in the first place, we want to

10  make sure we know what that is so that we can fairly account

11  for that in our damage model if we need to.

12         THE COURT:  So the Pallet Factory here is the

13  subcontractor then that is contracting with Northwest to

14  collect pallets from the retailers, and then the pallets go

15  to Northwest, and Northwest ideally would be returning them

16  to PECO at some amount of money, and that's what you're

17  fighting about?

18         MR. O'NEIL:  That pretty fairly represents it.  So

19  Northwest goes out, and I'll let Mr. Wix comment to his -- to

20  his client's relationship.  As I understand it, they go out

21  and sign a national contract with Target and say, we'll

22  handle all your distribution centers, pallets that come to

23  those distribution centers.  But they don't have the manpower

24  to service that themselves on a nation-wide basis.  They

25  subcontract it out.

1    The Pallet Factory is one of those subcontractor

2  vendors with them that come into contact with our pallets.

3  So there is some revenue share between Northwest and the

4  Pallet Factory as to there is an economic arrangement there

5  as to how much they're getting paid and how much Target is

6  getting paid for this whole thing, and we just want

7  transparency as to what that economic arrangement is for all

8  three of those parties so that we can build a damages model

9  that fairly accounts for the effort.

10    THE COURT:  Would the Pallet Factory also work as a

11  subcontractor for some other companies, and would they also

12  do their own work on their own, collect pallets for their own

13  benefit not because they have a contract relationship with

14  Northwest?

15    MR. WIX:  That's certainly my understanding, is

16  these independent contractors that Northwest Pallet enters

17  into agreements with are not solely doing the work just for

18  Northwest Pallet.  They have their own businesses.  I don't

19  know, they may very well have other arrangements with other

20  pallet recyclers to clear their docks in a certain particular

21  area, I don't know about that, but they certainly -- my

22  understanding is I don't think any of these recyclers have

23  100 percent of their business, which is independent

24  contracting and the work that they've agreed to do for

25  Northwest Pallet.

11

1       So I think, your Honor, part of our motion is that

2   these requests go way beyond anything that even arguably

3   could be related to Northwest Pallet, because it's asking for

4   any PECO Pallet or any arrangement that they have with any

5   retailer that, in our view, goes above and beyond what the

6   case is about.

7       And then quite frankly, as pointed out in our

8   motion, PECO's damages in this case relate to conversion, and

9   so everything that Mr. O'Neil is talking about about the

10  pricing relationship between Northwest Pallet and companies

11  like Pallet Recycler have nothing to do with whether

12  Northwest Pallet converted any pallets.

13      THE COURT:  What about Northwest's claims in the

14  other suit?

15      MR. WIX:  Our claim is for unjust enrichment, which

16  the measurement of damages which is the value of the pallet

17  returned to PECO, not any of the costs associated with

18  Northwest Pallet in getting that pallet back to PECO.  The

19  measure of unjust enrichment damages is the value conferred

20  on the recipient of that service.  So in this case it would

21  be what is the value of having a pallet that is otherwise not

22  in your possession and, in our opinion, lost or abandoned in

23  the marketplace returned to you so that you can then use it,

24  and rent it multiple times over the course of that pallet's

25  life.  And those are the issues and the information that we

1  need to get in order to proceed with our claim of unjust

2  enrichment, is what the value is to them.  Not what it might

3  cost us to get it back to them.

4  THE COURT:  Also for I guess the promissory

5  estoppel claim or some of the other claims, isn't part of

6  your damages model dependent on coming up with a fair

7  compensation for your services?  I understand you think the

8  fair compensation is what's in the agreement that sets out,

9  you know, what they had agreed to pay, but isn't there an

10  argument to be made that you need to figure out what it

11  really is in order to get to your damages for your claims?

12  MR. WIX:  I don't believe so, because our

13  promissory estoppel claims are based upon the promises made

14  by PECO, PECO, to pay us a certain --

15  THE COURT:  Is it peak-oh or peck-oh, by the way?

16  MR. WIX:  We say peak-oh in our office, but I hear

17  them say peck-oh.

18  MR. O'NEIL:  Phonetically it's P-A-Y-C-O.

19  MR. WIX:  PECO, I apologize.

20  THE COURT:  I was saying peak-oh, and I heard

21  peck-oh, so I switched.

