# Exhibit B

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PECO PALLET, INC.,                    )

          Plaintiff,                  )   Case No.

     vs.                              )   1:15-cv-06811

NORTHWEST PALLET SUPPLY CO.,          )

          Defendant.                  )


IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


NORTHWEST PALLET SUPPLY CO.,          )

          Plaintiff,                  )   Case No.

     vs.                              )   3:15-cv-50182

PECO PALLET, INC.,                    )

          Defendant.                  )


VIDEOTAPED DEPOSITION

OF

DR. JUDD H. MICHAEL

Thursday, April 26, 2018


Reported by:

ELIA E. CARRIÓN, CSR, RPR, CRR

Job No. 21447

1    PECO.

2        Q.    Is -- is true value like a recognized

3    accounting concept?

4        A.    I'm not sure about that.  I think I may

5    have been referring to it as opposed to a market

6    value.  So, for example, the market value may be $5

7    for a block pallet, but the value of that pallet to

8    PECO may be considerably higher.

9        Q.    So is the concept of true value something

10   that has been written about or studied in economic

11   or accounting literature?  Or is that just something

12   that you've -- a phrase that you came up with on

13   your own?

14       A.    I believe in this case, it was our

15   term -- or my term.

16       Q.    And have -- have -- have you ever seen

17   anyone in the academic community and peer-reviewed

18   journals talk about the concept of true value

19   before?

20       A.    Not that I recall.

21       Q.    And what, sir, is your opinion of the

22   true value to PECO of lost pallets and returned

23   pallets?

24       A.    I don't have one specific dollar value in

1   have to divide the -- these numbers by 3.5; correct?

2       A.    Approximately, which I did in the detail

3   on Section 5 there.

4       Q.    So you say each -- each rental to -- to

5   PECO results in the EBITDA or cash flow between

6   ██████████████; correct?

7       A.    From two different years, yes.

8       Q.    So we can agree that for each rental,

9   PECO makes in -- in profit, let's say, approximately

10  ████████.  Are you comfortable with that?

11      A.    Yes.

12      Q.    And so can you explain to me, sir, how

13  you could -- if your opinion is correct, how PECO

14  could run a business paying someone $234 to get back

15  something that they made ██████ renting?

16      A.    They didn't make only ███████ off the

17  pallet.

18      Q.    Well -- well, you just told me you agree

19  that they made ████████ in profit per rental; right?

20      A.    But if a pallet is returned to them, they

21  don't rent it just once.

22      Q.    But in order to re-rent it, they have to

23  buy it back from you, according to your view of the

24  world, for upwards of $234 a pallet; correct?

Page 33

1       Q.      Well, I -- you know, I get to ask you
2   hypothetical questions at the -- at the deposition
3   because you're an expert.  So my hypothetical for
4   you, Dr. Michael, is:  Let's assume that PECO makes
5   ██████████ a pallet; let's assume that the Court
6   accepts your opinion in this case that it -- on the
7   highest end possible, $234 a pallet; and let's say
8   all of PECO's pallets that are rented end up in the
9   hands of Northwest Pallet.  Are you with me there?
10      A.      Yes.
11      Q.      Okay.  How -- and -- and North -- and
12  Northwest Pallet charges PECO $234 to get its pallet
13  back after each rental trip.  How long, in my
14  hypothetical, sir, could PECO continue to stay in
15  business, rent -- paying $234 for something it makes
16  ██████████ on profit renting?
17      A.      Well --
18      MR. WIX:  Object to form.
19      A.      -- without running the numbers, I don't
20  know; but not very long.
21      Q.      (By Mr. O'Neil)  You see the absurdity of
22  the position you've set out in your report on this,
23  in this regard, don't you, sir?
24      A.      No.

1   district?

2        A.    I don't recall.

3        Q.    The 11th Circuit?

4        A.    I believe that the court documents that I

5   read mention the 11th Circuit.

6        Q.    And what district circuit or -- does the

7   Northern District of Illinois sit in, sir?

8        A.    I don't recall.

9        Q.    It's not the 11th Circuit, is it?

10       A.    Not that I know of.

11       Q.    And so have you done any comparative law

12   analysis between the differences between

13   11th Circuit law and -- and 7th Circuit law on

14   the -- on the cause of action of unjust enrichment?

15       A.    No.

16       Q.    So you are offering an opinion that PECO

17   has been unjustly enrichment by Northwest's

18   services, but you cannot tell me any of the elements

19   of the tort of unjust enrichment under 7th Circuit

20   law; is that correct?

21       A.    Correct.

22       Q.    And you're -- you're not offering any

23   opinions on the general operation and structure of

24   the pallet industry, are you, sir?