22  MR. WIX:  Our promissory estoppel claims are based

23  upon the promises that they made to us of a certain amount

24  that they would pay for the return of pallets.  So for

25  instance, from January of 2015 until May 12, 2015 when PECO

1    sent us the letter saying we're no longer going to pay you,

2    they had previously promised to pay anywhere from $1.25 or

3    $1.95 per pallet, depending upon where it came from, for the

4    return of those pallets.

5            And during those three months -- four, four and a

6    half months, Northwest Pallet returned a number of pallets.

7    So part of our promissory estoppel claim is we're entitled to

8    the amount you promised us, because based upon that promise

9    we went out and gathered those pallets and returned them to

10   you.

11           So the only thing that we need to determine is

12   whether we acted reasonably on reliance on their promise for

13   a certain amount.  We don't need any information from anybody

14   else to determine what that amount should be.  The amount is

15   based on what they unequivocally promised to pay us to do

16   that for.

17           THE COURT:  So your unjust enrichment claim you're

18   saying similarly doesn't require any independent assessment

19   of the value of the service of returning the pallets?

20           MR. WIX:  Well, our position is the value of the

21   benefit conferred on PECO.  So what the value of having a

22   pallet returned to them is to them.

23           Now, our position on that is what it actually costs

24   us to get the pallets back to them is not necessarily

25   indicative of what the value is to them.  If it only costs us

1   hypothetically ten cents a pallet to get it back to them, but

2   they're going to re-rent that pallet for $5.25, and they're

3   going to do that multiple times per year, the value to them

4   of having that pallet back is far greater than what our cost

5   is.  And that is what the measure of unjust enrichment is,

6   the damages under an unjust enrichment theory is the value

7   conferred on the recipient.  So our position is that that's

8   the kind of information that we need to be uncovering in

9   discovery versus what our actual costs are in doing it.

10          MR. O'NEIL:  Your Honor, we strongly disagree that

11   that's the right measure of damages and that's the right

12   legal theory under which to measure the damages.

13          THE COURT:  Under their case or your case?

14          MR. O'NEIL:  Under their case and our case.  So we

15   have a bailment claim.  And under bailment law, the theory of

16   damages is the exact opposite of what Mr. Wix articulated,

17   and it is the actual cost of the services that have been

18   provided, not the value conferred upon us.  So we think

19   that's the right measure of damages, and what I think you've

20   seen here is a preview of what is probably coming in

21   competing expert reports about different theories.  But we're

22   in discovery, and what Mr. Wix would like to do is prevent me

23   from getting discovery about my theory of damages in this

24   case and the appropriate measure of damages so I can't even

25   put in that measure in a report in the case.

1     So if you think about it in a very simple

2   hypothetical as Northwest Pallet being a tow truck driver,

3   and they're towing a BMW.  The BMW costs $50,000.  Under his

4   theory of damages the fee for the tow job would be well, the

5   car is worth 50,000 to you, so my fee can be 50,000.  That's

6   his theory.  And my theory is it costs $185 for a tow truck

7   job across the street, and that's the right measure of

8   damages for that effort.  That is really a point of

9   divergence intellectually and legally between these parties,

10  but at the discovery stage we should be entitled to take

11  discovery on the basic factual underpinnings of our competing

12  theories of damages, and we can present these to the Court

13  and maybe there will be motions in limine at some other

14  stage, but this at the discovery stage is not the right point

15  in time I think for us to say that you can't even have

16  discovery related to your theory of damages in the case that

17  is sound under the case law.

18      THE COURT:  So I am going to permit some third

19  party discovery on these issues, and what I'm trying to

20  establish is perhaps some sort of limit or outer boundary to

21  the scope of that discovery.

22      It does seem to me that Northwest would have

23  standing to object to the subpoena based on the fact that

24  these are going to the heart of its business relationship

25  with third parties which could potentially damage those third

1   parties and therefore there is a direct interest that

2   Northwest is seeking to protect.  That said, this information

3   strikes me as highly probative to some extent to the

4   substance of the case.

5           So while I think Northwest has standing to move to

6   quash the subpoena, I'm not going to quash the subpoena.  And

7   what I'm struggling with a little bit, and I'll ask the

8   parties to provide input on, is to the extent I'm concerned

9   about the third parties having to disclose information about

10  business practices and relationships that do not have to do

11  with Northwest's arrangement for collecting pallets,

12  including PECO pallets, and then returning those to PECO,

13  does that go beyond the scope of what should be permitted, is

14  that something that potentially is invasive of proprietary

15  interests of those third parties because it's getting into

16  separate business relationships.