Page 51

1     A.    I believe there were two issues:  One,

2  that she had paid them, they were unjustly enriched

3  because they received money and did not provide the

4  services; and No. 2, for the damages to the

5  furniture.

6     Q.    And do you remember the names of -- of

7  either the plaintiff or defendant parties in that

8  case?

9     A.    Sorry, I don't.

10     Q.    And what court was it pending in?

11     A.    I don't recall.

12     Q.    Well, who was the lawyer that retained

13  you in the case?

14     A.    I don't recall.

15     Q.    Have you ever taught any classes on

16  economic theory?

17     A.    No.

18     Q.    Have you ever taught any classes on

19  accounting?

20     A.    I've taught courses that include

21  accounting concepts.

22     Q.    Have you ever taught any classes on the

23  measurement of damages for unjust enrichment?

24     A.    No.

1     Q.    Did you study the concept of unjust

2  enrichment in college when you got your degree at

3  Texas A&M?

4     A.    Not that I recall.

5     Q.    What about when you got your MBA, did you

6  study the concept of unjust enrichment then?

7     A.    Not that I recall.

8     Q.    What about when you got your Ph.D. in

9  wood products, did you study the concept of unjust

10  enrichment then?

11     A.    Not by name.

12     Q.    What was your concentration or area of

13  research for your Ph.D.?

14     A.    The furniture industry was the industry

15  of focus.  The concentration was on the use of

16  trade shows information used by different parties to

17  determine pricing for furniture as well as the

18  impact of design.

19     Q.    None of your Ph.D. studies, I presume

20  then, related to the pallet industry though?

21     A.    Correct.

22     Q.    And none of your Ph.D. studies involved

23  the measurement of damages for unjust enrichment;

24  correct?

1     A.    Correct.

2     Q.    Your résumé indicates you're a partner in

3  a company called Scientific Management

4  Solutions LLC; correct?

5     A.    Yes.

6     Q.    And what is SMS, for short?

7     A.    It's the partnership between Dr. Ray and

8  I to provide consulting and other services to the

9  forest-based or wood-based industries.

10     Q.    And are there any other employees of SMS

11  besides you and Dr. Ray?

12     A.    Other than ad hoc employees, no.

13     Q.    And you -- are you and Dr. Ray the only

14  equity owners in the business?

15     A.    Yeah.

16     Q.    And have you ever been retained by a

17  pallet recycler to provide any services other than

18  in this case?

19     A.    Yes.

20     Q.    Okay.  And tell me about that.

21     A.    The biggest example would be the CHEP

22  case where there were eight named plaintiffs, and

23  Dr. Ray and I -- and I were retained to represent

24  them.

1  understand quantum.  Is that a legal term that I

2  should know?

3       Q.    No.  No.  It's a -- well, let me ask the

4  question a different way.

5            What is the appropriate legal measure

6  of unrest -- unjust enrichment damages under

7  Illinois law, sir?

8       A.    I don't know.

9       Q.    And so what test did you apply in

10 determining that the damages that -- for -- for

11 unjust enrichment should be between $2.22 and $16.93

12 if you do not know what the legal measure of damages

13 for an unjust enrichment claim is under Illinois

14 law?

15      A.    I believe I used it as the value of the

16 asset returned to the owner, which is commonly used

17 in unjust enrichment trials.

18      Q.    And if the Court in this case determines

19 that the appropriate measure of unjust enrichment

20 damages is the value of the services provided, we

21 would agree -- you would agree with me that your

22 damages opinion would be irrelevant; right, sir?

23      MR. WIX:  Objection.  Asked and answered.

24      A.    I think I've already answered that my

1   numbers in Report No. 1 are irrelevant.

2       Q.    (By Mr. O'Neil)  Okay.  Let's talk about

3   your first method of replacement cost.  What's your

4   basis for using replacement cost to measure unjust

5   enrichment damages?

6       A.    That's a starting value just to

7   illustrate to the -- the Court that PECO has in some

8   cases, as I cite here, indicated the value of its

9   pallets are $20.  And when they recover those

10  pallets from the marketplace, they assign a value of

11  $20 per.

12      Q.    Has -- has the academic community tested

13  the correctness of using replacement cost to measure

14  unjust enrichment damages, sir?

15      A.    Not that I know of.

16      Q.    Are there publications adopting the

17  replacement cost methodology for calculating unjust

18  enrichment damages that you're aware of?

19      A.    Not that I'm aware of.

20      Q.    Has an expert offered and had accepted

21  this methodology in any case in which you're aware

22  of, sir?

23      A.    No.

24      Q.    You came up with this methodology

1   entirely on your own; right, sir?

2       A.    I'm not sure that that's correct.  The

3   replacement cost was mentioned in a previous case,

4   and it's logical because PECO employees are using

5   the replacement cost to reflect the value of pallets

6   brought back into their system.