17          And then second, even if that's the case, those

18  third parties aren't here objecting.  So while I do think

19  Northwest has standing to be concerned about its own business

20  relationships with these third parties, if the third parties

21  aren't complaining about this stuff off to the side that's

22  not directly related to Northwest, maybe that's not of

23  sufficient interest for Northwest to be objecting to it.

24          So let me start by, I guess, asking on the PECO

25  side:  First, are you confirming that you do, in fact, want

1    information from these subcontractors about their

2    arrangements to the extent they involve PECO pallets, even if

3    Northwest is not a party to the arrangement?

4           MR. O'NEIL:  So I think it is relevant to the

5    damages in terms of what their fee is to do that work, that

6    --

7           THE COURT:  You want to know what the market rate

8    is.

9           MR. O'NEIL:  I want to know what the market rate

10   is.  But I would be willing to get at that information in a

11   very narrow tailored way that is not burdensome to these

12   third parties.  Like I don't have to get into email

13   correspondence between them and another partner beside

14   Northwest, I would just need a sort of report, documents

15   sufficient to show rather than all documents related to the

16   subject.  If they could just give us a report saying here's

17   what the economics of the labor looks like for this in a

18   spreadsheet, it could be perhaps as narrow as one document.

19          We're not seeking to get into the inner workings or

20   the interplay of the communications in their business

21   relationship with anyone else.  We just want to know what the

22   market looks like for the stack, sort, and load effort.

23          THE COURT:  Are you planning to issue 30(b)(6)

24   notices to any of these subcontractors?

25          MR. O'NEIL:  We may have to, but I hope not to.  I

1  think we're going to start with the first party discovery and

2  see what information we can get.  We may do a 30(b)(6) to

3  Northwest Pallet, and we would only do that if we felt like

4  we needed to, and we would not do it in a blanket fashion to

5  all eleven of these people.  We would try to be strategic

6  based on document production and maybe do one and see if we

7  need to do any more.  But that's not our intention with doing

8  this, is to invoke a significant number of third-party

9  discovery.

10  We've sent these eleven folks a letter after we saw

11  you last that said, you know, Judge Wood is holding a hearing

12  on the 10th, if you want to object here's the address, please

13  come, and you have an opportunity to be heard.

14  We can send them another letter today clarifying

15  what we're seeking for in this consistent with the Court's

16  direction and concern on this particular issue.  We can

17  basically offer to constrain the boundaries of what we're

18  looking for in a more narrow way in light of the Court's

19  guidance, and we can do that and get that to them via Federal

20  Express right away.

21  THE COURT:  Well, I think the issue is what you're

22  asking them to do, which is to create a spreadsheet that

23  summarizes all of this information.  I'm not sure that there

24  is a good mechanism under the federal rules for them to have

25  to do that, except for having to sit for a deposition.

1    Because for a document request, they could certainly object
2    to having to create a document.

3              MR. O'NEIL:  I should be clear.  I was asking for a
4    report that could be run in the ordinary course of the
5    business or that exists in the ordinary course of the
6    business, not that they create some new document that's never
7    before existed.  But if they have -- maybe it's just a
8    financial statement, a quarterly financial statement that has
9    that information; they can redact the other things.  We would
10   work with them to try to get that one piece that is not
11   related to Northwest.

12             And I don't think it's that -- I think we may be
13   concerned about something that's not -- a non-issue.  I don't
14   think these recyclers are working with other parties to
15   handle PECO pallets, because PECO would be pretty cognizant
16   of that I think if these people were getting their hands on
17   their pallets through some other stream of commerce.  I think
18   we would already kind of know about that.  So I think the
19   concern is well-founded, but I think factually may not be
20   very prevalent.

21             THE COURT:  Mr. Wix, let's assume that I'm going to
22   allow discovery relating to the subcontractors' relationship
23   with Northwest and the collection of those pallets and what
24   that arrangement is.  Should I be concerned about the more
25   expansive category that I just described?