7       Q.    I'm -- I'm referring to the -- the

8   concept of using replacement cost to calculate

9   unjust enrichment damages.  You're not aware of --

10  of any other expert using that methodology, are you,

11  sir?

12      A.    That's correct.

13      Q.    And you're unaware of any Court in any

14  state or -- or federal courthouse in the

15  United States that has accepted replacement cost as

16  a measure of unjust enrichment damages; right, sir?

17      MR. WIX:  Objection.  Foundation.

18      A.    I didn't look for any though.

19      Q.    (By Mr. O'Neil)  And let's talk about the

20  repair versus replace calculation in -- in line 2.

21  Has the academic community tested the correctness of

22  this methodology for measuring unjust enrichment

23  damages?

24      A.    Not that I know of.

1    MR. WIX:  Objection.  Foundation.

2              (Court reporter clarification.)

3    MR. WIX:  Foundation.

4    Q.    (By Mr. O'Neil)  And has the repair

5    versus replace methodology been accepted by the

6    academic community study in the pallet industry as

7    a -- as an appropriate measure of damages in an

8    unjust enrichment claim?

9    A.    Not that I know of.

10    Q.    And are you aware of any expert that's

11    offered and had accepted the repair versus replace

12    methodology in an unjust enrichment case?

13    A.    No.

14    Q.    And are you aware of any courts which

15    have -- have used the repair versus replace

16    methodology in measuring unjust enrichment damages?

17    A.    No.

18    Q.    Let's go to the third line, book value.

19          Has the academic community tested the

20    correctness of using book value for unjust

21    enrichment damages in litigation?

22    A.    Not that I know of.

23    Q.    And are you aware of any publications

24    that have used the book value methodology to

Page 132

1    calculate unjust enrichment damages?

2         A.    No.

3         Q.    Are you aware of any expert who's offered

4    and had accepted the book value methodology for

5    calculating unjust enrichment damages?

6         A.    No.

7         Q.    And are you aware of any Court that's

8    adopted the book value methodology in calculating

9    unjust enrichment damages?

10        A.    No.

11        Q.    Let's go to revenue per pallet.

12             Are you aware of any academic community

13   literature that's tested the correctness of the

14   revenue per pallet methodology for calculating

15   unjust enrichment damages?

16        A.    No.

17        Q.    And has the revenue per pallet

18   methodology for calculating unjust enrichment

19   damages been accepted by the academic community?

20        MR. WIX:   Objection.   Foundation.

21        A.    Not that I know of.

22        Q.    (By Mr. O'Neil)  Are there any

23   publications that you're aware of that have accepted

24   the revenue per pallet methodology to calculate

Page 133

1    unjust enrichment damages?

2        A.    If I may call the decision from the

3    Mock case a publication, then I'll say that was

4    considered by the Court.

5        Q.    Are you aware of any expert that's

6    offered and had accepted the revenue per pallet

7    methodology in an unjust enrichment case?

8        A.    No.

9        Q.    Okay.  Let's go to the fifth methodology,

10   the annual earnings per pallet.

11           Are you aware of any academic literature

12   which has tested the correctness of this methodology

13   for measuring unjust enrichment damages?

14       A.    No.

15       Q.    And has this methodology been accepted by

16   any academic study in the pallet industry, to your

17   knowledge?

18       A.    No.

19       Q.    Are you aware of any publications

20   adopting the annual earnings per pallet as a measure

21   of unjust enrichment damages?

22       A.    No.

23       Q.    Are you aware of any expert who's offered

24   and had had accepted this methodology of measuring

1    unjust enrichment damages?

2         A.    No.

3         Q.    Are you aware of any Court which has

4    accepted the annual earnings per pallet as a measure

5    of unjust enrichment damages?

6         A.    Partially.

7         Q.    And that's a reference to the Mock Pallet

8    case?

9         A.    Correct.

10        Q.    Okay.  Last one is lost pallet fees.  Has

11   the academic community tested the correctness of the

12   lost pallet fee methodology for calculating unjust

13   enrichment damages?

14        A.    No.

15        MR. WIX:  Objection.  Foundation.

16        Q.    (By Mr. O'Neil)  Has the lost pallet fees

17   methodology for calculating unjust enrichment

18   damages been tested in any peer-reviewed

19   publications that you're aware of?

20        A.    No.

21        Q.    Are you aware of any expert who's offered

22   and had accepted the lost pallet fee methodology for

23   calculating unjust enrichment damages, to your

24   knowledge?

Page 135

1      A.    Let me provide the example that the CHEP

2    financial analyst used lost pallet fees in that

3    judgment that was relied on by the Court, if I

4    recall correctly.