1    MR. WIX:  Well, I think so, for largely the same

2    point that we've raised before, because at the end of the day

3    these pallet recyclers, just like Northwest Pallet, is a

4    competitor of PECO Pallet.  They're renting pallets out in

5    the marketplace, pallet recyclers are getting white wood

6    pallets, repairing them, recycling them, and selling them out

7    in the marketplace, too, and they're both competing for the

8    same business with manufacturers, and producers, and anybody

9    who is shipping product for the business to use their

10    pallets.

11    So for them to -- it's one thing -- I won't belabor

12    the point on why I don't think it's relevant to damages

13    because you've ruled on that -- but it's one thing to say all

14    right, I'm going to allow PECO to get information related to

15    Northwest, which we can, you know, mark as confidential, or

16    attorneys' eyes only under the protective order, it's another

17    thing to then go to these third parties and say we don't --

18    we not only want your information on how you do business with

19    Northwest Pallet, we want all your information on how you do

20    business, when they are, in fact, at the end of the day

21    competitors in the same business of supplying pallets to

22    entities that ship product.  So I think there is a concern

23    that the Court should be cognizant of.

24    THE COURT:  And is PECO actually seeking all

25    communications between Northwest and subcontractors about the

1    arrangements, or are you actually expecting the

2    subcontractors to run email searches to try to get every

3    email back and forth?

4         I don't know if this is an industry where there is

5    a lot of email traffic about these arrangements or if you

6    sign an agreement, enter into an arrangement, and then it's

7    sort of self-effectuating, you don't need to correspond very

8    much.

9         MR. O'NEIL:  So from the few people we have heard

10   from that have contacted us, they have said they have none or

11   almost no emails.  So I don't think this is a heavy email

12   thing.  If a particular -- one of these respondents came and

13   said look, that's very burdensome, we have a lot of emails, I

14   think we would limit the search terms to perhaps Northwest

15   Pallet, or NWP, or the ampersand Northwest Pallet.Com email

16   post fix, or something like that.

17        Again, we are not -- we envision the document

18   productions from these eleven people to be thin.  I'm not

19   expecting to see more than 500 pages or a thousand pages from

20   these people.  If someone came and said look, I've got a

21   hundred thousand pages, we would gladly work with them to

22   narrow the universe down.  I do not think these are

23   significantly large productions that we're asking for.

24        THE COURT:  Are you expecting to see a written

25   contract that breaks down the compensation that's going to go

1   to the subcontractor versus the compensation that's going to

2   Northwest?

3          MR. O'NEIL:  I am expecting to see that, and that's

4   something that we've asked for from Northwest.  And we have a

5   motion to compel that maybe we'll get to later today, but

6   that's a piece of that as well.  But that's something we

7   would like, whether it's from the third party or from

8   Northwest.  But there is a business arrangement that should

9   specify the economics, we believe, and we would like that

10   document.

11          THE COURT:  Okay.  So one more question about the

12   scope of PECO's subpoena.  I think it goes back to January of

13   2013.  That I think -- let's see.  When did the Asset

14   Recovery Program come into effect?

15          MR. O'NEIL:  That's been going for many years.  We

16   used January of 2013 because that's the date that we agreed

17   to with Northwest for both directions on our ESI protocol.

18          THE COURT:  I see.  So it's to be consistent with

19   other discovery in the case?

20          MR. O'NEIL:  Yes.

21          MR. WIX:  Although I would -- sorry to interrupt --

22   I would point out there are different categories of documents

23   where we have agreed to a not lengthy -- not as lengthy a

24   time period.  There are some categories where we've agreed we

25   only need to go back to January 1st, 2015, for instance.

1    And I would point out that the initial motion to

2    quash of the first two subpoenas that PECO filed back in

3    November and then we filed a motion to quash those in

4    December, those subpoenas only went back to January 1, 2014.

5    So while I agree with Mr. O'Neil that that was a time

6    parameter that was part of our ESI protocol, it certainly

7    isn't written in stone based upon what we've done in this

8    case.

9    MR. O'NEIL:  Again, we would be flexible.  If one

10   of these eleven people called us up and said look, we think

11   that's a lot of information, can we constrict the time

12   period, we would say of course, we'll work with you.

13   We believe that's the relevant time period, but if

14   -- we would prefer to resolve this amicably without taking

15   the Court's time.  And if we had to take some time off for

16   that with a particular recycler because they had a lot of

17   volume, we would gladly do that.

18   THE COURT:  Okay.  For the contracts, assuming they

19   exist, that show the breakdown in the compensation, is that

20   something that Northwest would be seeking to designate as

21   attorneys' eyes only because you wouldn't want the business

22   people at PECO to know the exact breakdown?