5      Q.    Was that an expert witness?

6      A.    I'm not sure how he was called.

7      Q.    As far as you know, Dr. Michael, this

8    Court that's trying this case in which we're sitting

9    for your deposition today would be the first court

10   in the history of the United States jurisprudence to

11   accept any of these six methodologies for

12   calculating unjust enrichment damages; isn't that

13   true?

14       MR. WIX:  Objection.  Foundation.  Legal

15   conclusion.

16       A.    I don't know that one way or the other.

17       MR. WIX:  This may be a good time, Bill?

18       MR. O'NEIL:  Perfect.

19       MR. WIX:  All right.  Hate to break up the

20   party, but I gotta be out in the suburbs.

21       THE VIDEOGRAPHER:  It is 5:44 P.M.  We are off

22   the record.

23                    (WHEREUPON, the deposition was

24                    adjourned until 8:00 A.M.,

Page 137

```
 1   STATE OF ILLINOIS )

 2                     )  SS:

 3   COUNTY OF C O O K )

 4

 5            I, ELIA E. CARRIÓN, CSR, RPR, CRR, a

 6   Certified Shorthand Reporter of said state, do

 7   hereby certify:

 8

 9            That previous to the commencement of the

10   examination of the witness, the witness was sworn to

11   testify the whole truth concerning the matters

12   herein;

13

14            That the foregoing deposition transcript

15   was reported stenographically by me, was thereafter

16   reduced to typewriting under my personal direction

17   and constitutes a true record of the testimony given

18   and the proceedings had;

19

20            That the said deposition was taken before

21   me at the time and place specified;

22

23            That I am not a relative or employee or

24   attorney or counsel, nor a relative or employee of
```

Page 138

1   such attorney or counsel for any of the parties

2   hereto, nor interested directly or indirectly in the

3   outcome of this action;

4

5           IN WITNESS WHEREOF, I do hereunto set my

6   hand of office at Chicago, Illinois, this 3rd day of

7   May, 2018.

8

9

10  C.S.R. Certificate No. 084.004641.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 142

          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
                  EASTERN DIVISION

PECO PALLET, INC.,                    )

          Plaintiff,                  )   Case No.

      vs.                             )   1:15-cv-06811

NORTHWEST PALLET SUPPLY CO.,          )

          Defendant.                  )


          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
                  EASTERN DIVISION


NORTHWEST PALLET SUPPLY CO.,          )

          Plaintiff,                  )   Case No.

      vs.                             )   3:15-cv-50182

PECO PALLET, INC.,                    )

          Defendant.                  )

                    VOLUME II

              VIDEOTAPED DEPOSITION

                      OF

              DR. JUDD H. MICHAEL

              Friday, April 27, 2018


Reported by:

ELIA E. CARRIÓN, CSR, RPR, CRR

Job No. 21448

1  that the number really is something other than 28 to

2  31 cents.  You just have a different way of -- of

3  looking at the issue; right?

4      A.    I would agree with the first part.  I'm

5  not sure that I have a thought on the second part of

6  your statement in terms of I disagree with that.

7      Q.    Okay.  Let me ask -- ask you a better

8  question.

9            You -- you don't have any opinion that

10  PECO has incorrectly calculated the average

11  network-wide recovery rate as 28 to 31 cents;

12  correct?

13      A.    Correct.

14      Q.    Okay.  It -- let's look at your rebuttal

15  report, Exhibit 27, paragraph 20(b) on page 6.  You

16  say:  PECO may provide incentives to PDs -- capital

17  P, capital D, little s -- that, in effect, increase

18  the compensation retailers are receiving for

19  returning PECO assets.  Do you see that?

20      A.    Yes.

21      Q.    Sir, are you aware of any specific

22  incentives between PECO and any particular

23  participating distributor?

24      A.    Other than the footnote that I have

1                    REPORTER'S CERTIFICATION

2

3              I, ELIA E. CARRIÓN, CSR, RPR, CRR, a

4    Certified Shorthand Reporter in and for the state of

5    Illinois, do hereby certify:

6

7              That the foregoing witness was by me duly

8    sworn; that the deposition was then taken before me

9    at the time and place herein set forth; that the

10   testimony and proceedings were reported

11   stenographically by me and later transcribed into

12   typewriting under my direction; that the foregoing

13   is a true record of the testimony and proceedings

14   taken at that time.

15

16             That before the conclusion of the

17   deposition, the witness has requested a review of

18   this transcript pursuant to Rule 30(e)(1).

19

20             IN WITNESS WHEREOF, I do hereunto set my

21   hand of office at Chicago, Illinois, this 4th day of

22   May, 2018.

23

24   C.S.R. Certificate No. 084.004641.