23   MR. WIX:  Correct.

24   MR. O'NEIL:  And we have no issue with that, your

25   Honor.

1          THE COURT:  Okay.  So again, based on not having

2     any motion for protective order that's been presented by any

3     of the third parties, and just on the briefing that PECO and

4     Northwest have submitted on the motion to quash and our

5     argument in court, I'm inclined to deny the motion to quash

6     but impose some restrictions with respect to the third-party

7     productions just to make it a little more manageable, a

8     little less invasive to the third parties, and a little more

9     clearly relevant and probative so that the third parties --

10    so that PECO may seek from the third parties generally the

11    documents that are called for by the subpoena as they relate

12    to the third parties' relationship with Northwest to collect,

13    store, or return the PECO pallets, and those materials should

14    be provided to Northwest so they have an opportunity to

15    determine whether they should be designated as confidential

16    or attorneys' eyes only subject to the protective order.

17          Are the third parties being given an opportunity as

18    well to designate under the protective order?

19          MR. O'NEIL:  That would be available to them under

20    the protective order.

21          MR. WIX:  I know one of -- Mobile Pallet I think

22    responded and marked everything attorneys' eyes only.  So I

23    know they were all provided with a copy of the protective

24    order when the subpoena was served, as were all of the

25    recipients of the subpoenas that were issued by Northwest

25

1 | Pallet.

2 | I don't know -- again, I can't speak for

3 | Mr. O'Neil -- I know one of the pallet recyclers who I think

4 | might have responded, I don't remember which one, but

5 | certainly raised an issue whether the protective order in

6 | this case truly applies to the third parties since they

7 | aren't a party to the protective order. Oh, actually, you

8 | know what? That was one of the recipients of our subpoenas

9 | who was making that objection to me, and I think we're going

10 | to work it out, but I just raise that.

11 | THE COURT: I would think the parties could work

12 | out an addendum to the protective order to make it clear and

13 | give comfort to third parties that they would have ability to

14 | designate under the order as well.

15 | MR. WIX: Right. And that's what I discussed with

16 | the attorney for one of the recipients of our subpoenas.

17 | THE COURT: So for the documents, I'll say

18 | information that would go beyond the subcontractors'

19 | relationship with Northwest to whatever activities they might

20 | be doing on their own or with other business partners, how

21 | would you propose to limit the description? Documents

22 | sufficient to show what? What is the spreadsheet that you

23 | think can be created in the ordinary course?

24 | MR. O'NEIL: Sure. Let me take a shot at trying to

25 | narrow it down. Documents sufficient to show your cost to

1    stack, sort, and load PECO pallets, and the amount which you

2    charge to stack, sort, and load PECO pallets.

3                THE COURT:  Do you expect that there will be other

4    subcontractors or third parties from which you'll be seeking

5    this information?

6                MR. O'NEIL:  I don't think so.  We tried to pick a

7    list of these eleven folks based on the discovery we saw from

8    Northwest Pallet, and we don't intend at this point to serve

9    any more third-party subpoenas on any of their other

10   recycling partners or subcontractors.

11               THE COURT:  Mr. Wix, would you concur that this

12   sort of spreadsheet or report is something that the third

13   parties should be able to generate in the ordinary course of

14   their business?  Would you expect that?

15               MR. WIX:  That I don't know, your Honor.

16               THE COURT:  Would Northwest be able to do it?

17               MR. WIX:  I would think that they may be able to

18   show something that what their present costs and/or charges

19   are; to the extent going back to 2013, I don't know.  But,

20   you know, I would think, yeah, Northwest Pallet would be able

21   to, I believe -- well, there is a lot of different factors

22   that go into it, and I don't know whether these recyclers

23   necessarily put all of it together to determine what the true

24   cost really is of stacking, sorting, and loading a pallet in

25   terms of transportation, mileage, gas, labor, worker's comp,

1  all those different categories which they may have individual

2  knowledge of, whether they put it all together, not to

3  mention -- well, this gets into damages theories that I'm

4  sure you'll hear a lot about with the experts, but the whole

5  idea of the lost cost opportunity to the pallet recyclers by

6  having to have space in their trailers taken up by PECO

7  pallets versus white wood pallets, which is where they're

8  really making their living and earning their income.

9       But to answer your question, I would think so.  I

10  just don't know the extent.

11       THE COURT:  You say the third parties are really

12  making their income from the white wood pallets and not the

13  PECO pallets?  PECO pallets?

14       MR. WIX:  I think that the pallet recyclers at the

15  core of their business is the recycling and resale of white

16  wood pallets.  Obviously I don't know what their

17  relationships are outside of Northwest Pallet, so maybe they

18  have different relationships with respect to this stacking,

19  sorting, collecting, and transportation of PECO pallets from

20  other sources that is making them a lot of money and it's a

21  more significant part of their revenue than I'm aware of.  So

22  I suppose I should retract that statement a little bit

23  because I don't know the extent of what their relationship is

24  with other people beyond Northwest Pallet as it pertains to

25  the collection and return of PECO pallets.

1        THE COURT:  Okay.  So is -- at least for present

2   purposes is Northwest comfortable then with the limitation

3   for third parties that they can satisfy the subpoena by --

4   with respect to the non-Northwest-related arrangements with

5   documents sufficient to show the cost to stack, sort, and

6   load PECO pallets and the amount that they charge to stack,

7   sort, and load PECO pallets?

8        MR. WIX:  You said Northwest --

9        THE COURT:  I'm sorry.  PECO.

10       MR. O'NEIL:  We're fine with that limitation of

11  documents sufficient to show, and to the extent they don't

12  have such documents, then they obviously can't produce those

13  to us and maybe we'll have to take a deposition in that

14  instance.  But I don't know whether they track this, but if

15  they do, I would think most businesses track whether they're

16  profitable, what their costs are and what their profit margin

17  is, but if for some reason they don't, they can tell us that,

18  and we'll work with them to find some other solution and

19  we'll move on.

20       THE COURT:  I assume that Northwest would maintain

21  your objection even to that more narrowly-drawn category of

22  documents, you would still be seeking to quash those

23  categories?

24       MR. WIX:  We would.

25       THE COURT:  Fair enough.  So I'm inclined to allow

1    the subpoena to stand with that restriction that the third

2    parties will be able to satisfy the non-Northwest portion of

3    the production as I just described on the record, and again,

4    my position at this point is based in part on the fact that I

5    haven't heard from any third party coming in saying wait a

6    minute, this is burdensome, or it's getting into my other

7    business relationships, and it's a problem and it's an issue

8    for me.

9              If there is a third party that wants to raise it, I

10   would say this ruling, which is on Northwest's motion to

11   quash, would be without prejudice to those third parties

12   coming in and making an objection.  It's possible that they

13   might have waived it at this point if their time for

14   objecting is passed or whatever the situation is, but knowing

15   that certain of these third parties have been in

16   communications with PECO, and maybe Northwest as well, I

17   think I'm going to leave the door open for them to at least

18   make an argument even if ultimately I find it's untimely,

19   because to me there is some difference between Northwest,

20   which is not just a defendant in this overall litigation but

21   also a plaintiff, and so to some extent Northwest is also

22   responsible for the fact that there is -- to some extent,

23   that there is going to be discovery on the issue of how this

24   industry is working and functioning and how costs are

25   allocated.  So I think an objection from a third party would

1   carry more weight with me with respect to the scope of the

2   subpoena, the burdensomeness of it at this point.

3           So Mr. Wix, I did give you some limitation, so you

4   can feel you got something for your client and its business

5   partners.

6           My expectation is that a lot of the actual detailed

7   cost information would be appropriate for at least

8   confidential designation and probably attorneys' eyes only if

9   there are details of the business relationship that, you

10  know, perhaps could be used by business people at PECO, for

11  example, in the future and their pricing models.

12          I take it there have been -- there are no efforts

13  by PECO to quash Northwest's subpoenas, and I haven't seen

14  any protective order come in from third parties to Northwest

15  subpoenas, so there is nothing for me to decide on that.

16          MR. O'NEIL:  That's correct, your Honor.

17          MR. WIX:  There is nothing to decide, your Honor.

18  I think we're in the same boat, that there's a couple we

19  haven't heard from, so perhaps there might be a motion to

20  compel at some point, but not at the moment.

21          THE COURT:  Good.  So let's talk about the motion

22  to compel that was filed previously.  Have the parties made

23  any progress on your own in trying to get information

24  exchanged?

25          MR. O'NEIL:  I think we made some progress, your