**Exhibit C**

**APPENDIX OF UNREPORTED CASES CITED IN PECO'S MOTION TO EXCLUDE DR. JUDD MICHAEL'S REPORT AND RELATED TESTIMONY**

- *Angelopoulos v. Keystone Orthopedic Specialists, S.C.*, 12 cv 5836, 2017 WL 2178504 (N.D. Ill. May 16, 2017)

- *Medicines Company v. Mylan, Inc.*, 11 cv 1285, 2014 WL 1227214

- *Smith v. Union Pacific Railroad*, 11 cv 986, 2017 WL 2656583

- *Vaughn v. Konecranes, Inc.*, 14 136 DCR, 2015 WL 1636431

2017 WL 2178504
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Dr. Nicholas ANGELOPOULOS, Plaintiff,

v.

KEYSTONE ORTHOPEDIC SPECIALISTS, S.C.,
Wachn, LLC, and Martin R. Hall, M.D., Defendants.

Case No. 12-cv-5836
|
Signed 05/16/2017

**Attorneys and Law Firms**

Chris C. Gair, Thomas Reynolds Heisler, Vilia Margaret
Dedinas, Gair Law Group Ltd., Chicago, IL, for Plaintiff.

Arthur M. Holtzman, Bevin Megan Brennan, Lawrence
W. Byrne, Naureen Amjad, Pedersen & Houpt, P.C.,
Kevin William Doherty, Michael Thomas Sprengnether,
Doherty & Progar LLC, Chicago, IL, Brian T. Ginley,
Skawski Law Offices, LLC, Oak Brook, IL, for
Defendants.

**MEMORANDUM OPINION AND ORDER**

Robert M. Dow, Jr., United States District Judge

\*1  Before the Court are Plaintiff's *Daubert* motion
to bar certain expert testimony by Michael Pakter
[314], Defendants' *Daubert* motion to bar certain expert
testimony by Jay Sanders [309], Plaintiff's motions *in
limine* [326] and [339], Defendants' motions *in limine*
[317], and Defendants' motion to amend the final pretrial
order to include proposed supplemental agreed voir
dire questions and contested jury instructions [352]. For
the reasons set forth below, Plaintiff's *Daubert* motion
(Plaintiff's motion *in limine* No. 1) to bar expert testimony
by Michael Pakter [314] is granted in part and denied in
part. Defendants' *Daubert* motion to bar certain expert
testimony by Jay Sanders [309] is denied.

Plaintiff's motions *in limine* [326] are granted in part
and denied in part: the Court grants Plaintiff's motions
Nos. 3 and 4; the Court denies Plaintiff's motion No.
5; and the Court provisionally denies Plaintiff's motion
No. 2. Plaintiff's motion *in limine* No. 7 [339] is granted.

Defendants' motions *in limine* [317] are granted in part
and denied in part: the Court grants Defendants' motions
Nos. 6 and 8; the Court denies Defendants' motions
Nos. 1, 5, 7, 10, and 11; the Court reserves its ruling on
Defendants' motion No. 4, and the Court provisionally
grants Defendants' motions Nos. 2 and 3.[1] Defendants'
motion to amend the pretrial order [352] is granted, and
the Court will consider the proposed voir dire questions
and jury instructions that the parties submitted to the
Court on May 12, 2017. The Court will issue rulings
on Plaintiff's motion *in limine* No. 6 [326, at 10] and
Defendants' motion *in limine* No. 12 [350] in a separate
order. A final pretrial conference is set for May 18, 2017
at 10:00 a.m. This case remains set for a jury trial to
commence on May 23, 2017.[2]

[1]  The Court previously granted in part and denied in
part Defendants' motion *in limine* No. 9 and denied as
moot witness Dr. Michael Hartman's motion to quash
subpoena [360]. [364.]

[2]  As a reminder, the parties are to submit by 12:00 noon
on May 19, 2017 a chart of objections to exhibits
that takes into consideration the Court's rulings on
the motions *in limine*; the chart should contain the
exhibit number, a short description of the exhibit, the
objection, and the response to the objection. Plaintiff
is to submit a binder of Plaintiff's disputed trial
exhibits; the Court already has copies of Defendants'
disputed trial exhibits, so no additional copies are
necessary unless new objections are raised.

**I. Background**

Nicholas Angelopoulos ("Plaintiff"), an anesthesiologist,
brings suit against his former business associate,
Martin R. Hall ("Hall"), and the two businesses
in which they were associates, Keystone Orthopedic
Specialists, S.C. ("Keystone"), and Wachn, LLC
("WACHN") (collectively, "Defendants"), for their
alleged participation in a fraud to deprive Plaintiff of
money to which he was entitled.[3]  In his governing
Third Amended Complaint [222], Plaintiff alleges claims
against Defendants for fraudulently filing an information
return in violation of 26 U.S.C. § 7432 (Count I);
common law fraud (Count II); breach of fiduciary duty
(Count III); breach of contract (Counts V and VI);
and unjust enrichment (Count VII). Plaintiff also seeks
a determination of the fair value of his distributional
interest pursuant to 805 ILCS § 180/35-65 (Count Four).

Defendants bring counterclaims against Plaintiff for breach of the purported WACHN Operating Agreement (Count I) and breach of contract (Count II). On September 16, 2016, the Court denied Defendants' motion for summary judgment, noting that many facts were in dispute. [303.]

[3]       Ira K. Dubin and Ira K. Dubin Ltd. d/b/a Green Dubin & Co. were also named as defendants in this action, but were dismissed from the case with prejudice on September 10, 2014. [See 191.]

## II. *Daubert* Motions [314] and [317]

### A. Legal Standard

**\*2** Federal Rule of Evidence 702[4] and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provide the legal framework for the admissibility of expert testimony. *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015). The purpose of the *Daubert* inquiry is to scrutinize proposed expert witness testimony to determine whether it has "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" so as to be deemed reliable enough to present to a jury. *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). Rule 702 requires the district court judge to act as a gatekeeper to ensure that admitted expert testimony is relevant, reliable, and has a factual basis. *Id.* at 809; see also *Daubert*, 509 U.S. at 589. The Seventh Circuit has stressed that "the key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion[.]" *Textron*, 807 F.3d at 834 (citation and internal quotation marks omitted) (alteration in original).

[4]       Federal Rule of Evidence 702 states:
          A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or a determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

To determine whether expert testimony is admissible, the district court must ascertain (1) whether the expert is qualified, (2) whether his methodology is scientifically reliable, and (3) whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). *Daubert* sets forth the following non-exhaustive factors for the district court to consider when assessing an expert's methodology: (1) whether the theory has been or is capable of being tested; (2) whether the theory has been subjected to peer review and publication; (3) the theory's known or potential rate of error; and (4) the theory's level of acceptance within the relevant community. *Daubert*, 509 U.S. at 593–94; see also *Bielskis*, 663 F.3d at 893. However, the test for reliability is flexible, and "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co.*, 526 U.S. at 142; see also *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) (noting that the Seventh Circuit "gives the [district] court great latitude in determining not only *how* to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable"). In addition, the touchstone of admissibility under Rule 702 is helpfulness to the jury. *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991). An expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion. *Id.* "An expert witness is not permitted to parrot what some lay person has told him and testify that he believes the person was being truthful." *Goldberg v. 401 N. Wabash Venture LLC*, 755 F.3d 456, 461 (7th Cir. 2014); see also *Benson*, 941 F.2d at 604 ("[T]he jury does not need an expert to tell it whom to believe, and the expert's 'stamp of approval' on a particular witness' testimony may unduly influence the jury.").

### B. Analysis

**\*3** Many of the liability and damages issues in this case center on the accounting records kept by Defendants Keystone and WACHN under the supervision of Defendant Hall. Plaintiff and Defendants have hired

experts to assess whether Defendant Keystone's profit and loss statements and Form 1099-MISC contained false or fraudulent information and expenses, as Plaintiff contends, or instead accurately disclosed Defendant Keystone's income and expenses and calculated Plaintiff's share of the same, as Defendants contend. As the Court noted in its summary judgment opinion, the experts disagree on almost everything, including basic factual predicates, which accounting methodology is appropriate to use, whether certain of Defendant Keystone's expenses were properly disclosed to the physicians, whether those expenses were reasonable, and whether those expenses were properly attributed to Keystone rather than the other companies owned by Defendant Hall.

### 1. Defendants' Challenge to Certain Testimony by Jay Sanders [309]

Plaintiff retained as an expert Jay Sanders, an accountant with 30 years of experience providing accounting services to medical practices. Defendants move to bar three of Sanders's opinions: Opinion No. 5 in Sanders's expert report, which values Plaintiff's purported interest in WACHN; Opinion No. 6, which discusses WACHN's failure to remove Plaintiff from his personal guarantees of the WACHN loan; and Opinion No. 3, which states that Plaintiff was wrongly charged $599,168 for excess overhead as compared to industry norms.

### a. Opinion No. 5: Valuation of Plaintiff's Interest in WACHN

In his Opinion No. 5 "Damages Associated with WACHN, LLC," Plaintiff's expert Sanders valued Plaintiff's purported interest in WACHN using three different methods: (1) the initial equity approach; (2) the income approach; and (3) the cost approach. Defendants take issue with Sanders's use of the income approach, arguing that for purposes of this approach, Sanders impermissibly relied on information provided by Gary Fazio, Vice Chairman of CBRE Group, Inc. According to Sanders, the "income approach is the most commonly used method for appraising commercial and industrial real estate based on the net income the property produces to an investor." [309-1 (Sanders's Expert Report), at 43.] He explained in his expert report that the income approach is computed by taking the Net Operating Income of a real

estate asset (collected rent minus operating expenses) and dividing it by the capitalization rate, which is the rate of return a prospective investor is expecting given the current health of the economy, interest rates, geographical area, and other factors.

Sanders stated in his report that Fazio told him that (1) the net rental rate of the building in which WACHN is located was $15 to $17 per square foot per year, (2) the most recent operating expenses, including common area maintenance and real estate taxes, were $13 per square foot per year, and (3) the capitalization rate for medical office buildings in the Chicago area was 6%, but that the capitalization rate should be increased by 1% because the building is located in Hazel Crest, and it should be further increased by another 1% because the WACHN space is a condominium unit and not a fee simple transaction. [309-1, at 44.] Using these figures and the income approach, Sanders concluded that the equity value of the building was just under $954,000 and Plaintiff's purported interest in WACHN is worth $191,000.

First, Defendants argue that it is unclear what Fazio relied on to provide Sanders with figures for the net rental rate, recent operating expenses, and current capitalization rate for medical office buildings in the Chicago area. Defendants contend that Sanders improperly relied on Fazio's figures without doing any independent research or otherwise verifying the figures and neglected to consider differences between medical office suites. Second, Defendants argue that Sanders impermissibly opined that the income approach is the "most widely used and accepted valuation standard for commercial real estate," but that Sanders did not explain how he reached such an opinion and admitted that he himself has never done any real estate appraisal work and does not have a real estate appraisal license. Third, Defendants challenge Sanders's conclusion that the income method he used was "based on very recent information [from Fazio] regarding the prevailing rental rates, operating expenses, and capitalization rates for that building, locale and economic environment," without indicating what dates or years the rates are based on.

**\*4** The Court is not convinced by Defendants' arguments. An expert "may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. In fact, "it is common in technical fields for an expert to base

an opinion in part on what a different expert believes[.]" *Dura Automotive Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 309, 613 (7th Cir. 2002). For example, a physician, though not an expert in radiology, may rely on an x-ray in formulating a diagnosis. See *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F.Supp.2d 794, 808 (N.D. Ill. 2005). Further, "it is apparent from the wording of Rule 703 that there is no *general* requirement that the other expert testify as well." *Dura*, 285 F.3d at 613; see also *Walker v. Soo Line R. Co.*, 208 F.3d 581, 589 (7th Cir. 2000) (explaining that "[m]edical professionals have long been expected to rely on the opinions of other medical professionals in forming their opinions" and that "courts frequently have pointed to an expert's reliance on the reports of others as an indication that their testimony is reliable").

However, expert testimony relying on the opinions of other should be rejected if the testifying expert's opinion is too speculative or if the underlying basis is faulty. *Walker*, 208 F.3d at 588. Further, "while Rule 703 was intended to liberalize the rules relating to expert testimony, it was not intended to abolish the hearsay rule." *Loeffel Steel Prods., Inc.*, 387 F.Supp.2d at 808. Thus, an expert is "not permitted to be the mouthpiece of [an expert] in a different specialty," *Dura Automotive Sys. of Indiana, Inc.*, 285 F.3d 309, or to vouch for the truth of what another expert told him, *Loeffel Steel Prods., Inc.*, 387 F.Supp.2d at 808. Under Rule 703, an expert may rely on hearsay in formulating his opinion, but the underlying hearsay is not admissible for the truth of the matter asserted. *Loeffel Steel Prods., Inc.*, 387 F.Supp.2d 7at 808.

The Court concludes that Sanders permissibly relied on figures provided by Fazio, Vice Chairman of CBRE, one of the largest commercial real estate brokers in the United States, who has participated in more than 3,000 lease transactions and whose clients include hospitals and medical staff members. See *Walker*, 208 F.3d at 589 (holding that expert physician's opinion was not rendered unreliable by her partial reliance on another doctor's work and explaining that "[t]o the degree that she might have relied on faulty information, the matter certainly could be explored on cross-examination"); *Main St. Mortg., Inc. v. Main St. Bancorp., Inc.*, 158 F. Supp. 2d 510, 516 (E.D. Pa. 2001) (holding that expert Certified Public Accountant's use of capitalization rate that defendant objected to did not destroy the reliability of expert's opinions that defendant was free to challenge expert's method for calculating lost profits through cross examination and through its own damages expert). Further, Plaintiff asserts in his response that Defendant Hall and certain other witnesses affiliated with Keystone, including Renee Breese, may be able to testify to the rental income and capitalization rate of the WACHN building. Plaintiff also asserts that he will present at trial, separate from Fazio's data, evidence about WACHN's operating expenses and the rental income paid to WACHN through Keystone. If this evidence is indeed presented at trial, it may serve to either confirm or refute the figures used by Sanders for his valuation.

Sanders may use the figures provided by Fazio to offer an opinion within Sanders's domain of expertise in valuation —that is, he can testify that assuming a net rental income of $16 per square foot, operating expenses of $13 per square foot, and a capitalization rate of 8%, the equity value of the building would be just under $954,000 and Plaintiff's share would be worth $191,000. However, he cannot vouch for the accuracy of Fazio's figures for the net rental rate of the building, the most recent operating expenses, and the capitalization rate for medical office buildings in the Chicago area. In other words, Sanders cannot act as Fazio's spokesman. See *In re James Wilson Assocs.*, 965 F.2d 160, 172–173 (7th Cir. 1992) (explaining that the expert architect could use what a consulting engineer told him to offer an opinion in the architect's domain of expertise, but he could not testify for the purpose of vouching for the truth of what the engineer had told him); *Dura Automotive Sys. of Indiana, Inc.*, 285 F.3d at 613 (if affidavits of experts had timely been filed, expert hydrogeologist could have testified that well field was contaminated by volatile organic compounds and that if defendant's plastics plant was within the well field's capture zone, some of the contaminants may have come from that plant; however, hydrogeologist could not testify that plant was actually within well field's capture zone, as he was not an expert in mathematical models of groundwater flow and modeling on which he relied had been done by other non-testifying experts).

**\*5** Additionally, to the extent that Defendants challenge Sanders's qualifications on the basis that he has not done real estate appraisal work and does not have a real estate appraisal license, this argument fails because Sanders is a Certified Public Accountant and a Certified Valuation Analyst. As an expert in business valuation, he is sufficiently qualified to offer an opinion as to the

valuation of the WACHN business. See *Fed. R. Evid. 702* (an expert may be qualified "by knowledge, skill, experience, training, or education"); *Indus. Hard Chrome, Ltd. v. Hetran, Inc.*, 92 F. Supp. 2d 786, 794 (N.D. Ill. 2000) (certified public accountant who specialized in business valuation was qualified to testify as an expert on the issue of damages in breach of contract suit). Sanders's admitted lack of specialization in real estate appraisal work is not a disqualifying factor; rather, it is yet another subject for cross-examination. See *Walker, 208 F.3d at 589* (holding that district court abused its discretion in excluding expert testimony that employee had suffered post-traumatic stress disorder and explaining that although expert physician was not a psychiatrist or psychologist, she was qualified as a physician); *Loeffel Steel Prod., Inc.*, 387 F. Supp. 2d at 802 (business appraiser's lack of specific experience with particular machines did not disqualify him from being considered an expert to offer opinion on economic loss).

Finally, Defendants challenge for the first time in their reply brief Sanders's use of the initial equity approach and the cost approach. However, arguments raised for the first time in a reply brief are waived. See *United States v. Hughes*, 970 F.2d 227, 235, n.6 (7th Cir. 1992) (arguments raised for the first time in a reply brief are waived); *Forsythe v. Rosen Med. Grp., LLC*, 2015 WL 127921, at *5 (N.D. Ill. Jan. 8, 2015) (denying motion *in limine* and explaining that argument raised for the first time in reply brief and not argued in initial motion was waived). Further, even if the Court were to consider these arguments on the merits, they are underdeveloped and do not cite any authority. Therefore, Defendants' motion to bar Plaintiff's expert Sanders's Opinion No. 5 "Damages Associated with WACHN, LLC" is denied.

### b. Opinion No. 6: WACHN Guarantee

In Defendants' *Daubert* motion [309] and motion *in limine* No. 11 [317, at 12], Defendants seek to bar Opinion No. 6 of Plaintiff's expert Sanders on the ground that he uses an unreliable methodology. Defendants contend that Sanders's Opinion No. 6 attributes Great Lakes Bank's refusal to remove Plaintiff as a personal guarantor of the WACHN $1.42 million loan balance to the actions of Defendant Hall. To reach his opinion, Sanders relies on (1) his review of two commercial guarantees signed by Plaintiff with Great Lakes Bank, (2) the bank statements

of Great Lakes Bank regarding the status of the loans as of January 2, 2014; and (3) his own "involvement with other medical practices." Defendants argue that Sanders premised his opinion on the fact that Plaintiff dissociated from WACHN but that Sanders was in fact unsure if Plaintiff had actually dissociated.

Defendants' motion to bar Sanders's Opinion No. 6 is denied. The Court agrees with Plaintiff that Defendants misapprehend Sanders's opinion. Sanders did not opine that Defendant Hall "was to blame for Plaintiff not being removed from his personal WACHN guarantees." [317, at 12.] Rather, Sanders stated his opinion that (1) "a dissociated physician who is no longer entitled to the income or ownership of a medical building partnership should be released from all liabilities associated with the investments," (2) that "WACHN should have procured a release of Plaintiff's personal guaranty of the WACHN loan," and (3) "the damage to [Plaintiff] is the full extent of the available credit on the loan." Additionally, Defendants have not shown that Sanders's reliance on his review of commercial guarantees and bank statements of Great Lakes Bank amounts to improper methodology. See *Fed. R. Evid 703* ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."); *Artunduaga v. Univ. of Chicago Med. Ctr.*, 2016 WL 7384432, at *5 (N.D. Ill. Dec. 21, 2016) ("[I]t is proper for counsel to furnish factual assumptions to experts as long as the factual assumptions are supported by the record."). Finally, Defendants' argument for excluding Sanders' testimony on the guarantee because he was unsure if Plaintiff had actually dissociated from WACHN fails, as this goes to weight and not admissibility.

### c. Opinion No. 3: Excess Overhead Charges

**\*6** In Defendants' motion No. 11, they challenge Sanders's opinion No. 3 that Plaintiff was wrongly charged $599,168 for excess overhead, as compared to industry norms. Defendants argue that Sanders' reliance on Medical Group Management Association ("MGMA") statistics for this opinion was problematic for three reasons: (1) Sanders compared the average expenses for orthopedic surgeons in the MGMA Physicians Compensation and Production Survey for Single Specialty Practices 2008 Report to the actual expenses of Keystone from 2004 to 2007, yet Plaintiff was not an orthopedic

surgeon, and pain management specialists like Plaintiff generate less revenue than orthopedic surgeons; (2) the MGMA data Sanders used was the national mean for all single-specialty orthopedic surgery practice, and the national mean will be different from an orthopedic surgery practice in Illinois; (3) the MGMA recommends using caution in interpreting its data because the data may not be representative of all providers in medical practices. Additionally, Defendants take issue with the fact that Sanders conceded that a deviation from an industry norm is not *per se* evidence of wrongdoing or problems with the accounting systems.

Defendants' motion to bar Sanders's Opinion No. 3 is denied. Defendants have not shown that Sanders's method in calculating Plaintiff's excess overhead charges was unreliable. Rather, Defendants merely challenge the accuracy of the statistics on which Sanders relied. Experts "may rely properly on a wide variety of sources," *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1020 (7th Cir. 2000), and may rely on "experimental, statistical, or other scientific data generated by others in the field," *Abbott Labs. v. Sandoz, Inc.*, 743 F. Supp. 2d 762, 793–94 (N.D. Ill. 2010). As the Seventh Circuit has stressed, the focus of a *Daubert* inquiry is "not the ultimate correctness of the expert's conclusions," but rather "the soundness and care with which the expert arrived at her opinion[.]" *Textron*, 807 F.3d at 834 (citation and internal quotation marks omitted) (alteration in original). To the extent that Defendants disagree with the statistics used by Sanders and the outcome of his calculation, these arguments go to the weight of Sanders's testimony, and not admissibility. Thus, Defendants are free to explore these issues on cross-examination at trial. See *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact.").

## 2. Plaintiff's Challenge to Certain Testimony of Michael Pakter [314]

Plaintiff seeks to preclude the testimony of Defendants' expert, Michael Pakter. To begin with, Plaintiff argues that much of Pakter's testimony will not provide specialized knowledge that would assist the jury in understanding the facts at issue, but rather would simply repeat the factual contentions of Defendant Hall and

his associates. According to Plaintiff, Pakter's testimony purports to resolve issues of credibility of competing witness testimony, which invades the province of the jury and does not involve any expertise. In addition, Plaintiff contends that some of Pakter's testimony purports to advance legal opinions that would impinge upon the Court's role as the sole source of the relevant law in this case.

The Court agrees with Plaintiff that many of Pakter's proffered opinions merely parrot what Defendants have told him about disputed facts or offer opinions that state legal conclusions. As explained above, an opinion witness cannot simply vouch for the testimony of a fact witness. Nor can an opinion witness interview various fact witnesses, sift through their statements, and then purport to tell the jury what those witnesses meant, understood, believed, or agreed to. And the Seventh Circuit has explained that in considering whether an expert witness's testimony will improperly invade the judge's role as the sole source of the relevant law at a trial, courts and parties must recognize the difference between "stating a legal conclusion" (which is not permitted) and "providing concrete information against which to measure abstract legal concepts" (which is permitted). *United States v. Blount*, 502 F.3d 674, 680 (7th Cir. 2007); *Bone Care Intern., LLC v. Pentech Pharma., Inc.*, 2010 WL 3928058, at *14 (N.D. Ill. Oct. 1, 2010). As set out below in detail, in numerous instances the opinions expressed in Pakter's report, if repeated in court, would infringe upon the role of the jury, the Court, or both.

**\*7** However, some of the challenged portions of Pakter's report properly provide the factual assumptions on which Pakter relies for his expert opinions and thus provide context for presenting those opinions for the jury's consideration. The Court sets out below its rulings on the specific challenges:

- Plaintiff's objection No. 1 (page 16) is overruled. [5] Plaintiff takes issue with part of Pakter's rebuttal of Sanders Opinion No. 1 in which Pakter states: "The revenues and expenses of the MDSC were purposely and deliberately disclosed to [Plaintiff] and other physicians when they were included in the Bucket Reports. * * * Based on my Interviews, [Plaintiff] and other physicians routinely reviewed the Bucket Reports and requested adjustments, which they were then made with revised Bucket Reports

provided." However, this statement provides part of the factual assumptions on which Pakter relied for his conclusion that followed: "Consequently, when presented quarterly to Hall, [Plaintiff] and others [the Bucket Reports] disclosed reliably, openly and completely all the revenues and expenses of the 'consolidated entity' for that financial quarter." These statements provide context for Pakter's explanation of his opinion that "Sanders elected to call certain deliberate and necessary differences between QuickBooks and the Bucket Reports errors when they were purposefully only reconciling items." [314 Exhibit A (Pakter's Expert Report), at 13.]

• Plaintiff's objection No. 2 (page 17) is overruled. Plaintiff challenges Pakter's statement that "Hall represented to me that [Plaintiff] was provided with all of the information and/or documentation he requested." However, this statement supports Pakter's opinion that "Sanders failed to acknowledge that [Plaintiff] and others were provided access to the accounting system and proper summaries thereof," [314 Exhibit A, at 13]. Further, it was in response to Sanders's opinion that "[t]here was also a lack of transparency in the accounting in that the other physicians were not provided backup for the items in the Bucket Report and did not have access to this information as the majority of Keystone's financial records and invoices were maintained at [Defendant Hall's] personal residence rather than at the Keystone's offices." [301-1 (Sanders's Expert Report), at 16.] As noted above, the experts in this case may only testify as to the facts on which they relied in formulating their opinions; they may not vouch for the accuracy of those facts. Presumably, each side will call fact witnesses (including Defendant Hall), who will testify to (and be cross-examined on) these underlying facts.

• Plaintiff's objection No. 3 (page 18) is sustained. These statements do no more than parrot facts that Defendants provided to Pakter. Additionally, Pakter's conclusion that "there are no assertions that [Plaintiff] was not credited with his revenues and billings" is improper, as that is an issue for the jury to decide at trial based on the testimony of the fact witnesses.

• Plaintiff's objection No. 4 (page 20) is sustained. These statements simply parrot what Pakter was told in interviews and do not apply any expertise. See *Benson*, 941 F.2d at 604–05 (concluding that the district court abused its discretion in admitting testimony of expert who "did not give helpful expert testimony that cast another witness's testimony in good or bad light [and] instead [ ] simply told the jury whom to believe").

**\*8** • Plaintiff's objection No. 5 (page 20) is overruled, provided that the basis of Pakter's opinion is his analysis of accounting records and does not simply repeat what others may have told him about the Bucket Reports.

• Plaintiff's objection No. 6 (page 21) is sustained. Pakter cannot give an expert opinion that Plaintiff was an employee of Defendant Keystone, as that is a legal conclusion about a contested fact for the jury to decide at trial. Plaintiff contends that he was a shareholder or partner of Keystone, whereas Defendants contend that he was an employee. However, Pakter may opine on the extent to which Plaintiff's compensation was calculated in a manner consistent with how other employees and/or partners were compensated at Keystone. Pakter also may critique Sanders's understanding of the economic structure at Keystone.

• Plaintiff's objection No. 7 (page 23) is sustained in part. Pakter cannot opine that the "the employment compensation formula" was "agreed" as that is a disputed fact issue for trial. However, Pakter can give a variation of his proposed opinion: he can testify that based on his review of the Bucket Reports and other information and documentation in discovery, the compensation formula to which Defendants' fact witnesses testified was consistently followed and that the Bucket Reports were accurately designed and implemented to specifically follow that employment compensation formula.

• Plaintiff's objections Nos. 8 and 9 (page 27) are sustained, as Pakter merely restates contested facts. To the extent that Pakter offers his opinion on these contested facts to contradict the factual assumptions underlying Sanders's opinion, the Court notes that challenges to the factual basis of Sanders's opinion are better suited for cross-examination. See *Bonner v.*

*ISP Technologies, Inc.*, 259 F.3d 924, 929–30 (8th Cir. 2001) (explaining that it is up to the opposing party to examine the factual basis of an expert opinion in cross-examination).

• Plaintiff's objection No. 10 (page 28) is sustained, as whether Plaintiff agreed to Defendant Hall's "management" or "franchise" fee is an issue to be resolved at trial based on fact witness testimony, and Pakter did not draw on any expertise to offer his opinion that based on his interviews, Plaintiff agreed with this fee arrangement.

• Plaintiff's objection No. 11 (page 30) is sustained. Pakter offered these statements as proposed reasons for why Sanders was incorrect that Plaintiff was wrongly charged for Roalsen's payroll and travel expenses. However, Pakter offered no expertise in stating what Plaintiff purportedly agreed to regarding an arrangement to pay Roalsen or in repeating what interviewees told him about Roalsen's work.

• Plaintiff's objections Nos. 12 (page 32), 13 (page 33), and 14 (page 35) are sustained. Whether Plaintiff agreed to certain fee arrangements is a disputed fact for trial.

• Plaintiff's objection No. 15 (page 35) is sustained. Whether there was an agreement to increase Plaintiff's percentage of Keystone's expenses is a disputed fact for trial.

• Plaintiff's objection No. 16 (page 36) is sustained. Pakter did not draw on any expertise to offer his opinion that Plaintiff as covered by two medical malpractice policies at his own specific request.

**\*9** • Plaintiff's objections Nos. 17 (page 38), 18 (page 40), 19 (page 42), 20 (page 43), 21 (page 44), 22 (page 45), 23 (page 46), and 24 (page 47) are sustained, as whether Plaintiff agreed to certain fee arrangements is a disputed fact for trial.

• Plaintiff's objection No. 25 (page 28) is sustained, as whether Plaintiff was an employee or partner of Defendant Keystone is a contested issue for trial. However, to the extent that Pakter can apply specialized knowledge to explain to the jury ways in which the accounting records that he examined suggest that Plaintiff was treated as (or compensated

as) an employee and not a partner, he may offer those opinions.

• Plaintiff's objection No. 26 (page 50) is sustained, as whether Plaintiff agreed to certain fee arrangements is a disputed fact for trial.

• Plaintiff's objection No. 27 (page 54) is sustained, as whether Plaintiff contributed the $100,000 relating to cash reserves is a disputed issue for trial.

• Plaintiff's objections Nos. 28 (page 55) and 29 (page 55) are sustained, as whether Plaintiff agreed to certain arrangements is a disputed fact for trial.

• Plaintiff's objections Nos. 30 (page 60) and 31 (page 63) are sustained, as Pakter offered no specialized knowledge or expertise to form these opinions and merely parroted what he was told by Defendants in interviews. See *Stachniak v. Hayes*, 989 F.2d 914, 925 (7th Cir. 1993) ("We have stated that "[c]redibility is not a proper subject for expert testimony; the jury does not need an expert to tell it whom to believe, and the expert's 'stamp of approval' on a particular witness' testimony may unduly influence the jury.") (citation and internal quotation marks omitted).

• Plaintiff's objection No. 32 (page 70) is sustained, as whether Plaintiff signed the Operating Agreement dated January 1, 2005 is a disputed fact for trial and Pakter is not being offered as a handwriting expert.

• Plaintiff's objection No. 33 (page 78) is sustained, as Pakter offered no specialized knowledge or expertise to form this opinion and merely parroted what he was told by Defendants in interviews.

5      The Court is referring to the numbered objections attached as Exhibit 1 to this opinion.

Plaintiff also argues that Pakter improperly seeks to offer legal opinions by stating that Defendant Hall is completely innocent of any fraudulent conduct, that there is no evidence of fraud, and that Defendants made a "good faith effort" to account for the amounts that Plaintiff allegedly failed to pay Defendant Keystone when he disassociated. As noted above, the Seventh Circuit has stressed that expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible. *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003).

Further, expert testimony that an individual did or did not act fraudulently is inadmissible, as the fact finder, not the expert, must determine whether Plaintiff has offered sufficient evidence to show that Defendants acted fraudulently. See *Apotex Corp. v. Merck & Co.*, 2006 WL 1155954, at *8 (N.D. Ill. Apr. 25, 2006), aff'd, 507 F.3d 1357 (Fed. Cir. 2007) (holding expert testimony inadmissible under Rule 702 where expert report stated that "[i]t is my opinion based on the evidence that [defendant's conduct was] a fraud on the courts"); *Ass'n Ben. Servs., Inc. v. AdvancePCS Holding Corp.*, 2005 WL 2335484, at *4 (N.D. Ill. Sept. 23, 2005) (holding that expert's testimony that defendant committed fraud "extends beyond the permissible scope of expert testimony"). Again, the key distinction is between "stating a legal conclusion" (which is not permitted) and "providing concrete information against which to measure abstract legal concepts" (which is permitted). *Blount*, 502 F.3d at 680.

**\*10** More specifically, Plaintiff challenges Pakter's statement that "I can and have concluded that there is no proof or support for the assertion that [Plaintiff] was defrauded. Sanders has not shown—nor could he show—any evidence of fraud." [314 Exhibit A (Pakter's Expert Report), at 18.] Defendants argue that Pakter made this statement in response to Sanders's opinion that "The accounting system set up across [Defendant] Hall's various companies was not consistent with Generally Accepted Accounting Principles, was unreliable, and lacked appropriate transparency." Defendants also argue that this opinion is proper since Pakter is a Certified Fraud Examiner. Plaintiff also challenges Pakter's statement that: "As part of my review and analyze [sic] of these issues, I analyzed the above-listed financial elements of the 1099-MISC and concluded there was a good faith effort to account for the amounts that [Plaintiff] failed to pay [Defendant] Keystone when he disassociated from [Defendant] Keystone." [*Id.* at 83.] Defendants argue that this statement is in response to Sanders's statement that in his opinion, "the 1099-MISC was improperly issued."

The Court agrees with Plaintiff that, with one minor exception discussed below relating to Pakter's criticism of Sanders's work, these statements improperly offer legal conclusions as to whether or not Defendants committed fraud and whether Defendants acted in good faith. See *Richman v. Sheahan*, 415 F. Supp. 2d 929, 950 (N.D. Ill. 2006) (holding that expert was not permitted to testify that

defendants "were carrying out there [sic] lawful duties" because "[t]hat conclusion does not put the facts in context or assist the jury in understanding the facts at issue"); *Klaczak v. Consol. Med. Transp. Inc.*, 2005 WL 1564981, at *8 (N.D. Ill. May 26, 2005) (holding that expert could not testify that defendants committed fraud and stating that "proffered expert assertions about another's subjective intent or knowledge are not helpful to the jury"); *Dahlin v. Evangelical Child & Family Agency*, 2002 WL 31834881, at *3 (N.D. Ill. Dec. 18, 2002) (holding that expert could not testify that defendant's actions constituted fraud and explaining that "[t]his is a quintessential jury determination on which the Court will instruct a jury concerning the factors it is to consider"). Here is the exception: to the extent that Pakter wishes to respond to Sanders's statements, he can testify that Sanders's opinions are unsupported or testify that "there is sufficient accounting support for the inclusion of the underlying components of the $159,577.45 contained in the 1099-MISC," without using legal terms such as "fraud" and "good faith." Plaintiff also challenges Pakter's statement that "[t]here is nothing in the record in this litigation that contradicts that [sic] the overall reliability of the Bucket Reports." However, this is not a legal conclusion and Plaintiff certainly is welcome to try to establish the opposite proposition at trial.

In sum, Pakter is permitted to testify about disputed facts in order to provide the factual assumptions on which he relies for his expert opinions and thus provide helpful context for presenting his opinions to the jury. Pakter must then apply his expertise to these disputed facts in a way that is helpful to the jury. However, he is not permitted to simply recapitulate what Defendants have told him about disputed facts or endorse the testimony of a fact witness, as "the jury does not need an expert to tell it whom to believe, and the expert's 'stamp of approval' on a particular witness' testimony may unduly influence the jury." *Benson*, 941 F.2d at 604. Nor is Pakter permitted to opine on whether or not there is evidence of fraud or offer any other opinions that state legal conclusions. See *id.* (explaining that an expert's opinion must be "an opinion informed by the witness' expertise[ ] rather than simply an opinion broached by a purported expert").

Finally, Plaintiff objects to Pakter's opinion that Sanders's testimony would "not help the trier of fact to determine the facts at issue," is "not based on sufficient facts or data," is "not the product of reliable principles and

Angelopoulos v. Keystone Orthopedic Specialists, S.C., Slip Copy (2017)
2017 WL 2178504, 119 A.F.T.R.2d 2017-1882

methods," and that Sanders "has not reliably applied the principles and methods to the facts of the case." Plaintiff contends, without citing any relevant authority, that this testimony usurps the Court's role as the gatekeeper of expert opinions. Defendants agree that Pakter will not testify in front of the jury that Sanders's opinions "will not help the trier of fact to determine the facts at issue." The Court agrees with Plaintiff that arguing the legal standard under *Daubert* to the jury would be improper; indeed, the Court already has rejected that argument in overruling Defendants' motion to exclude portions of Sanders's testimony. Nevertheless, Pakter remains free to criticize Sanders's methodology, factual assumptions, and conclusions.

### III. Motions *in Limine*

#### A. Legal Standard

**\*11**  A motion *in limine* is a motion made "at the outset" or "preliminarily." BLACK'S LAW DICTIONARY 803 (10th ed. 2014). Motions *in limine* may be used to eliminate evidence "that clearly ought not be presented to the jury because [it] clearly would be inadmissible for any purpose." *Jonasson v. Lutheran Child & Family Svcs.*, 115 F.3d 436, 440 (7th Cir. 1997). The party seeking to exclude evidence "has the burden of establishing the evidence is not admissible for any purpose." *Mason v. City of Chicago*, 631 F. Supp. 2d 1052, 1056 (N.D. Ill. 2009). The power to rule on motions *in limine* inheres in the Court's role in managing trials. *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). Because motions *in limine* are filed before the Court has seen or heard the evidence or observed the trial unfold, rulings *in limine* may be subject to alteration or reconsideration during the course of trial. *United States v. Connelly*, 874 F.2d 412, 416 (7th Cir. 1989).

#### B. Defendant Hall's Alleged Prior Bad Acts (Plaintiff's Motion No. 2 and Defendants' Motions 2, 3, 8, 9, and 10)

##### 1. Cloud 1099-MISC and Roalsen K-1

The Court will first address Plaintiff's motion *in limine* No. 2 and Defendants' motions *in limine* Nos. 2, 3, 8, 9, and 10, which deal with related issues. Plaintiff moves to allow Rule 404(b) evidence of Defendant Hall's prior bad acts in retaliating against former business associates. In the current action, Plaintiff alleges that Defendants

filed a fraudulent 1099-MISC with the IRS and falsely claimed that Plaintiff owed Defendants money, when, according to Plaintiff, Defendants actually owed Plaintiff money. Plaintiff claims that these allegations are relevant to Count I (fraudulently filing an information return in violation of 26 U.S.C. § 7432) and Count II (common law fraud), which both require proof of intent. Plaintiff intends to offer evidence that Defendant Hall subjected other former business associates to "strikingly similar fraudulent filings in retaliation for their defections from Keystone right around the same time." [326, at 2.] This evidence includes an allegedly false 1099-MISC issued to former Keystone employee George Cloud and Cloud's trial testimony concerning the incident, and an allegedly false Schedule K-1 issued to Defendant Hall's brother-in-law Merritt Roalsen and Roalsen's deposition testimony concerning the incident. On the other side of the coin, Defendants' motion No. 2 seeks to exclude the 1099-MISC issued by Keystone to Cloud (Plaintiff's Exhibit No. 14), and Defendants' motion No. 3 seeks to exclude a text message from Roalsen to Plaintiff about the Schedule K-1 issued by Defendant Hall (Plaintiff's Exhibit No. 22).

Rule 404(b) prohibits the introduction of evidence of other crimes or bad acts when such evidence is offered to prove the character of a person in order to show "conduct in conformity therewith." *United States v. Robinson*, 161 F.3d 463, 466 (7th Cir. 1998); Fed. R. Evid. 404(b). That is, evidence of prior bad acts is not admissible for an impermissible propensity inference. However, Rule 404(b) expressly permits evidence of prior bad acts to be introduced for purposes other than to establish a propensity for wrongdoing, including proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, *or modus operandi.* Fed. R. Evid. 404(b); *Robinson*, 161 F.3d at 466. Both parties rely on a four-part test formerly used by the Seventh Circuit to determine the appropriateness of admitting evidence of prior bad acts. However, the Seventh Circuit explicitly abandoned this four-part test in *United States v. Gomez*, in favor of a more straightforward rules-based approach. [6] 763 F.3d 845, 853 (7th Cir. 2014) ("This change is less of a substantive modification than a shift in paradigm that we hope will produce clarity and better practice in applying the relevant rules of evidence.").

[6]        Under the old four-prong test, the admissibility
           of evidence of prior bad acts was dependent

upon whether: (1) the evidence is direct towards establishing a matter in issue other than the defendant's propensity to commit the act accused of; (2) the evidence the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue; (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (4) the evidence has probative value that is not substantially outweighed by the danger of unfair prejudice. *Robinson*, 161 F.3d at 467. The fourth prong of this test incorporated Rule 403. *Id.*

**\*12** Under *Gomez*, the proponent of the evidence must first show "that the other act is relevant to a specific purpose other than the person's character or propensity to behave in a certain way." 763 F.3d at 860 (citing Fed. R. Evid. 401, 402, 404(b)). Although other-act evidence need not be excluded whenever a propensity inference can be drawn, its relevance to a permitted purpose "must be established through a chain of reasoning that does not rely on the forbidden [propensity] inference." *Id.* Thus, courts must ask not just *whether* the proposed other-act evidence is relevant to a non-propensity purpose but *how* exactly the evidence is relevant to that purpose." *United States v. Anzaldi*, 800 F.3d 872, 882 (7th Cir. 2015) (citing *Gomez*, 763 F.3d at 856). The district court must assess whether the probative value of the other-act evidence is substantially outweighed by the risk of unfair prejudice. *Gomez*, 763 F.3d at 860. The court's Rule 403 balancing should take into account the extent to which the non-propensity fact for which the other-act evidence is offered is actually contested in the case. *Id.*

Plaintiff argues that he offers the evidence involving the 1099-MISC issued to Cloud and the K-1 issued to Roalsen to show identity, *modus operandi*, intent, and absence of mistake. First, Plaintiff argues that Defendant Hall put his identity at issue by taking the position that if anyone filed the false 1099-MISC, it was not him personally. Plaintiff relies on Defendants' Proposed Final Jury Instruction No. 4, which states, in relevant part: "[Defendant Hall] denies that he filed any Form 1099-MISC regarding [Plaintiff]." However, in their response brief, Defendants take the position that identity is *not* in dispute here.[7] [331, at 3.] To the extent that identity is not in dispute, Plaintiff's argument that the evidence is relevant to show identity fails. Additionally, if identity is in dispute, Plaintiff's argument that the evidence is relevant to show *modus operandi* also fails, as *modus operandi* evidence is generally admissible only to prove the identity of the

defendants. See *Robinson*, 161 F.3d at 467 ("[evidence of *modus operandi*] may be properly admitted pursuant to Rule 404(b) to prove identity"); *Goldberg v. 401 North Wabash Venture LLC*, 2013 2013 WL 1499043, at \*6 (N.D. Ill. Apr. 11, 2013) (holding that evidence was not admissible to establish *modus operandi* and explaining that *modus operandi* evidence "is generally only admissible to prove the identity of the defendants, which here is not in dispute").

[7]  The Court will further explore this issue with counsel at the final pre-trial conference on May 18 to ensure a consistency of approach in regard to any issues relating to identity and the related issue of who was responsible for the filing of 1099-MISC forms on behalf of the corporate Defendants in this case.

Further, based on the current record, the Court is not convinced that the acts in question are similar enough to the case at bar for a *modus operandi* rationale to apply. Evidence of *modus operandi* shows a defendant's "distinctive method of operation." *Robinson*, 161 F.3d at 467. The Seventh Circuit has cautioned that "[i]f defined broadly enough, modus operandi evidence can easily become nothing more than the character evidence that Rule 404(b) prohibits." *United States v. Smith*, 103 F.3d 600, 603 (7th Cir. 1996). Thus, the similarities between the crimes must be "sufficiently idiosyncratic to permit an inference of pattern for purposes of truth." *Robinson*, 161 F.3d at 468 (citation and internal quotation marks omitted). Generic patterns are insufficient for purposes of *modus operandi* because allowing such evidence "would gut the Rule, rending it useless as a check on character evidence that would otherwise be inadmissible." *United States v. Thomas*, 321 F.3d 627, 635 (7th Cir. 2003).

Here, Defendants issued a 1099-MISC that reported payment of $159,577.45 to Plaintiff. Defendants contend that the payment reported in the 1099-MISC included $100,000 that Plaintiff owed to cash reserves and $28,000 that Plaintiff owed for his share of the WACHN down payment. Plaintiff disputed that he owed these amounts and contended that he had already made all required contributions. The parties also dispute whether $38,010.45 included in the 1099-MISC was a bonus that Defendants chose to give Plaintiff or earned income. [See 303 (Summary Judgment Opinion), at 7.] In contrast, the 1099-MISC issued to Cloud was, according to Defendants, in relation to a 2001 Dodge Ram Van that Defendants Keystone and Hall gave to Cloud, who was

at the time a Keystone staff employee. Other than the fact that a 1099-MISC was used in both scenarios, the scenarios appear to be quite different from one another based on the record before the Court. The other Rule 404(b) issue involves an allegedly fake K-1 issued to Roalsen by MedStaff, a company that is not party to this lawsuit and in which Defendants allege that Defendant Hall owns no interest. Plaintiff does not provide enough detail from which the Court can conclude that these past acts are similar enough to the case at hand (or sufficiently idiosyncratic) that they "permit an inference of pattern for purposes of truth." Robinson, 161 F.3d at 468.

**\*13** Plaintiff also proposes to offer the evidence involving the 1099-MISC issued to Cloud and the K-1 issued to Roalsen to show intent and absence of mistake. Plaintiff contends that Defendants are taking the position that if the filing was false, it was not intentional, and thus Plaintiff should be able to rebut this defense with evidence of Defendant Hall's prior bad acts involving information returns. However, Plaintiff does not satisfactorily explain why Defendant Hall's prior bad acts relating to the allegedly false information returns to Cloud and Roalsen are relevant to proving Defendant Hall's intent and lack of mistake as to Plaintiff's 1099-MISC. To differentiate between the "illegitimate use of a prior [bad act] to show propensity and the proper use of a prior [bad act] to prove intent, the [proponent of the evidence] must affirmatively show why a particular prior [bad act] tends to show the more forward-looking fact of purpose, design, or volition to commit the new crime." Miller, 673 F.3d at 699 (citation and internal quotation marks omitted). Here, Plaintiff has not shown a link between Defendant Hall's alleged involvement in issuing false information returns in the past and his state of mind was when issuing Plaintiff's 1099-MISC. Cf. Anzaldi, 800 F.3d at 881–82 (in tax fraud prosecution, evidence of defendant's attempt to structure her fees in a way she believed would circumvent government attention was admissible for propensity-free chain of reasoning: evidence tended to prove intent to defraud and helped negate defendant's asserted good faith defense because she would not have attempted to hide her fee activity from the government if she truly believed her tax positions were legitimate); United States v. Urena, 844 F.3d 681, 684 (7th Cir. 2016) (evidence of defendant's seven prior removals from U.S. was admissible in prosecution for being alien found in U.S. after deportation for non-propensity purpose: evidence

was probative of defendant's knowledge that he could not lawfully reenter U.S. without permission).

The evidence involving the Cloud 1099-MISC and the Roalsen K-1 also presents a Rule 403 issue. There is a high risk of confusing of the issues and wasting time, which may outweigh the probative value of such evidence. The Court will not permit a lengthy sideshow on these issues or "time consuming mini-trials regarding the merits of these other allegations." Patterson v. City of Chicago, 2017 WL 770991, at *4 (N.D. Ill. Feb. 28, 2017); see also Fed. R. Evid. 403, 611. The jury is not being asked to decide the propriety of Defendant Hall's issuance of the 1099-MISC for Cloud's car or MedStaff's issuance of the K-1 to Roalsen, as these events are not at issue in this trial. Further, the evidence Plaintiff offers has a high risk of undue prejudice, as it may invite the jury to infer that Defendant Hall is the type of person who commits fraud against his business partners and employees using tax forms, and thus Defendant Hall is more likely to have subjected Plaintiff to fraud in the case at hand. See United States v. Stacy, 769 F.3d 969, 974 (7th Cir. 2014) (in prosecution for conspiracy to manufacture methamphetamine, district court erred in admitting evidence of defendant's prior possession of methamphetamine and pseudoephedrine pills because government's argument that evidence was probative of defendant's intent to use pseudoephedrine to make methamphetamine and his knowledge of the process for making methamphetamine relied on a forbidden propensity inference: that defendant's history of involvement with methamphetamine manufacturing makes it more likely that he intended to use the pseudoephedrine pills to make methamphetamine); Gomez, 763 F.3d at 863 (district court erred in admitting evidence that a small user quantity of cocaine of a different purity of that in the conspiracy was found in defendant's bedroom after conspiracy ended, as government's theory —that because defendant possessed a small quantity of cocaine at the time of his arrest, he must have been involved in the cocaine-distribution conspiracy—rested on pure propensity); Miller, 673 F.3d at 698 ("[I]ntent is the exception most likely to blend with improper propensity uses.").

Thus, the Court provisionally excludes any evidence pertaining to the 1099-MISC issued to Cloud and the K-1 issued to Roalsen. If Defendants put identity at issue, then Plaintiff may present to the Court (outside the presence

Angelopoulos v. Keystone Orthopedic Specialists, S.C., Slip Copy (2017)

2017 WL 2178504, 119 A.F.T.R.2d 2017-1882

of the jury) an offer of proof with additional details as to how the proposed evidence is relevant to showing identity and *modus operandi*. See *United States v. Miller*, 673 F.3d 688, 696 (7th Cir. 2012) ("The district court wisely waited until after opening statements and cross-examination of a key witness to learn the defense theory before deciding whether to admit the details under Rule 404(b)."). If the Court does decide to admit this evidence at trial, the Court will consult with counsel about whether and when to give a limiting instruction to minimize the prejudicial effect. The Seventh Circuit has noted that appropriate jury instructions may help to reduce the risk of unfair prejudice inherent in other-act evidence, but has also cautioned against "judicial freelancing in this area," as a defendant may prefer to go without a limiting instruction to avoid highlighting the evidence. See *Gomez*, 763 F.3d at 860. Finally, the Court notes that even if this evidence does not come in as substance evidence under Rule 404(b), Plaintiff may be permitted to cross-examine Defendant Hall about the allegedly false tax returns he issued to Cloud and Roalsen under Rule 608(b) because these specific instances of conduct goes to Defendant Hall's character for truthfulness. The Court reserves ruling on this issue as well. However, to the extent that the Court may allow such cross-examination, Plaintiff would not be allowed to introduce extrinsic evidence. See Fed. R. Evid. 608(b).

### 2. Tom Boecker

**\*14** Turning to Defendants' related motions *in limine*, Defendants' motion No. 8 seeking to bar reference to documents subpoenaed from Tom Boecker is granted, as Plaintiff asserts that he does not intend to offer Plaintiff's Exhibit 27, which consists of the documents subpoenaed from Boecker. Boecker was a part owner of Midwest Diagnostics, a company in which Defendant Hall had an interest, and he worked with Defendant Hall during the same period that Plaintiff was with Keystone. Plaintiff asserts that he intends to call Boecker to testify that when he left Midwest Diagnostics to start his own company, Defendant Hall told him that he owed him money which he did not actually owe, and that according to Boecker, this was Defendant Hall's *modus operandi* with many former business associates.

The Court concludes that Plaintiff has not demonstrated how Boecker's testimony would be relevant for a specific

purpose other than propensity. Boecker's testimony is not relevant to *modus operandi* because identity is not at issue (Defendant Hall is not asserting as a defense that someone else told Plaintiff that Plaintiff owed him money), and *modus operandi* evidence is generally only admissible to prove the identity of the defendants. See *Robinson*, 161 F.3d at 467; *Goldberg*, 2013 WL 1499043, at \*6. Further, without additional detail, the general act of telling someone he owes money that he does not actually owe is not "sufficiently idiosyncratic to permit an inference of pattern for purposes of truth." *Robinson*, 161 F.3d at 468 (citation and internal quotation marks omitted); *Miller*, 637 F.3d at 699 (explaining that prior conviction "cannot be admissible merely because it was for the same crime" and that "[p]attern evidence *is* propensity evidence, and it is inadmissible unless the pattern shows some meaningful specificity or other feature that suggest identity or some other fact at issue").

Plaintiff seems to be offering Boecker's testimony to suggest that Defendant Hall "made up phony debts" in the past and thus he is the type of person who makes up phony debts. This is an impermissible propensity inference, and thus Boecker's testimony is not admissible for this purpose. However, under Rule 608(a), Boecker may testify may testify as to opinion or reputation evidence about Defendant Hall's character for untruthfulness pursuant. Additionally, under Rule 608(b), Plaintiff may be permitted to cross-examine Defendant Hall about the alleged fraud against Boecker without introducing extrinsic evidence because the specific instance of conduct goes to Defendant Hall's character for truthfulness. This Rule 608(b) issue, too, is reserved at this time. [8]

[8]    Defendants' motion *in limine* No. 10 seeks generally to exclude prior bad acts evidence under Rule 404(b). Given the specific rulings made above, the Court denies Defendants' motion *in limine* No. 10 without prejudice to either side making a contemporaneous Rule 404(b) objection if any particularized disputes of that nature arise at trial.

### C. Plaintiff's Motions *in Limine*

### 1. Plaintiff's Motion No. 3 to Exclude Defendants' Exhibit No. 6 and Reference to a Prescription Written to Merritt Roalsen

Plaintiff seeks to exclude Defendants' Exhibit No. 6, which is a record of a pain medication prescription written in 2006 by Plaintiff to Merritt Roalsen, Defendant Hall's former brother-in-law and business manager. Defendants contend that Plaintiff testified at his deposition that Roalsen was not his patient and that he wrote him a prescription of Ultram as a courtesy. According to Defendants, the American Medical Association prohibits physicians from writing prescriptions for controlled-substances to non-patients, and thus they should be able to introduce the prescription at trial. Plaintiff argues that any reference to this prescription should be barred as irrelevant because there is no evidence that the prescription was not medically justified, and Defendants are improperly attempting to use the prescription as propensity evidence to show bad character.

 *15 Plaintiff's motion is granted. Even assuming that Plaintiff's writing this prescription for a non-patient was improper under the standards of the American Medical Association, Rule 404(b) excludes evidence of prior bad acts if the purpose is to show a person's propensity to behave in a certain way. Fed. R. Evid. 404(b); Gomez, 763 F.3d at 855. Defendants have not shown that this evidence is relevant for any purpose other than for an impermissible propensity inference. Rule 403 provides an alternative basis for this ruling, as the probative value of any evidence about the Roalsen prescription would be minimal and the potential for prejudice to Plaintiff, as well as a distracting but unfruitful sideshow for the jury, would be significant. Fed. R. Evid. 403; 611. Additionally, although Rule 608(b) permits cross-examination on specific instances of conduct if the conduct is probative of the character for truthfulness or untruthfulness of the witness, Plaintiff's writing a prescription is not probative of his character for truthfulness or untruthfulness. See Fed. R. Evid. 608(b). Further, the prescription itself cannot be admitted, as extrinsic evidence is not admissible to prove specific instances of a witnesses' conduct in order to attack the witnesses' character for truthfulness. Id.; United States v. Holt, 486 F.3d 997, 1001 (7th Cir. 2007). Defendants' Exhibit No. 6 is excluded, and Defendants are not to reference Roalsen's prescription.

### 2. Plaintiff's Motion No. 4 to Exclude Defendants' Exhibit No. 8 and Preclude Mention of an Alleged Disciplinary Hearing

Plaintiff moves to exclude Defendants' Exhibit No. 8, which is a "Notice of a Disciplinary Hearing" and attached complaint issued by the State of Illinois Department of Professional Regulation to Plaintiff in 2004. Plaintiff also seeks to bar any reference to this alleged disciplinary hearing. Plaintiff contends that the complaint relates to his allegedly not having completed required "Continuing Medical Education," but that he simply had to provide evidence that he had in fact completed his continuing medical education and that there was never a hearing or a sanction. Defendants argue that Plaintiff has not offered evidence of a dismissal order and that Plaintiff became employed with Keystone in 2004, thus this notice of a disciplinary hearing is relevant.

Plaintiff's motion is granted. Defendants have not shown that this evidence is relevant for any purpose other than for an impermissible propensity inference. Moreover, the allegations regarding this alleged disciplinary hearing have little probative value, since there is no evidence that Plaintiff was ultimately subject to a disciplinary hearing or sanction, yet have high prejudicial value and risk creating an unnecessary sideshow. See Fed. R. Evid. 403, 611. Additionally, although Rule 608(b) permits cross-examination on specific instances of conduct if the conduct is probative of the character for truthfulness or untruthfulness of the witness, Plaintiff's receipt of this "Notice of a Disciplinary Hearing" is not probative of truthfulness or untruthfulness. See Fed. R. Evid. 608(b). Further, the notice itself cannot be admitted, as Rule 608(b) prohibits the use of extrinsic evidence to prove specific instances of a witnesses' conduct in order to attack the witnesses' character for truthfulness. Id.; Holt, 486 F.3d at 1001.

### 3. Plaintiff's Motion No. 5 to Exclude Defendants' Exhibit No. 42: WACHN's 2008 Amended Operating Agreement

Plaintiff seeks to bar Defendants' Exhibit No. 42, which purports to be WACHN's Amended Operating Agreement dated January 2008. Plaintiff alleges that by January 2008, he had left WACHN, along with Dr. Marc Chang and Dr. Daniel Weber, and thus the Amended Operating Agreement is signed only by Defendant Hall and one of the other WACHN doctors, Dr. Phillip Narcissi. Plaintiff contends that in January 2008, Defendants Hall and WACHN had

2017 WL 2178504, 119 A.F.T.R.2d 2017-1882

not paid him for his interest in WACHN, including his $111,000 cash contribution. According to Plaintiff, the Amended Operating Agreement provides that any member "vacating" the WACHN premises and "failing to monetarily contribute to the financial responsibility of WACHN * * * shall immediately forfeit any cash contribution and any share ownership set forth in this agreement. The redistribution of ownership shall be decided by remaining members." [326, at 9–10 (quoting Defendants' Exhibit 42, Article 9).] Plaintiff argues that the Amended Operating Agreement was intended to illegally divest Plaintiff of his interest but that without Plaintiff's written consent, the document is null and void according to the WACHN Operating Agreement's Section 13.10, which provides that "Amendments hereto shall require the written consent of the Members."

**\*16** Plaintiff argues that the Amended Operating Agreement should be barred because it has no legal force and would mislead and confuse the jury. However, Plaintiff asserts that he should be able to inquire on cross-examination of Defendant Hall about his attempt to alter the agreement retroactively since it bears on Defendant Hall's credibility and on Plaintiff's claims that Defendant Hall retaliated against him for resigning from Keystone and withdrawing from WACHN. Defendants, for their part, argue that WACHN continued to operate after Plaintiff ceased being a member and that the corporate records of WACHN are relevant to its operations.

The Court concludes that the alleged Amended Operating Agreement is relevant to WACHN's operations and notes that the evidence can cut both ways. On one hand, Defendants may use the Amended Operating Agreement to argue that Plaintiff forfeited his cash contribution. On the other hand, Plaintiff may argue that Defendant Hall attempted to alter the agreement retroactively to deprive Plaintiff of his cash contribution. To the extent Plaintiff believes that the Operating Agreement was not validly amended and that it does not apply to Plaintiff, he is free to explore these issues at trial. Further, Plaintiff has not shown that the introduction at trial of the Amended Operating Agreement would be unduly prejudicial. Thus, Plaintiff's motion is denied.

#### 4. Plaintiff's Motion No. 7 [339] to Exclude Defendants' Exhibit No. 32 and No. 33

Plaintiff moves to exclude Defendants' Exhibit Nos. 32 and 33, which are purportedly equipment leases for medical equipment leased by Keystone. Defendants offer these exhibits to support Defendant Hall's counterclaim that Plaintiff still owes him money for this equipment (including an OEC C-arm, C-arm radiolucent procedure table and a Smith and Nancy radio frequency ablator, which cost Defendant Keystone approximately $225,000, according to the counterclaim). Plaintiff contends that he requested production of these documents on July 3, 2013, by requesting all documents relating to the expenses that Defendant Hall claimed Plaintiff owed him, as well as all documents reflecting Keystone's purchase of medical equipment or other assets from 2001–2007. However, Defendants did not produce the documents until April 4, 2017, more than a year after fact discovery had closed.

Federal Rule of Civil Procedure 26(a) requires a party to disclose all documents that the party has in its possession, custody, or control and my use to support its claim. F.R.C.P. 26(a). A party cannot offer evidence that was not produced during discovery unless the failure to produce was harmless or substantially justified. Fed. R. Civ. P. 37(c)(1); *United States Sec. & Exch. Comm'n v. Berrettini*, 2015 WL 5159746, at \*1 (N.D. Ill. Sept. 1, 2015). The determination of "whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *David v. Caterpillar, Inc.,* 324 F.3d 851, 857 (7th Cir. 2003) (citation and internal quotation marks omitted). The following factors guide the Court's discretion: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Id.*

Here, Plaintiff has been prejudiced by Defendants' late disclosure of these documents because Plaintiff has not had an opportunity to explore this new evidence through depositions, interrogatories, or supplemental document requests. Plaintiff has not had an opportunity to inquire about whether these equipment expenses were paid, by whom they were paid, where and how the equipment was used, or what efforts Defendants made to sell, lease, or use the equipment. Further, Defendants cannot cure this prejudice without delaying trial, and Defendants have not made any argument that their failure to disclose these documents earlier was substantially justified.

Angelopoulos v. Keystone Orthopedic Specialists, S.C., Slip Copy (2017)

2017 WL 2178504, 119 A.F.T.R.2d 2017-1882

**\*17**  Defendants argue that the late disclosure is harmless because at Defendant Hall's deposition, Defendant Hall raised the topic of the equipment in response to a question about office expenses and Plaintiff's counsel asked Defendant Hall some questions about the equipment. According to Defendant, Plaintiff's counsel could have asked additional questions at that time but chose not to, thus demonstrating that Plaintiff had "minimal interest in the allegations regarding the equipment" in the counterclaim. These arguments are unavailing. As Plaintiff points out, Defendant Hall's deposition occurred eight days after the counterclaim was filed, which was the first time Defendants claimed that Plaintiff owed Defendant Keystone money for this equipment. And because Defendants had not produced any evidence supporting these allegations, Plaintiff's counsel did not ask Defendant Hall many questions about the equipment at his deposition. Plaintiff's strategy may have been different if Defendants had properly disclosed the documents. Thus, Plaintiff's motion is granted.

**D. Defendants' Motions *in Limine***

**1. Defendants' Motion No. 1 to Exclude
Plaintiff's Exhibit No. 13: Centier
Mortgage/Lien on the WACHN Property**

Defendants move to exclude Plaintiff's Exhibit No. 13, which is a mortgage between Centier Bank and WACHN. Defendants argue that this exhibit is irrelevant because the Center mortgage/lien was placed on the WACHN property in 2011, which is after Plaintiff allegedly disassociated with WACHN in 2007, and because a release of mortgage was entered into between Centier Bank and WACHN in 2016.

Plaintiff argues that this exhibit is relevant to the alleged scheme to defraud. According to Plaintiff, he was required in 2005 to make a $111,000 capital contribution and guarantee a $1 million loan to Great Lakes Bank in order for WACHN to purchase Keystone's office space in Hazel Crest, in exchange for 20% interest in WACHN. Plaintiff contends that when he left Keystone, Defendant Hall refused to purchase Plaintiff's interest in WACHN and prevented Great Lakes Bank from offering to release Plaintiff as a guarantor of the loan. Plaintiff further contends that in 2011, Defendant Hall pledged the WACHN building as collateral to Centier

Bank for one of Defendant Hall's other business ventures, further encumbering Plaintiff's interest in WACHN for Defendant Hall's benefit, without Plaintiff's consent. The Court concludes that Plaintiff has shown that Plaintiff's Exhibit No. 13 is relevant, and thus Defendants' motion is denied.

**2. Defendants' Motion No. 4 to Exclude Plaintiff's
Exhibit No. 19: Surveillance Photos of Defendant Hall**

Defendants seek to exclude Plaintiff's Exhibit No. 19, which are surveillance photos dated February 11, 2014, of Defendant Hall in the parking lot and lobby of the medical practice where former Keystone physician, Dr. Chang, is employed. Defendants argue that the photos are irrelevant. Plaintiff argues that the photos corroborate Dr. Chang's deposition testimony that Defendant Hall came to Dr. Chang's office and threatened to sue Dr. Chang if he did not make Plaintiff drop his lawsuit against Defendant Hall. Dr. Chang testified in his deposition that Defendant Hall threatened to "drag [Dr. Chang] in" and "come after [him] for monies" that Defendant Hall claimed Dr. Chang owed him, if he did not convince Plaintiff to drop the lawsuit.

The Court reserves ruling at this time on Defendants' motion *in limine* No. 4. To be sure, the Seventh Circuit has explained, "evidence of a defendant's attempts at intimidation of a witness * * * is admissible to demonstrate a defendant's 'consciousness of guilt[.]' " *United States v. Balzano*, 916 F.2d 1273, 1281 (7th Cir. 1990). Nevertheless, provided that Defendant Hall does not deny going to Dr. Chang's offices on the date that the photographs were taken, the photos themselves would add little or nothing of probative value to Dr. Chang's testimony. If Plaintiff still wishes to admit the photographs during or at the close of Dr. Chang's direct testimony, Plaintiff may request a brief sidebar and the Court will address the issue at that time.

**3. Defendants' Motion No. 5 to Exclude Plaintiff's
Exhibit No. 1: Defendant Hall's Personal Tax Returns**

**\*18**  Defendants seek to exclude Plaintiff's Exhibit No. 1, which consists of Defendant Hall's and his wife's personal federal and state tax returns for years 2005–2007. Defendants argue that this exhibit is irrelevant.

2017 WL 2178504, 119 A.F.T.R.2d 2017-1882

Plaintiff argues that the returns contain relevant evidence that Defendant Hall owned, controlled, and profited from a network of companies that he used to funnel profits away from Keystone and into his own pocket. Plaintiff further contends that Defendant Hall's scheme to defraud involved running nearly all of his Keystone patient billing income through his S-corporation, Martin R. Hall, M.D.S.C. According to Plaintiff, Defendant Hall kept this income a secret from Plaintiff and the other Keystone partners, and the tax returns show that nearly all of Defendant Hall's income came through Martin R. Hall, M.D.S.C. Plaintiff also argues that the tax returns show that Defendant Hall received tax benefits relating to a house owned by his wife in Homewood, Illinois, which was used to store Keystone records and for the Halls for personal business, and that these tax benefits are part of the alleged scheme to defraud. The Court concludes that Plaintiff has shown that Plaintiff's Exhibit No. 1 is relevant, and thus Defendants' motion is denied. [9]

[9]    Plaintiff also argues that the tax returns are admissible as evidence of Defendant Hall's net worth, which is relevant to the computation of punitive damages. Whether or not tax records from more than a decade ago would be admissible on that basis alone is not clear to the Court without a better appreciation for the totality of Defendant Hall's financial records, which will be explored at trial.

### 4. Defendants' Motion No. 6 to Exclude Plaintiff's Exhibit No. 15: Jenner & Block Invoices

Defendants move to exclude Plaintiff's Exhibit No. 15, which consists of bills from Plaintiff's accountant, Vranas & Vlahos Accountants, and his former attorneys at Jenner & Block. Plaintiff asserts that he does not seek to introduce evidence of attorney's fees to the jury and only seeks to present this issue to the Court after trial, if the jury finds that Defendants are liable under Count I (fraudulently filing an information return in violation of 26 U.S.C. § 7432). Given that attorneys' fees will be a matter for the Court to address in the event that the jury returns a verdict for the Plaintiff and the Court cannot envision any scenario in which it would be proper for either side to raise the subject of attorneys' fees in the presence of the jury, Defendants' motion is granted.

### 5. Defendants' Motion No. 7 to Exclude Plaintiff's Exhibit No. 28: Defendant Hall's Affiliation with Hind General Hospital, LLC

Defendants move to exclude Plaintiff's Exhibit No. 28, which consists of documents showing Defendant Hall's income from Hind Hospital. Defendants argue that these documents are irrelevant. Plaintiff argues that the documents show income that Defendant Hall hid from his partners at Keystone and are relevant to Plaintiff's claim that Defendant Hall breached his fiduciary duty to his partners in charging them an inflated management fee of $140,000. Plaintiff contends that with Defendant Hall's "duties at Hind, his busy private practice, and the demands of his other businesses, [Defendant Hall] could not possibly have earned the excessive management fee. The Court concludes that Plaintiff has shown that the documents are relevant to Plaintiff's claims and Defendants have not shown that the documents are unduly prejudicial. Thus, Defendants' motion is denied.

### IV. Conclusion

**\*19**  For the reasons set forth above, Plaintiff's *Daubert* motion (Plaintiff's motion *in limine* No. 1) to bar expert testimony by Michael Pakter [314] is granted in part and denied in part. Defendants' *Daubert* motion to bar certain expert testimony by Jay Sanders [309] is denied. Plaintiff's motions *in limine* [326] are granted in part and denied in part: the Court grants Plaintiff's motions Nos. 3 and 4; the Court denies Plaintiff's motion No. 5; and the Court provisionally denies Plaintiff's motion No. 2. Plaintiff's motion *in limine* No. 7 [339] is granted. Defendants' motions *in limine* [317] are granted in part and denied in part: the Court grants Defendants' motions Nos. 6 and 8; the Court denies Defendants' motions Nos. 1, 5, 7, 10, and 11; the Court reserves its ruling on Defendants' motion No. 4, and the Court provisionally grants Defendants' motions Nos. 2 and 3. [10] Defendants' motion [352] is granted, and the Court will consider the proposed voir dire questions and jury instructions that the parties submitted to the Court on May 12, 2017. The Court will issue a ruling on Plaintiff's motion *in limine* No. 6 [326, at 10] and Defendants' motion *in limine* No. 12 [350] in a separate order. A final pretrial conference is set for May 18, 2017 at 10:00 a.m. This case remains set for a jury trial to commence on May 23, 2017.

10    The Court previously granted in part and denied in part Defendants' motion *in limine* No. 9 and denied as moot witness Dr. Michael Hartman's motion to quash subpoena [360]. [364.]

## Exhibit 1: Plaintiff's Objections to Conclusions and Opinions of Michael Pakter

| Objection No. | Page of Report | Inadmissible Conclusion |
|---|---|---|
| No. 1 | 16 | The revenues and expenses of the MDSC were purposely and deliberately disclosed to Angelopoulos and other physicians when they were included in the Bucket Reports. Based on my Interviews, Angelopoulos and other physicians routinely reviewed the Bucket Reports and requested adjustments, which they were then made with revised Bucket Reports provided....Consequently, when presented quarterly to Hall, Angelopoulos and others they disclosed [sic] reliably, openly and completely all the revenues and expenses of the 'consolidated entity' for that financial quarter. |
| No. 2 | 17 | Hall represented to me that Angelopoulos was provided with all of the information and/or documentation he requested. |
| No. 3 | 18 | It is my understanding that Angelopoulos did indeed raise questions on the quarterly Bucket Report and was provided information and/or documentation responsive to his questions. During my interview of Keystone's accounting personnel, they advised me that they provided Angelopoulos with copies of all EOBs supporting patient billing....It is my understanding that Sanders was provided all of the EOBs supporting Angelopoulos' billings....Accordingly, I can conclude and have concluded that there are no assertions that Angelopoulos was not credited with all his revenues and billings between 2004 Q1 and 2007 Q3. |
| No. 4 | 20 | Based on my Interviews, Angelopoulos agreed with his employee compensation formula arrangement and contemporaneously consented to all specific allocations of income and expenses when it was clearly disclosed and reported to him in the Bucket Reports. |
| No. 5 | 20 | Hall was credited in the Bucket Reports with all his patient billings and Angelopoulos was credited in the Bucket Reports with all his calculation of employee compensation) with all his patient billings. |
| No. 6 | 21 | Sanders failed to understand and acknowledge Angelopoulos' agreed upon economic arrangement with Keystone. Angelopoulos was an employee of Keystone, an entity wholly owned by Hall. Angelopoulos' compensation, as an employee, followed a specific formula agreed upon by the parties - an agreement specifically described by Sanders in his Expert Report. |
| No. 7 | 23 | Based on my review of the Bucket Reports and other information and/or documentation in discovery in this litigation, this system [Pakter's characterization of the contract between Plaintiff and Keystone] was consistently followed from 2004 to 2007. The Bucket Reports were accurately designed and implemented to specifically follow the agreed employment compensation formula. |
| No. 8 | 27 | Based on my Interviews, Angelopoulos agreed with these [contractual] arrangements and contemporaneously consented to all allocations of income |
| No. 9 | 27 | and expenses when presented, disclosed and reported to him in the Bucket Reports. |
| No. 10 | 27 | Defendants imposed no restrictions on Angelopoulos' access to back-up data including but not limited to Angelopoulos' expenses. |
| No. 11 | 28 | Based on my Interviews, Angelopoulos agreed with this arrangement [regarding Hall's 'management fee'] and consented to this specific charge when it was clearly disclosed and reported to him in the Bucket Reports. |
| No. 12 | 30 | Based on my Interviews, Angelopoulos agreed with this arrangement regarding [Merritt 'Bear'] Roalsen and consented to these specific charges when it was clearly disclosed and reported to him in the Bucket Reports....Based on my Interviews, Roalsen devoted the bulk of his efforts to Keystone, especially finding physicians to join the practice and managing Keystone's employees and facilities. |
| No. 13 | 32 | Based on my Interviews, Angelopoulos consented to this specific charge [for the 2007 Q3 Facility Fee] when it was clearly disclosed and reported to him in the Bucket Report. |
| No. 14 | 33 | Based on my Interviews, Angelopoulos agreed with the arrangement that Keystone would pay all of WACHN's expenses and consented to these specific WACHN charges when it was clearly disclosed and reported to him in the Bucket Reports. |
| No. 15 | 35 | Based on my interviews, Angelopoulos agreed with this arrangement [as to the increase in 2007 Q3 expenses] and consented to this specific charge when it was clearly disclosed and reported to him in the Bucket Reports in 2007 Q3. |
| No. 16 | 35 | Angelopoulos' compensation agreement contemplated that Angelopoulos' percentage of Keystone's expenses would fluctuate over time depending on the number of physicians. When Dr. Change left Keystone, Angelopoulos' percentage of Keystone's expenses increased. Soon thereafter, Angelopoulos also left Keystone. |
| No. 17 | 36 | Based on my Interviews, Angelopoulos was covered by two medical malpractice policies beginning in or around 2005 at his own specific request. As this was Angelopoulos' direct expense under his employee compensation arrangement with Keystone, he consented to and was charged this amount. |
| No. 18 | 38 | Based on my Interviews, Angelopoulos agreed with the annual allocations of the costs of MedStaff employees to Keystone and non-Keystone companies including the related medical insurance and other costs of the employees when these were disclosed and reported to him in the Bucket Reports. |
| No. 19 | 40 | Based on my interviews, Angelopoulos agreed with this arrangement [as to paying for the expenses relating to Hall's home in Homewood, Illinois] and consented to this specific charge when it was clearly disclosed and reported to him in the Bucket Reports from 2005 to 2007. |
|  | 42 | Based on my Interviews, Angelopoulos agreed to pay the costs of the Qualified Retirement Plan, as part of the overall costs of Roalsen's employment compensation package, when these were disclosed and reported to him in the Bucket Reports. |
| No. 20 | 43 | Based on my Interviews, Angelopoulos agreed with this arrangement [regarding office function expenses] and consented to this specific charge when it was clearly disclosed and reported to him in the Bucket Report during 2004 to 2007. |
| No. 21 | 44 | Hall represented that Angelopoulos specifically agreed to absorb these charges [Dr. Narciso] and consented to these charges when they were disclosed and reported in the Bucket Reports. |
| No. 22 | 45 | Based on my Interviews, Angelopoulos agreed with the then-existing allocations of Missys expenses and consented to this specific charge when it was clearly disclosed and reported to him in the Bucket Reports. |
| No. 23 | 46 | Based on my Interviews, Angelopoulos agreed with hourly rates at which Keystone was billed for MRI services and consented to this specific charge when it was clearly disclosed and reported to him in the Bucket Reports. |
| No. 24 | 47 | Based on my Interviews, Angelopoulos agreed with this arrangement [regarding the asset acquisition expenses] and consented to these specific charges when they were clearly disclosed and reported to him in the Bucket Reports from 2004 to 2007. |
| No. 25 | 48 | Angelopoulos was an employee of Keystone. |
| No. 26 | 50 | Based on my Interviews, Angelopoulos agreed with Keystone's (and not the MGMA's) levels of expenses and consented to pay the agreed-upon percentages of Keystone's expenses when these were clearly disclose and reported to him in the Bucket Report for 2004 to 2007. |
| No. 27 | 54 | Based on my Interviews, while Angelopoulos agreed to contribute the $100,000 cash reserves, he never did and Hall contributed on his behalf. |
| No. 28 | 55 | Based on my Interviews, Angelopoulos agreed to the 2004 financial arrangements and was aware there was little or no shared income to be had between July and December 2004. |
| No. 29 | 60 | Based on my Interviews, Angelopoulos agreed with this arrangement to account for patient receipts when collected (and not when billed) and to base Angelopoulos' employee compensation formula on collected payment receipts. |
| No. 30 | 62 | Based on my Interviews, Angelopoulos agreed with this arrangement [regarding the physical therapy adjustments] and consented to this specific adjustment when it was clearly disclosed and reported to him in the Bucket Reports....Based on my Interviews, the process the [sic] culminated with that income adjustment for physical therapy income was begun at the specific request of Angelopoulos who believed, mistakenly, that he was not given sufficient credit for physical therapy income. After the re-analysis specifically requested by Angelopoulos was completed, adjustments were made to Keystone's Bucket Reports. These adjustments, however, resulted in Angelopoulos receiving less credits than he previously received for physical therapy income. |
| No. 31 | 63 | Based on my Interviews, the process the [sic] culminated in that income adjustment for MRI income was begun at the specific request of Angelopoulos who believed, mistakenly, that he was not given sufficient credit for MRI income. After the re-analysis specifically requested by ... |
| No. 32 | 70 | Angelopoulos was completed, adjustments were made to Keystone's Bucket Reports. These adjustments, however, resulted in Angelopoulos receiving less credits than he previously received for MRI income.<br><br>I have seen the original Operating Agreement dated January 1, 2005, which Angelopoulos claims he never signed, although to my eyes his signature is apparent from the face of the original Operating Agreement. Even if that were true (which Defendants dispute), Angelopoulos appeared to have participated in "ordering" a special meeting on June 29, 2007 for the purpose of, among other things, amending the original Operating Agreement. It is my understanding and I have assumed that it would make little sense that Angelopoulos would order a meeting to amend the original Operating Agreement and agree on how to amend it, if he believed there was never an enforceable Operating Agreement to begin with. Angelopoulos signed the Summary of the WACHN meeting dated June 29, 2007 which contained the amendments to the Operating Agreement discussed above. |
| No. 33 | 78 | [B]ased on my Interviews, all the other items [in the 1099-MISC] are merely charges to Angelopoulos that he should have repaid, but did not. |

## All Citations

Slip Copy, 2017 WL 2178504, 119 A.F.T.R.2d 2017-1882

End of Document                                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1227214
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

The Medicines Company, Plaintiff,

v.

Mylan Inc., Mylan Pharmaceuticals Inc., and
Bioniche Pharma USA, LLC, Defendants.

No. 11–cv–1285
|
Signed March 25, 2014

**Attorneys and Law Firms**

Angus Chen, David A. Zwally, Mark P. Walters, Porter F. Fleming, Frommer Lawrence & Haug LLP, Jason A. Lief, Morgan Lewis & Bockius, LLP, New York, NY, John Bostjancich, Patricia Susan Smart, Smart & Bostjancich, Chicago, IL, for Plaintiff.

David E. Jones, Autumn N. Nero, David J. Harth, Emily J. Greb, Perkins Coie LLP, Madison, WI, James B. Coughlan, Perkins Coie LLP, Chicago, IL, Scott D. Eads, Perkins Coie LLP, Portland, OR, Shannon M. Bloodworth, Perkins Coie LLP, Washington, DC, for Defendant.

### *MEMORANDUM OPINION AND ORDER*

AMY J. ST. EVE, District Court Judge:

**\*1** This is a patent infringement action by The Medicines Company ("TMC") against Defendants Mylan, Inc., Mylan Pharmaceuticals Inc. and Bionche Pharma USA, LLC alleging infringement of United States Patent No. 7,582,727 (the " '727 patent"),[1] a product patent. In advance of trial, Defendants move to exclude the commercial success opinion of non-retained employee expert Anthony Flammia. For the reasons discussed below, the Court grants the motion.

---

[1]    The Court previously granted Mylan's summary judgment motion as to United States Patent No. 7,598,343 (the " '343 patent"). (R. 309.)

## BACKGROUND

This action arises out of a patent infringement case involving the '727 Patent. The '727 patent "relates to a compounding process for preparing a pharmaceutical batch(es) of a drug product or a pharmaceutical formulation(s) comprising bivalirudin as an active ingredient." ('727 patent at col. 2 ll. 29–32) Bivalirudin is the active ingredient in Angiomax®, which is an anticoagulant drug used in patients with unstable angina who are undergoing percutaneous transluminal coronary angioplasty. (R. 1, Comp. at ¶¶ 11, 13.) TMC markets Angiomax®. (*Id.* ¶ 13.)

In this case, TMC alleges that Mylan, before the expiration of the patent-in-suit, submitted Abbreviated New Drug Application ("ANDA") No. 202471 to the U.S. Food and Drug Administration ("FDA"), seeking approval to engage in the commercial manufacture, use, sale, offer for sale, and/or importation of its generic Angiomax® product. TMC contends that Mylan's ANDA No. 202471 infringes certain claims of the '727 patent. Specifically, TMC asserts that Mylan has infringed claims 1–3, 7–10 and 17 of the '727 patent. Claim 1 is an independent claim, and the remaining asserted claims depend on Claim 1. Claim 1 states:

> Pharmaceutical batches of a drug product comprising bivalirudin (SEQ ID NO: 1) and a pharmaceutically acceptable carrier for use as an anticoagulant in a subject in need thereof, wherein the batches have a maximum impurity level of $Asp^9$-bivalirudin that does not exceed about 0.6% as measured by HPLC.

Each asserted claim in the '727 patent contains a limitation requiring the pharmaceutical batches at issue to have "a maximum impurity level of $Asp^9$-bivalirudin that does not exceed about 0.6%." No claims in the '727 patent explicitly refer to "efficient mixing" or any other steps in the bivalirudin compounding process.

## LEGAL STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." *Lewis v. Citgo Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir.2009). Rule 702 provides, in relevant part, that "[i]f scientific, technical or other specialized knowledge will assist the trier of fact[,] ... a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion...." *Id. See also Happel v. Walmart Stores, Inc.,* 602 F.3d 820, 824 (7th Cir.2010).

**\*2** Under the expert-testimony framework, courts perform the gatekeeping function of determining whether the expert testimony is both relevant and reliable prior to its admission at trial. *See id.; Power Integrations, Inc. v. Fairchild Semiconductor Int'l., Inc.,* 711 F.3d 1348, 1373 (Fed.Cir.2013); *United States v. Pansier,* 576 F.3d 726, 737 (7th Cir.2009)* ("To determine reliability, the court should consider the proposed expert's full range of experience and training, as well as the methodology used to arrive [at] a particular conclusion."). In doing so, courts "make the following inquiries before admitting expert testimony: first, the expert must be qualified as an expert by knowledge, skill, experience, training, or education; second, the proposed expert must assist the trier of fact in determining a relevant fact at issue in the case; third, the expert's testimony must be based on sufficient facts or data and reliable principles and methods; and fourth, the expert must have reliably applied the principles and methods to the facts of the case." *Lees v. Carthage College,* 714 F.3d 516, 521–22 (7th Cir.2013); *see also Stollings v. Ryobi Tech., Inc.,* 725 F.3d 753, 765 (7th Cir.2013); *Power Integrations,* 711 F.3d at 1373; *Pansier,* 576 F.3d at 737.

The Seventh Circuit has repeatedly stated that "genuine expertise may be based on experience or training." *United States v. Conn,* 297 F.3d 548, 556 (7th Cir.2002) (quoting *Tyus v. Urban Search Mgmt.,* 102 F.3d 256, 263 (7th Cir.1996)). "[W]hile extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Trustees of Chicago Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Tr. Funds v. Royal Int'l Drywall & Decorating, Inc.,* 493 F.3d 782, 787–88 (7th Cir.2007) (citations and quotations omitted). As such, courts

"consider a proposed expert's full range of practical experience, as well as academic or technical training, when determining whether that expert is qualified to render an opinion in a given area." *Id.* (quoting *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir.2000)).

In assessing the admissibility of an expert's testimony, the Court's focus "must be solely on principles and methodology, not on the conclusions they generate.' " *Winters,* 498 F.3d at 742 (quoting *Chapman v. Maytag Corp.,* 297 F.3d 682, 687 (7th Cir.2002)). *See also Stollings,* 725 F.3d at 765. "The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett,* 487 F.3d 482, 489 (7th Cir.2007) (quoting *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). "A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.,* 689 F.3d 802, 805 (7th Cir.2012).

## ANALYSIS

### I. Anthony Flammia

Mr. Flammia has worked for TMC since 2003. He currently serves as TMC's Vice President of New Business Ventures. When TMC implemented the new manufacturing process at issue in this case, Mr. Flammia served as TMC's Vice President of Global Manufacturing Supply. In this position, Mr. Flammia had responsibility for contract manufacturing, the commercial clinical supply chain for Angiomax®, attempts to solve Angiomax® batch failures, and the implementation of the new and improved manufacturing process for Angiomax®.

TMC has disclosed Mr. Flammia as its non-retained employee expert on commercial success. In its initial disclosure, TMC provided that "Mr. Flammia may testify regarding the commercial success of The Medicines Company's bivalirudin product, Angiomax®, as a result of commercial reliability from consistently minimized Asp[9]-bivalirudin levels in batches of improved Angiomax®." (R. 359, Declaration of Emily Greb, Ex. 1.)

2014 WL 1227214

**\*3** In its Amended Rule 26(a)(2) expert disclosure, TMC made the following discourse regarding Mr. Flammia's expert opinions:

> Mr. Flammia is expected to testify on the subject matter of the commercial success of Improved Angiomax® as an indicia of nonobviousness. As Vice President, Global Manufacturing and Supply from 2006 to 2010, Mr. Flammia was responsible for the manufacture and supply of The Medicines Company's Angiomax® product. The facts and opinions to which Mr. Flammia is expected to testify are as follows:

> The commercial reliability from consistently minimized Asp$^9$-bivalirudin levels in batches of Improved Angiomax® is a commercial success.

> In particular, the original manufacturing process for Angiomax® resulted in pharmaceutical batches with inconsistent and randomly higher levels of impurities, including Asp$^9$-bivalirudin ("Original Angiomax®"). Rejected batches of Original Angiomax® resulted in lost sales. The lost sales ranged as high as approximately $15–20 million per batch.

> The patents-in-suit disclose minimizing levels of Asp$^9$-bivalirudin. Improved Angiomax® batches with the claimed characteristics of the '727 and '343 patents consistently have lower impurity levels and are less likely to be rejected due to impurity levels.

> A nexus exists between the commercial success of Improved Angiomax® and the claims of the '727 and '343 patents. The commercial success of Improved Angiomax® can be attributed, in whole or in part, to the claims of the patent, i.e., minimizing levels of Asp$^9$-bivalirudin. The minimization of Asp$^9$-bivalirudin, allows The Medicines Company to avoid lost sales associated with rejected batches. The significance of this can be measured against The Medicines Company's research-and-development ("R & D") budget for Angiomax®. The sales lost (per batch) are approximately the same as The Medicines Company's R & D budget. The Medicines Company allocates approximately $13–22 million annually to R & D for Angiomax®, which represents 15–20% of its total R & D budget. Thus, each failed batch of Angiomax® represents the loss of one year's worth of R & D on Angiomax®.

(*Id.* at Ex. 2.)

Mr. Flammia admitted that he did not see TMC's amended disclosures until the morning of his June 2013 "expert" deposition. (R. 361, 6–3–13 Flammia Dep. at 21.)

## II. Mr. Flammia's Testimony Fails to Meet the Mandates of *Daubert*

As a defense to this infringement action, Mylan has asserted that the '727 patent is obvious and thus invalid under 35 U.S.C. § 103. "A patent may not issue 'if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.' " *In re Cyclobenzaprine Hydrochloride Extended–Release Capsule Patent Litig.,* 676 F.3d 1063, 1068 (Fed.Cir.2012) (citing 35 U.S.C. § 103(a) (2006)). "Obviousness is a question of law based on underlying factual findings: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the art; and (4) objective considerations of nonobviousness." *Id.* Objective considerations of nonobviousness include, among other factors, the "commercial success of the patented invention." *Id.* at 1075. "[T]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." *Microsoft Corp. v. i4i Ltd. P'ship,* ––– U.S. ––––, 131 S.Ct. 2238, 2245, 180 L.Ed.2d 131 (2011) (citing 35 U.S.C. § 282).

**\*4** TMC seeks to offer Mr. Flammia's testimony on the commercial success of Angiomax® to support its nonobvious arguments. Defendants challenge it on the grounds that his methodology does not comport with the legal requirements for commercial success.

### A. Commercial Success

Mylan first challenges Mr. Flammia's "commercial success" opinions because they are not grounded in Federal Circuit law and fail to follow an accepted methodology. Specifically, Mr. Flammia opines that the '727 patent is a commercial success because it has resulted in fewer rejected bivalrudin lots and batches of Angiomax®, and thus it saves TMC certain overhead

costs. TMC's assertion fails under the law of commercial success.

The Federal Circuit teaches that "the most probative evidence of commercial success is not overall sales, but whether those sales represent " 'a substantial quantity in th[e] market.' " *Novo Nordisk A/S v. Caraco Pharmaceutical Laboratories, Ltd.,* 719 F.3d 1346, 1356 (Fed.Cir.2013), (citing *In re Applied Materials, Inc.,* 692 F.3d 1289, 1300 (Fed.Cir.2012)). In order to establish commercial success, TMC must prove that the product has a substantial share of sales in a definable market. *Id.* at 1356 n.5; *In re: Applied Materials, Inc.,* 692 F.3d at 1300 ("[T]he more probative evidence of commercial success relates to whether the sales represent a substantial quantity in the market") (citations and quotations omitted); *In re Huang,* 100 F.3d 135, 140 (Fed.Cir.1996).

Mr. Flammia has failed to identify any evidence that the '727 patent has resulted in increased sales or market share. When asked whether he intended to offer opinions regarding commercial success, he said that he was "prepared to talk about the commercial reliability and robustness of the manufacturing process." (R. 361, 6–3–13 Flammia Dep. at 21.) Furthermore, Mr. Flammia is not offering any opinions or testimony regarding increased sales, market share, or customer demand relating to features claimed in the '727 patent. It was also clear from Mr. Flammia's deposition testimony that he did not have an understanding of the Federal Circuit's definition of commercial success in the context of obviousness. TMC contends that Mr. Flammia's testimony nevertheless establishes commercial success because he opines that the new process in the '727 patent results in fewer rejected batches of Angiomax® thus saving TMC overhead costs. TMC argues that this "commercial reliability" translates to commercial success. TMC, however, has failed to provide any support for its argument that the saving of manufacturing costs alone is a measure of commercial success. Indeed, in *The Medicines Company v. Hospira, Inc.,* No. 1:09–cv–00750–RGA, another TMC litigation involving the '727 patent, the District Court in Delaware rejected this same argument by TMC. (R. 358, Affidavit of Greb in Support of Defendants' *Daubert* Motions, Ex. 16, Letter to the Honorable Richard G. Andrews from Mary B. Matterer and attached exhibits.)

TMC's reliance on *Litton Systems, Inc. v. Honeywell, Inc.,* 87 F.3d 1559 (Fed.Cir.1996), *vacated on other*

grounds, 520 U.S. 1111 (1997), is misplaced. In *Litton,* the patent at issue claimed a method for coating "a substrate with multiple layers of materials to form an optical component. This method uses ion beams to coat optical material with multiple layers. The result is an almost perfectly reflective mirror." *Id.* at 1563–64. These mirrors are essential components in the manufacturer of ring-laser gyroscopes used for navigational control of aircraft. Honeywell, the defendant and accused infringer, manufactured ring-laser gyroscopes. In addressing the issue of commercial success, the Federal Circuit noted that Litton "enjoyed commercial success with the patented method." *Id.* at 1569. In fact, "Litton captured about seventy percent of the military market for guidance systems." *Id.* Additionally, Honeywell admitted that the invention was critical to its highly successful industry. The Federal Circuit did not suggest in *Litton* that a party can establish commercial success based upon the savings of manufacturing costs.

**\*5** In addition, TMC's contention that Mylan merely raises a factual issue is simply wrong. Mylan does not challenge the facts underlying Mr. Flammia's opinions. Instead, it seeks to exclude his opinions because he does not apply the correct legal standard for commercial success.

Because Mr. Flammia applies the wrong legal standard regarding commercial success and does not opine on, or consider, TMC's increased sales, market share, or customer demand relating to the '727 patent, his methodology fails to comply with the law on commercial success. Accordingly, the Court strikes his opinions on commercial success because they are legally flawed and will not be helpful to the trier of fact. *United States v. Mire,* 725 F.3d 665, 674 (7th Cir.2013) (Rule 702 permits expert opinions "provided the testimony is helpful to the trier of fact").

**B. Nexus**

Mylan further challenges Mr. Flammia's commercial success opinions because he has failed to opine or prove that a nexus exists between the novel features of the '727 patent and any alleged commercial success. The Court agrees.

It is well established that "[e]vidence of commercial success ... is only significant if there is a nexus between the claimed invention and the commercial success."

2014 WL 1227214

*Galderma Labs., L.P. v. Toolmar, Inc.,* 737 F.3d 731, 740 (Fed.Cir.2013), quoting *Ormco Corp. v. Align Tech., Inc.,* 463 F.3d 1299, 1311–12 (Fed.Cir.2006). *See also Metso Minerals, Inc. v. Powerscreen Intern. Distribution, Ltd.,* 526 Fed.Appx. 988, 998 (Fed.Cir.2013), quoting *Wyers v. Master Lock Co.,* 616 F.3d 1231, 1246 (Fed.Cir.2010) ("Our case law clearly establishes that the patentee must establish a nexus between the evidence of commercial success and the patented invention.");

*Pregis Corp. v. Kappos,* 700 F.3d 1348, 1356 (Fed.Cir.2012) ("The lack of nexus between the claimed subject matter and the commercial success or purportedly copied features of the EZ I machine renders Free–Flow's proffered objective evidence uninformative to the obviousness determination."). There must be "proof that the sales were a direct result of the unique characteristics of the claimed invention—as opposed to other economic and commercial factors unrelated to the quality of the patented subject matter." *In re Applied Materials, Inc.* 692 F.3d at 1299–1300. TMC bears the burden of establishing a nexus between the novel features of the patent and commercial success. *See W. Union Co. v. MoneyGram Payment Sys., Inc.,* 626 F.3d 1361, 1372–73 (Fed.Cir.2010). Given that TMC has failed to establish the requisite nexus, its "commercial success evidence is not significant." *ArcelorMittal France v. AK Steel Corp.* 700 F.3d 1314, 1326 (Fed.Cir.2012).

During his deposition, Mr. Flammia testified as follows about the nexus requirement:

Q: What is your understanding of the nexus requirement?

Lawyer: Objection.

A: As I stated earlier I understand my role in general terms of giving the expert opinion for the company on the reliability of manufacturing process and its impact to The Medicines Company.

In broad terms all of these paragraphs and all of these words mean that and I am happy to do so.

Q: Okay. And so as with this phrase indicia of non-obviousness you don't have any understanding of what the nexus requirement is, correct?

Lawyer: Objection. Mischaracterizes testimony.

*6 A. I am not a trained attorney. I am not a legal counsel. I don't understand the legal impacts.

I understand the role that I am playing on this proceeding as an expert witness on the manufacturing reliability and its commercial impact and success to the company. That is my understanding of what I am here for.

(R. 361, 6–3–13 Flammia Dep. at 56–67.) Mr. Flammia did not appear to understand the nexus requirement in this context.

TMC contends that Mr. Flammia's opinions satisfy the nexus requirement because he opines that the minimization of $Asp^9$-bivalirudin allows TMC to reliably and consistently produce Angiomax®, and that Angiomax®'s commercial success is due to this commercial reliability. The '727 patent, however, is a "pure product" patent that does not include process-related elements. TMC cannot assert a nexus on a characteristic that is not part of the claim in the '727 patent.

Furthermore, TMC has not informed its customers about the claimed improvement in the '727 patent. (R. 361, 6–3–13 Flammia Dep. at 149–151.) Accordingly, TMC cannot claim that its customers based their purchasing decisions on a feature claimed in the '727 patent about which they were uninformed.

TMC next argues that the nexus is presumed in this case because the product is coextensive with the claimed invention in the '727 patent. It is clear that a presumption of a nexus applies if the commercial product is coextensive with the asserted claims. *See Teva Pharms. USA, Inc. v. Sandoz, Inc.,* 723 F.3d 1363 (Fed.Cir.2013); *Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.,* 229 F.3d 1120, 1129 (Fed.Cir.2000). A commercially successful product is not "coextensive" with the patented invention when the patented invention is "only a component of a commercially successful machine or process." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,* 851 F.2d 1387, 1392 (Fed.Cir.1988). It is undisputed that Angiomax® is covered by multiple patents, including the '727 patent, the '343 patent and U.S. Patent No. 5,196,404. Moreover, neither TMC nor Mr. Flammia has distinguished the contributions of each patent to the commercial product. Accordingly, the presumption does not apply. *See*

*Therasense, Inc. v. Becton, Dickinson & Co.,* 593 F.3d 1289, 1299 (Fed.Cir.2010), *vacated for en banc rehearing on inequitable conduct,* 374 Fed.Appx. 35 (Fed.Cir.2010) (not entitled to presumed nexus where several patents cover marketed product).

Defendant's argument that Mylan's challenges raise factual issues and are better suited for cross-examination fails. Mylan's challenges do not pertain to Mr. Fammia's credibility or the underlying factual predicates for his opinions. Instead, it challenges Mr. Fammia's methodology because he applies a legally incorrect methodology.

**CONCLUSION**

Because Mr. Fammia's opinions rest on an inaccurate theory of commercial success, his methodology is faulty and his opinions will not assist the trier of fact. Accordingly, the Court grants Mylan's motion to exclude his expert opinions.

**All Citations**

Not Reported in F.Supp.2d, 2014 WL 1227214

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 2656583
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Stanley SMITH, Plaintiff,
v.
UNION PACIFIC RAILROAD, Defendant.

Case No. 11–cv–986
|
Signed 06/20/2017

**Attorneys and Law Firms**

John Christopher Mullen, Jr., Mullen Law Offices,
Chicago, IL, Amir R. Tahmassebi, Konicek & Dillon,
P.C., Geneva, IL, for Plaintiff.

Tracy Bradford Farley, Brian A. Hartstein, Quarles &
Brady LLP, Chicago, IL, for Defendant.

**MEMORANDUM OPINION AND ORDER**

Robert M. Dow, Jr., United States District Judge

 *1 Before the Court is Defendant Union Pacific
Railroad's motion [112] to exclude the testimony of
Plaintiff Stanley Smith's expert, Timothy Lalk. For the
reasons set forth below, Defendant's motion [112] is
granted. This case is set for status hearing on July 12, 2017
at 9:30 a.m.

**I. Background** [1]

[1]      The facts set forth below are drawn primarily from
    Defendant's filing and exhibits. See [113], [113–1]
    through [113–9]. Plaintiff's response does not include
    a statement of facts or any objections to the facts as
    set forth in Defendant's filing.

In September 2005, while Plaintiff was employed by
Defendant as a locomotive engineer, Plaintiff's driver's
license was revoked for driving under the influence.
Plaintiff reported the incident to Defendant, and he
thereafter received a leave of absence through Defendant's
Employee Assistance Program ("EAP"). In October
2005, the EAP referred Plaintiff to a clinician at Rush
University Medical Center ("Rush"), John Houlihan, who
oversaw Plaintiff's voluntary participation in both offsite

inpatient and onsite outpatient treatment for chemical
dependency. The Rush outpatient program specifically
treated alcohol and cocaine abuse, and it was facilitated by
Edward Lynch, a behavioral health clinician. On May 26,
2006, Lynch discharged Plaintiff from Rush's outpatient
program and recommended that he "return to full work
responsibilities, without restrictions, in conjunction with
EAP, and employer." See [117–1] (Lalk Deposition) at
69; see generally [113–5] (Lynch Deposition Excerpts)
at 7–10. Mr. Houlihan thereafter recommended that
Defendant engage another doctor, psychiatrist Stafford
Henry, to conduct a full fitness-for-duty evaluation of
Plaintiff, which Dr. Henry performed in August 2006. Dr.
Henry ultimately recommended that Plaintiff complete
additional items before being permitted to return to work,
including at least one year of documented abstinence from
alcohol and other mood-altering substances and the use
of a C–Pap machine for Plaintiff's sleep apnea. See [113–
4] at 15–16 (9/3/2006 Report of Dr. Henry). Accordingly,
Defendant did not clear Plaintiff to return to work at that
time.

Plaintiff went on to participate in a one-year inpatient
treatment program in Texas from January 2007 to
January 2008. In June 2008, Dr. Henry conducted a re-
evaluation of Plaintiff. Dr. Henry again recommended
that Plaintiff complete additional items before returning
to work, again including a four-to-six month period of
documented abstinence and the use of a C–Pap machine.
See [113–4] at 27–28 (7/5/2008 Report of Dr. Henry).
Defendant began processing Plaintiff for return, but
Plaintiff was not cleared for return by Defendant until
July 2010, due to a delay in scheduling a required sleep
study for Plaintiff and his difficulty in procuring a C–Pap
machine.

In 2011, Plaintiff filed this action against Defendant,
alleging that it discriminated against him in violation of
the Americans with Disabilities Act, 42 U.S.C. § 12101
et seq., on account of his alcoholism because Defendant
did not allow Plaintiff to return to work in 2006 after his
completion of the Rush outpatient program. See [37] at ¶¶
15–18, 21, 31–40.

 *2 In support of his claims, Plaintiff has retained
Lalk, a vocational rehabilitation counselor, to render
an opinion as to (1) when Plaintiff was fit to
return to work, and (2) Plaintiff's damages. Lalk is a
certified rehabilitation counselor and a Missouri-licensed

professional counselor. See [117–2] (Lalk Expert Report) at 7. Lalk received a Master's degree in counseling from the University of Missouri-Columbia in 1979. *Id.* While working towards this degree, Lalk received instruction on chemical dependency counseling and he completed an internship that involved training in the subject area. See [117–1] at 32–37. He has worked in both public and private settings as either a vocational rehabilitation counselor or a vocational services specialist since 1979. [117–2] at 6. In his current position, which he has held since 1995, Lalk primarily conducts vocational rehabilitation evaluations for use in litigation. Specifically, Lalk reviews medical documentation and information regarding an individual's skills, training, and experience to determine that individual's employability and any needed accommodations. See [117–1] at 29. Lalk mainly testifies or otherwise offers opinions in Missouri workers' compensation lawsuits, civil cases in which an individual has sustained an injury that reduces his or her earning capacity, and marriage dissolution matters (where he evaluates the earning capacity of a spouse). See *id.* at 28–29. Lalk also has experience opining on disability-related matters before the Social Security Administration. *Id.* at 18–19. Since 2012, Lalk has offered testimony in more than 140 matters. See [117–2] at 8–19.

Here, Lalk reviewed selected case documents in rendering his opinions, which are laid out in a four-page report. In particular, Lalk's report notes that he relied on: (1) Plaintiff's deposition and the exhibits thereto, (2) the deposition of EAP Director Dr. Mark Jones and the exhibits thereto, (3) "Rush Behavioral Records," (4) the September 3, 2006 Report of Dr. Henry, (5) the July 9, 2008 Report of Dr. Henry,[2] (6) "Union Pacific Progress Notes [ ]," and (7) "Union Pacific Manual."[3] See [117–2] at 5. Lalk's deposition testimony confirms that he did not independently interview or evaluate the Plaintiff in forming his opinions, and neither his report nor his deposition indicate that he consulted or relied on any specific industry or other materials in generating his opinions.[4] See [117–1] at 7; see generally [117–2]. His overall opinions are as follows:

> Based on the materials reviewed referenced in the attachment and my education and experience[,] I have formed the following opinions. First, [Plaintiff] successfully completed the intensive inpatient

[sic] program at Rush Behavioral in May of 2006. At that time, he was fit to return to work and the Defendant should have undertaken [sic] measures to return [Plaintiff] to work in May of 2006. Second, that even after [Plaintiff's] continued treatment[,] the Defendant failed to allow [Plaintiff] to return to work. In late 2008, [Plaintiff] completed further treatment including that which Dr. Henry recommended. [Plaintiff] was fit to return to work at that time and was still not allowed to return. Finally, it is my opinion that the Defendant's failure to allow [Plaintiff] to return to work proximately caused damage to [Plaintiff] in the form of unpaid wages, medical bills[,] and unnecessary professional fees.

[117–2] at 2. Defendant seeks to preclude Lalk from testifying as to all three opinions, arguing that (1) he is not qualified to opine on Plaintiff's fitness to return to work at any point; (2) his opinions are not based on a reliable principles, scientific method, or reliable data; and (3) his testimony will not assist the jury. See [113].

[2]      For clarity, Dr. Henry's report is dated July 5, 2008. He sent the report to Defendant on July 9, 2008. See [113–4] at 17–28.

[3]      Lalk's expert disclosure does not indicate whether these documents were produced in litigation or whether they contain Bates numbering. See [117–2] at 5.

[4]      Lalk indicated in his deposition that he may have reviewed Lynch's deposition, but he could not recall if that was before or after he drafted his expert report. In addition, at times, Lalk testified that he was aware of or had read certain unspecified articles, studies, or other literature. But Lalk failed to name any such sources as materials upon which he relied in drafting his report or to identify them by name or title at any point, and the parties have not provided any indication that Lalk revised his expert report to name or reference any additional materials following his deposition.

Case: 1:15-cv-06811 Document #: 226-3 Filed: 06/20/18 Page 28 of 38 PageID #:2125
Smith v. Union Pacific Railroad, Slip Copy (2017)

2017 WL 2656583

## II. Legal Standard

**\*3** Federal Rule of Evidence ("Rule") 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert testimony. See *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009). Rule 702 permits the admission of expert opinion testimony if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* (quoting Fed. R. Evid. 702). Trial courts are obligated to act as a "gatekeeper" to ensure that the expert testimony is both reliable and relevant. See *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–49 (1999); *Daubert*, 509 U.S. at 589. The purpose of the *Daubert* inquiry is to scrutinize proposed expert witness testimony to determine whether it has "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" so as to be deemed reliable enough to present to a jury. *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Kumho Tire*, 526 U.S. at 152).

To determine reliability, the proponent must show that the expert's testimony is based on "sufficient facts or data" and that it is "the product of reliable principles and methods." Fed. R. Evid. 702. The *Daubert* principles apply equally to scientific and non-scientific expert testimony. *Kumho Tire Co.*, 526 U.S. at 147–49. Expert testimony may not be based on "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590; see also *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). District courts have "great latitude in determining not only how to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." *Pansier*, 576 F.3d at 737. And "any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994).

To determine relevance, the proponent must show that the expert's "reasoning or methodology properly can be applied to the facts in issue" and "the testimony will assist the trier of fact with its analysis of any of the issues involved in the case." *Daubert*, 509 U.S. at 592–93; *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000); Fed. R. Evid. 702.

Thus, in evaluating a motion to exclude expert testimony under Rule 702 and *Daubert*, the Court considers whether the proffered expert (1) is qualified, (2) has employed a reliable methodology, (3) offers opinions that follow rationally from the application of the expert's methodology and qualifications, and (4) presents testimony on a matter that is relevant to the case at hand. See *Kumho Tire*, 526 U.S. at 151–53; *Gen. Elec. Co.*, 522 U.S. at 146; *Daubert*, 509 U.S. at 589–93; *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011) (explaining that ultimately, the expert's opinion "must be reasoned and founded on data [and] must also utilize the methods of the relevant discipline"). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Still, the Court is mindful that question of whether the expert is credible or whether his theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based. *Smith*, 215 F.3d at 719.

## III. Analysis

### A. Lalk's Qualifications

**\*4** The first issue the Court must address is whether Lalk possesses the necessary qualifications to offer an expert opinion in this case. Rule 702 permits a witness to testify in the form of an opinion or otherwise if qualified as an expert by knowledge skill, experience, training or education. An expert is not entitled to offer opinions outside of his or her realm of expertise. See *United States v. Pree*, 408 F.3d 855, 871 (7th Cir. 2005) (citing *United States v. Benson*, 941 F.2d 598, 605 (7th Cir. 1991)).

Defendant argues that Lalk's opinions in this case are outside the scope of his expertise. In particular, Defendant asserts that Lalk cannot opine on when Plaintiff was able to return to work because (1) he is not a doctor; (2) he does not diagnose or treat alcoholism, drug abuse, or other conditions; (3) he has never conducted a return-to-work or fitness-for-duty examination; and (4) he has "zero relevant experience with locomotive engineers." See [113] at 8. In short, Lalk lacks direct experience with the narrow vocational issues involved in this case. [118] at 2–3. Plaintiff responds by generically emphasizing Lalk's long career as a vocational rehabilitation counselor and his

Smith v. Union Pacific Railroad, Slip Copy (2017)

2017 WL 2656583

"extensive experience" in evaluating whether a person is capable of performing a particular job or task or returning to work, and by arguing that Lalk is being offered to provide a vocational opinion, not a medical diagnosis. See [117] at 2–4.

A review of Lalk's resume and deposition testimony demonstrates that he is qualified to render an opinion as a vocational expert in this matter. Lalk is a licensed and certified counselor with approximately 38 years of experience as a vocational counselor or specialist, and he has offered vocational opinions in more than 140 matters in the last five years. He testified that he has significant experience with return-to-work and other employment considerations by way of his work on workers' compensation cases. See [117–1] at 19. Accordingly, Lalk's opinions on Plaintiff's ability to return to work are within the realm of his experience in evaluating the vocational capabilities. *Pree*, 408 F.3d at 871. Defendant's argument that Lalk should be disqualified from testifying in this particular case because he is not a doctor with expertise in substance abuse is inconsistent with the liberal approach to expert witness qualification taken by Rule 702. See *Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 801 (N.D. Ill. 2005). Further, Plaintiff has confirmed that Lalk is not being offered to diagnose Plaintiff's substance abuse, but instead to opine on Plaintiff's ability to return to work. See [117] at 3. "While making objective medical findings and diagnoses may be medical issues, once an individual's capabilities are defined, matching those abilities to a particular profession is not a medical matter or opinion." *Brewer v. Cuyahoga Valley Railway Co.*, 2004 WL 5508630, at *1 (N.D. Ohio Oct. 14, 2004) (finding vocational expert qualified to testify about a plaintiff's capabilities to return to work as a locomotive engineer). The same can be said about Defendant's overly restrictive argument that Lalk should be disqualified because he has not previously worked with locomotive engineers. See *id.* (finding the suggested requirement that vocational expert have previous experience with locomotive engineers too restrictive); see also *Smith*, 215 F.3d at 720 (district court erred in concluding that experts were not qualified in a relevant field solely because their expertise related to an area other than the one concerning the ultimate issue to be decided by the trier of fact).

**\*5** Although Defendant rightly points out that Lalk lacks experience in performing specific return-to-work

evaluations and that his experience with chemical dependency issues is thin and arguably out-of-date, the Court believes that disqualifying Lalk on these bases would amount to too narrow of a reading of Rule 702. As the Court finds that Lalk has the requisite foundation to offer opinions on Plaintiff's vocational abilities, Lalk's lack of specialization goes to the weight of his testimony, but does not disqualify him.

**B. Lalk's Opinions**

Finding that Lalk is qualified to offer vocational opinions in this case, the Court next analyzes whether the opinions offered by Lalk are sufficiently reliable and relevant to be presented to a jury. The reliability analysis focuses on the methodology of the expert. See *Clark v. Takata Corp.*, 192 F.3d 750, 756–57 (7th Cir. 1999). The relevance inquiry focuses on the application of the methodology and whether the expert testimony will assist the trier of fact with its analysis of any of the issues involved in the case. *Id.* at 757; *Smith*, 215 F.3d at 718.

1. Opinion that Plaintiff Was Fit
to Return to Work in May 2006

The parties do not dispute that Plaintiff completed Rush's intensive outpatient treatment program in May 2006. In his first opinion, Lalk uses this fact to draw the conclusion that, at the time of completion, Plaintiff was "fit to return to work." See, *e.g.*, [117–2] at 3 ("The discharge report from Rush Behavioral establishes that [Plaintiff] was fit to return to work."). Defendant argues that Lalk's opinion both is not based on a reliable method and is irrelevant. The Court agrees.

Turning first to Lalk's methodology, an expert must substantiate his opinion, and not simply provide the ultimate conclusion without analysis. *Clark*, 192 F.3d at 757 (citation omitted). The entirety of Lalk's "analysis" of whether Plaintiff was "fit to return to work" following his completion of the Rush outpatient treatment program hinges on Lalk's discussion of "two central criteria looked at when determining whether an individual is fit to return to work after treatment for substance abuse." [117–2] at 2. Lalk's report does little more than reference these general "criteria" and then conclusively set forth Lalk's subjective belief that their application proves that Plaintiff was fit to return to work in May 2006.

Specifically, the report states that these criteria are: (1) "whether the individual's job will invoke stress that would cause or trigger [him] to abuse drugs or alcohol," and (2) "whether that person will put others in danger if he is returned to work." *Id.* Through his report and deposition, Lalk fails to elaborate on these criteria, stating amorphously that they are drawn from "primarily overall training review of various pieces of literature on the subject and basically [Lalk's] own experience working with individuals with alcohol and drug dependencies" from 1979 to 1990. See [117–1] at 72–74. Lalk does not explain how to apply, analyze, or interpret the criteria. It appears from Lalk's report that the simple answers (1) "it will not" and (2) "he will not" could equal fitness to return to work, but this is not clearly set forth by Lalk in either his report or testimony.

In applying the first criterion, Lalk states that Plaintiff's "return to work in May of 2006 would not have put in him a position of stress so much as it would have resulted in him falling into substance abuse." [117–2] at 2–3. Lalk concedes that this conclusion is based on the absence of what he might consider relevant information in the records he reviewed. See [117–1] at 75 ("[T]here never seemed to be any issue in any of the records that I reviewed of [Plaintiff] ever abusing alcohol or drugs related to his job."); see also [117–2] at 3 ("there was no record of [Plaintiff] ever abusing alcohol or drugs while working for the Defendant[ ]"). In addition, Lalk explains that his conclusion regarding Plaintiff's stress levels rested on his unspecified "experience" "that a person that is working is usually under less stress than a person that's unemployed," not on any information specific to Plaintiff. See [117–1] at 75; see also *id.* at 76 ("there was never any indication" of Plaintiff's tolerance for stress in his work environment), 77–78 (explaining that some individuals derive stress from a fast-paced work environment and others thrive in that environment; "I don't know which—which type [Plaintiff] is."). For the second criterion, Lalk again relies on the lack of "evidence that [Plaintiff] would be a danger to himself or others or that he could not perform his job duties" in the documents he reviewed in this case. *Id.* at 3; see also [117–1] at 85 ("There was nothing in the record that suggested to me that his abuse of alcohol or drugs was in any way connected directly with performance at work.").

**\*6** Defendant argues that the two criteria discussed by Lalk are not adequately established and were not reliably

applied. [113] at 9–10. The Court agrees on both counts. First, Lalk has not provided any industry support as to how the criteria have been established—or any citation to where these criteria can be found—nor does he describe whether these criteria have been tested or subjected to peer review. In his deposition, Lalk again failed to explain where these criteria are found or how they are utilized by vocational counselors. See *Elcock v. Kmart Corp.*, 233 F.3d 734, 749 (3d Cir. 2000) (finding methodology of vocational rehabilitationist unreliable where she failed to introduce any evidence that the method was used by other experts or even referenced in vocational literature). What is more, Lalk does not describe any standards controlling this methodology, and in applying the criteria himself, Lalk relied only on speculation drawn from: (1) the absence of explicit statements in the limited records he reviewed and (2) his subjective and uninvestigated beliefs regarding Plaintiff's stress levels and tolerance. With these flaws, Lalk's "analysis" of Plaintiff's fitness to return to work in May 2006 is unreliable. See *Myers v. Ill. Central Railroad Co.*, 629 F.3d 639, 645 (7th Cir. 2010) (expert opinions that were based on a "hunch or an informed guess" were properly excluded); see also *Brown v. Burlington N. Santa Fe Railway Co.*, 765 F.3d 765, 773 (7th Cir. 2014) (affirming the exclusion of expert testimony that was premised on faulty methods and lack of investigation).

*Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809 (7th Cir. 2004), cited by Defendant, [113] at 15, supports this result. There, the Seventh Circuit affirmed the exclusion of expert testimony from a vocational rehabilitation counselor that the district court found to be speculative. Specifically, the proffered expert opined that plaintiff was capable of performing his job duties while acknowledging that she could offer no opinion on whether the plaintiff could perform specific job-related tasks. *Ammons*, 368 F.3d at 816. Similarly, in formulating his first opinion, Lalk states that Plaintiff was fit to return to work in May 2006 because a return would not have caused him stress, all the while acknowledging that he could not testify as to Plaintiff's work-related stress or tolerance thereof. [5]

[5]       Given that Lalk's report states that the Rush discharge report itself "establishes that [Plaintiff] was fit to return to work," it is unclear whether Lalk's "analysis" of the two above-described criteria played any real role in his conclusions. See [117–1] at 91

("If [Lynch is] indicating that [Plaintiff] could return to work at full responsibilities without restriction, then I'm not sure what else the EAP was looking for. He had met the requirements of the treatment program, so I would certainly accept the opinion of the discharge summary."). Giving Plaintiff the benefit of the doubt, the Court has analyzed Lalk's "application" of the criteria as his methodology, but the Court notes that Lalk's testimony obscures whether he even relied on his own criteria in rendering his opinion or whether he simply came to the conclusion on the face of the Rush discharge report alone. Either way, the only thing connecting the data and Lalk's opinion is his own say-so, which is unacceptable. See *Gen. Elec. Co.*, 522 U.S. at 146 ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").

In response, Plaintiff, who bears the burden of establishing that Lalk's testimony satisfies the *Daubert* standard, argues that Lalk's extensive expertise is the basis of his methodology and that courts have found the simple application of expertise to case documents to be an acceptable methodology.[6] See [117] at 5. The Court acknowledges that an expert's reliance on experience alone does not render his opinion unreliable, see 2000 Advisory Committee Notes to Rule 702, but both Plaintiff and Lalk fail to sufficiently explain how he has applied his extensive expertise to the facts of this case. His report only offers factual recitations and conclusions without any tangible substantiation. *Clark*, 192 F.3d at 757. The Seventh Circuit is clear: "[t]alking off the cuff—deploying neither data nor analysis—is not an acceptable methodology." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 608 (7th Cir. 2006) (citation omitted); see also *Zenith Elecs. Corp. v. WH–TV Broad. Corp.*, 395 F.3d 416, 418 (7th Cir. 2005) (" 'expert intuition[ ]' is neither normal among social scientists nor testable—and conclusions that are not falsifiable aren't worth much to either science or the judiciary").

[6]     Plaintiff cites *Heckler & Koch, Inc. v. German Sport Guns GmbH*, 71 F. Supp. 3d 866 (S.D. Ind. 2014) in support, but the Court finds the expert analysis in that case distinguishable. That expert (who was designated to provide testimony on the protectability of a trade dress) derived his opinion from his expertise, the facts of the case, and his "extensive review of the MP5 in comparison to other guns of similar type available

in the market." *Id.* at 907–08. And in presenting his opinion, he provided sufficient factual discussion and analysis to enable the fact finder to infer that the MP5 at issue in the litigation had acquired a secondary meaning, rather than merely presenting the conclusion that it had acquired a secondary meaning.

**\*7** The Court further disagrees with Plaintiff's suggestion that vocational experts are not suited to the use of scientifically reliable methods in generating their opinions. To this point, other courts have found the well supported opinions of vocational experts to be reliable and scientifically sound, unlike the speculative and conclusory opinion Lalk offers here. See, *e.g.*, *Hale v. Gannon*, 2012 WL 3866864, at \*4–\*5 (S.D. Ind. Sept. 5, 2012) (finding vocational expert's methodology to be scientifically reliable where expert derived plaintiff's functional limitations from medical records; applied light work limitations from the Dictionary of Occupational Titles; used the Bureau of Labor Statistics to determine wages; utilized a scientific report regarding work-life expectancy; and cited all of these sources in her report); *Orner v. Nat'l Beef Packaging Co., LLC*, 2015 WL 8334544, at \*9–\*10 (M.D. Pa. Dec. 9, 2015) (vocational rehabilitation expert's methodology was reliable where he reviewed ADA treatises, met with and evaluated the plaintiff, inspected the plaintiff's work area, observed the plaintiff's work environment, and researched potential tools to assist the plaintiff at work; "importantly, [this methodology] can be replicated, tested, verified, or debunked"); *Brewer*, 2004 WL 5508630, at \*2 (regarding the reliability of a locomotive-engineer return-to-work opinion offered by a vocational expert, noting, without deciding, that the expert relied on a treatise, plaintiff's medical records, job descriptions in the Dictionary of Occupational Titles, an interview regarding the plaintiff's job responsibilities, and other things); see also *Elcock*, 233 F.3d at 747 (a vocational rehabilitationist assessing an expert's determinations would want to be able to test the underlying hypotheses and review the standards controlling the operation of the techniques applied in an attempt to reproduce the results).

The Court simply cannot discern the requisite link between the records on which Lalk relied and his conclusion that Plaintiff was fit to return to work upon his completion of the Rush outpatient treatment program in 2006. *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003) ("It is critical under Rule 702 that there be a link between the facts or data the expert has

worked with and the conclusion the expert's testimony is intended to support."); *Gen. Elec. Co.*, 522 U.S. at 146. In formulating his opinion, Lalk does little more than review Plaintiff's discharge statement from Rush, note the absence of certain information in the documents reviewed, impute unsupported generalities to Plaintiff, and reach a bottom line conclusion. In so doing, Lalk provides nothing more than subjective assertions that are impermeable to challenge and incapable of repetition by anyone other than himself. In short, Lalk's opinion that Plaintiff was fit to return to work in May 2006 amounts to the kind of *ipse dixit* that the Supreme Court has prohibited (see *Gen. Elec. Co.*, 522 U.S. at 146) and is therefore inadmissible. [7]

[7]    Plaintiff argues that the medical records Lalk reviewed in forming his opinions are reliable, and he cites *Walker v. Soo Line R. Co.*, 208 F.3d 581, 586 (7th Cir. 2000), for the proposition that "[m]edical professionals reasonably may be expected to rely on self-reported patient histories." (Citation omitted). This argument misses the point. Not only is Lalk, by Plaintiff's own admission, not a medical professional so as to be covered by this proposition, but Defendant has not argued at any point to date that Lalk's review and reliance on Plaintiff's medical records renders his opinions unreliable. True, Defendant argues that Lalk did not rely on sufficient facts or data to support his opinions, but that is not the same. Further, the use of a permissible or reliable source cannot save Lalk's speculative and conclusory opinion here, which lacks the connective reasoning that ties those records—or any other supporting data—to the expert's ultimate opinions.

As an additional point, Lalk's opinion that Plaintiff was fit to return to work in May 2006 is also irrelevant. The relevance inquiry focuses on the application of an expert's methodology to the facts of the case and the overall helpfulness to the jury. *Daubert*, 509 U.S. at 593; *Smith*, 215 F.3d at 718. First, as already discussed, Lalk "methodology" is all but non-existent. Second, to the extent that Lalk's opinion merely notes that Defendant did not accept the discharge report at face value, this is readily apparent from the face of the documents in this case and Lalk does not offer any specialized knowledge in highlighting the dispute. See, *e.g.*, [117–1] at 70 ("I'm just pointing out that [Dr. Henry's] conclusions seemed to be different than the opinions of the treating personnel, the medical personnel at Rush."), 91 ("If [Lynch is] indicating that [Plaintiff] could return to work at full responsibilities

without restriction, then I'm not sure what else the EAP was looking for."); see also *Benson*, 941 F.2d at 604 (it was an abuse of discretion to admit expert testimony that, in part, drew inferences the jury was qualified to draw). Third, "[a]n expert witness is not permitted to parrot what some lay person has told him and testify that he believes the person was being truthful." *Goldberg v. 401 N. Wabash Venture LLC*, 755 F.3d 456, 461 (7th Cir. 2014); see also *Benson*, 941 F.2d at 604 ("[T]he jury does not need an expert to tell it whom to believe, and the expert's 'stamp of approval' on a particular witness' testimony may unduly influence the jury."). Lalk's opinion at times parrots the Rush discharge report completed by Lynch, while at the same time discrediting the conclusions reached by Dr. Henry. For example, Lalk's report states that Plaintiff denies making certain statements to Dr. Henry in 2006, and that it is Lalk's opinion that "[i]f the jury were to accept [Plaintiff's] testimony there is absolutely no basis for any further treatment." [117–2] at 3. Not only does this opinion border on an impermissible credibility determination, *Goodwin v. MTD Prods., Inc.*, 232 F.3d 600, 609 (7th Cir. 2000) ("[A]n expert cannot testify as to credibility issues."), in opining as to whether additional medical treatment was required, it also pushes Lalk's opinions beyond the bounds of his vocational expertise and purports to offer a medical opinion that he is not qualified to give. For all of these reasons, Lalk's opinion that Plaintiff was fit to return to work in May 2006 does not satisfy *Daubert*.

## 2. Opinion that Defendant Improperly Denied Plaintiff the Opportunity to Return to Work in 2008

**\*8** The Court also finds Lalk's second opinion, that "Defendant[ ] again improperly denied [Plaintiff] the ability to return to work" at some indefinite point in 2008, unreliable. Lalk's report indicates that this opinion is supported by (1) Plaintiff's completion of additional treatment and (2) Defendant's improper "stalling" or "unnecessary delay." [117–2] at 3. To the extent that Lalk opines that Plaintiff was able to return to work in 2008, this opinion is *ipse dixit* like his first opinion. To the extent that Lalk offers an opinion on Defendant's motives and rationale, this opinion is again speculative and it also improperly opines on matters outside of Lalk's expertise.

First, in discussing Plaintiff's abilities, Lalk jumps from facts to conclusions with even less "analysis" than his

first opinion. Lalk's report states that Plaintiff had completed "nearly two (2) years of additional treatment," he had "a period of sobriety since 2006," and at one point, he "successfully completed" certain requirements set forth by Dr. Henry. See *id.* Despite listing these factors, Lalk does not explain what about the additional treatment, period of sobriety, or completion of Dr. Henry's requirements qualified Plaintiff to return to work. In fact, he does not even attempt to (1) apply the two aforementioned "criteria" Plaintiff's situation in 2008, (2) analyze Plaintiff's fitness or abilities by any other method or rubric, or (3) discuss Plaintiff's job requirements or work environment. Again, *Daubert* requires that an expert's opinion must be grounded in "methods and procedures," and must consist of more than simply "subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 589. It may well be that this opinion lacks analysis because it is inherently reliant on Lalk's first opinion that Plaintiff was fit to return to work as of May 2006. As the Court already explained, that opinion is unreliable, and as such, any subsequent opinion predicated on that opinion, without any independent methodology or analysis, is also unreliable. See *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 745.

Second, to the extent that this opinion discusses Defendant's "improper denial" instead of Plaintiff's vocational fitness, Lalk concedes that it is based entirely on speculation. See *Ammons,* 368 F.3d at 815 (affirming the exclusion of expert testimony that was not based on any specific methodology applied to the facts but was only unsupported speculation). Specifically, at his deposition, Lalk conceded that he did not know why Defendant "stalled" Plaintiff's return to work: "I don't know if [Defendant was] doing that because [it was] following the advice of Dr. Henry, somebody misfiled paperwork, somebody had a grudge against [Plaintiff]. I can figure out all sorts of things that might be happening but I don't have the records of the decision makers at that time or what exactly was going on. So I'm just concluding that this may have been the reason why he was not reinstated in 2008." See [117–1] at 107. Moreover, in this opinion, Lalk again steps beyond the realm of his expertise in vocational matters to opine on the propriety of Defendant's actions. See, *e.g.*, [117–2] at 3 (discussing the sleep study and C–Pap machine issues, and opining that Defendant should have "addressed this issue in 2006, while [Plaintiff] still had insurance."). These are not opinions that Lalk is qualified to provide, as they have nothing whatsoever to do with

Plaintiff's vocational rehabilitation or abilities. See [117] at 3. Accordingly, the Court finds that Lalk's second opinion is unreliable and inadmissible.

### 3. Opinion on Damages

In his third opinion, Lalk concludes that "Defendant's failure to allow [Plaintiff] to return to work proximately caused damage to [Plaintiff] in the form of unpaid wages, medical bills and unnecessary professional fees." [117–2] at 2. Specifically, Lalk notes that Plaintiff made $72,000 as an engineer in 2005, and he therefore opines that Defendant's failure to return Plaintiff to work "resulted in an approximately $360,000.00 loss in wages and earnings." *Id.* at 3–4. Lalk's report does not specify the amount of medical and professional fees that Plaintiff "had to pay," although it notes that Defendant "cover[ed] the costs of treatment by way of Plaintiff's insurance." *Id.* at 2, 4. At his deposition, Lalk testified that the basis for his opinion on Plaintiff's damages was "a gross estimate of what [he] was told [Plaintiff's] wages were and the amount of time that he was not working"; Lalk testified that he procured this information from Plaintiff's deposition. [117–1] at 119. Lalk confirmed that in coming up with his damages amount, he performed a "straight back pay calculation," simply multiplying Plaintiff's yearly wages ($72,000) by the amount of time he was out of work (four years). *Id.* at 119–20. Defense counsel pointed out that $72,000 multiplied by four equals $288,000, not $360,000. Lalk agreed that he had miscalculated Plaintiff's back pay. *Id.* In addition, Lalk testified that he did not consider benefits in his calculation, and he confirmed that he did not consider mitigation, even though he agreed that any back pay wages should be reduced by the amount of mitigation. *Id.* at 120–22. Finally, as to the medical and professional fees Lalk mentioned in his damages opinion, Lalk conceded that he did not have dollar amounts for either, and he confirmed that the "professional fees" referenced are attorneys' fees. *Id.* at 122–23.

**\*9** Defendant argues that Lalk's damages opinion is not reliable or relevant. See [113] at 11–12, 14. Plaintiff does not offer a specific response to Defendant's arguments on Lalk's opinion on damages. The Court again agrees with Defendant. [8] As to Lalk's opinion on Plaintiff's back-pay damages, his "gross estimate" is speculative and does not demonstrate the level of "intellectual rigor" envisioned by *Daubert*. In addition, his report contains a mathematical

error in the straightforward back pay calculation, and Lalk admittedly did not consider any other information or items other than Plaintiff's annual wages in forming this opinion. He does nothing to analyze or include mitigating factors or benefits paid by Defendant. Perhaps even more strikingly, Lalk does nothing to analyze or even attempt to estimate the non-back pay damages on which he purports to opine. As such, Lalk's damages opinion is not based on "sufficient facts or data" as required by Rule 702, and it is not reliable. [9]

---

[8]    Lalk's opinion on damages is also impermissible to the extent that it states a legal conclusion, *i.e.*, that Defendant "proximately caused" Plaintiff's damages. See *Good Shepherd Manor Found. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) (excluding expert testimony that consisted of legal conclusions).

[9]    Lalk's opinion that Plaintiff's damages include his attorneys' fees also is impermissible. Although the ADA permits an award of "reasonable attorney's fees" to the prevailing party, 42 U.S.C. § 12205, Lalk is neither qualified to opine on this topic in general nor does he have any personal knowledge of the actual fees or work involved. This is apparent through the absence of any attempt in his report to quantify the total amount of attorneys' fees, let alone "reasonable" attorneys' fees.

Further, Lalk's simple back pay calculation based on figures supported only by testimony elicited in Plaintiff's deposition does not involve the application of specialized knowledge to the facts of the case. Because any layperson can grasp the simple concept and conduct the same analysis employed by Lalk here, his opinion on Plaintiff's damages in this case also is inadmissible because it is not relevant. See *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 329 (N.D. Ill. 2008) ("[N]o expert testimony is needed when the subject matter of the testimony is clearly within the average person's grasp."). Not only that, Lalk's statement that Plaintiff has some unspecified amount of non-back pay damages provides nothing of use to the jury.

### IV. Conclusion

For the foregoing reasons, Defendant's motion to exclude Lalk's testimony in this case [112] is granted. This case is set for status hearing on July 12, 2017 at 9:30 a.m.

### All Citations

Slip Copy, 2017 WL 2656583

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1636431
Only the Westlaw citation is currently available.
United States District Court, E.D. Kentucky,
Central Division, at Lexington.

George Vincent VAUGHN, Plaintiff,
v.
KONECRANES, INC.,
Defendant/Third Party Plaintiff
v.
Demag Cranes and Components Corp.;
Hetronic USA, Inc.; and Central Motor Wheel
of America, Inc., Third Party Defendants.

Civil Action No. 5: 14–136–DCR.
|
Signed April 13, 2015.

**Attorneys and Law Firms**

David Rollins Marshall, Marshall Law Office, Lexington, KY, for Plaintiff.

Jane C. Higgins, Jennifer Maria Jabroski, Phillips Parker Orberson & Arnett PLC, Licha H. Farah, Jr., Ward, Hocker & Thornton, Lexington, KY, for Defendants.


**MEMORANDUM OPINION AND ORDER**

DANNY C. REEVES, District Judge.

*1 This matter is pending for consideration of the Defendant Konecranes, Inc.'s motion to preclude Frederick G. Heath from testifying during trial in a manner consistent with the matters outlined in his expert reports. [Record no. 96] For the reasons discussed below, the defendant's motion will be granted.


**I.**

As discussed in prior orders, this action arises from a warehouse accident involving an industrial overhead crane. On May 8, 2012, while working at Central Motor Wheel of America, Inc. ("CMWA"), Plaintiff George Vincent Vaughn was injured when a crane pinned his foot. [Record No. 1–2, p. 21] Vaughn brought suit against Konecranes in the Bourbon Circuit Court under various

theories of negligence and product liability. Thereafter, the action was removed to this Court. [Record No. 1] The Court entered a Scheduling Order, assigning deadlines for discovery and dispositive motions and setting the case for trial to begin on August 18, 2015. [Record No. 12] Under that Scheduling Order, the parties were to complete discovery and supplement disclosures by February 2, 2015. [*Id.*]

The plaintiff hired Heath as a liability expert and expects him to testify regarding "why and how Mr. Vaughn was hurt," including offering opinions on Konecranes' alleged violation of a Crane Manufacturing Association of America Standard and the cause of the crane's malfunction. [Record No. 129–1, p. 4] On November 17, 2014, Heath issued his initial report. [Record No. 90–3] After the close of discovery, the plaintiff notified the Court of the necessity to supplement Heath's report based on newly-discovered information. [Record No. 91] The supplemental report was tendered on March 18, 2015. [Record No. 120–1] The defendant has raised objections to Heath's testimony based on Rule 702 of the Federal Rules of Evidence and the principles set out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Konecranes attacks the reliability of Heath's initial report and argues that the supplemental report was untimely and should be excluded.


**II.**

Any challenge to expert testimony must begin with Rule 702 of the Federal Rules of Evidence which was modified in December 2000 to reflect the Supreme Court's holdings in *Daubert* and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Rule 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702.

Based on the foregoing, for an expert's opinion to be admissible, it must satisfy three requirements. "First, the witness must be qualified by knowledge, skill, experience, training, or education. Second, the testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue. Third, the testimony must be reliable." *In re Scrap Metal Antitrust Litigation,* 527 F.3d 517, 529–30 (6th Cir.2006). When a party's expert witness is challenged, the Court assumes the role of a gatekeeper to determine whether the proposed testimony may be presented to the fact-finder. *Daubert,* 509 U.S. at 587.

**\*2** The Court need not hold a *Daubert* hearing to determine the admissibility of expert testimony, but nonetheless must ensure that the disputed testimony is both relevant and reliable. *See Nelson v. Tennessee Gas Pipeline Co.,* 243 F.3d 244, 249 (6th Cir.2001); *Clay v. Ford Motor Co.,* 215 F.3d 663, 667 (6th Cir.2000). In the case at hand, the admissibility of the expert testimony under *Daubert* has been fully briefed by the parties. This Court finds that the record is sufficient to perform its role under *Daubert* and a hearing would not be helpful in exercising that duty.

### III.

#### A. March 2015 Report

The defendant's motion to strike Heath as an expert is based largely on the initial report dated November 17, 2014. [Record No. 90–3] However, the plaintiff has supplemented Heath's initial report with another, dated March 20, 2015,[1] following the discovery of new information. [Record No. 120–1] Because Heath's March 2015 report was produced after the close of discovery and the deadline for expert testimony, Konecranes argues that it is untimely and testimony based on the report would be prejudicial. [Record No. 124] Conversely, the plaintiff maintains that this report should not be excluded because the defendant did not make its witnesses available for deposition at an earlier time. [Record No. 129–1]

1   This date appears to be in error, as the plaintiff submitted the report on March 18, 2015. [Record No. 120–1]

Rule 26(a)(2)(A) directs a party to "disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed.R.Civ.P. 26(a)(2)(A). These disclosures must be made "at the times and in the sequence that the court orders." Fed.R.Civ.P. 26(a)(2)(D). Rule 26(a)(2)(B) requires a written report be disclosed that "contain[s] a complete statement of all opinions to be expressed and the basis and reason therefor." Fed.R.Civ.P. 26(a)(2)(B). Rule 26(e) requires that a party who has made a disclosure under Rule 26(a) supplement that expert report in a timely manner if the party learns that a material part of the disclosure is incomplete or incorrect and if the information has not been known to the other party during discovery. Fed.R.Civ.P. 26(e).

The circumstances of this case underscore the importance of adhering to the Court's Scheduling Order and proceeding with timely discovery. It appears that counsel for several parties contributed to discovery delays and postponed key witness depositions. [Record Nos. 133–2, 133–3] These parties will not now be permitted to gain strategic advantage from the delays and induce technical violations rather than proceed on the merits of the case. Apparently, the defendant was aware that Heath's initial report would be supplemented following the deposition of Konecranes' employees, but counsel scheduled these depositions for the final business day of discovery. [*Id.*] Under these circumstances, the Court will accept the plaintiff's otherwise untimely expert report because it does not appear to result from a dilatory motive and purportedly relies on information disclosed only at the end of discovery. [Record No. 133] The Court finds the plaintiff's explanation reasonable and substantially justified. *See* Fed.R.Civ.P. 37(c)(1); *Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transport,* 596 F.3d 357, 370 (6th Cir.2010). Accordingly, the Court will include Heath's March 2015 report in its *Daubert* determination.

#### B. Reliability Requirement for Expert Testimony
**\*3** In addition to requirements that a witness qualify as an expert and that the opinions he wishes to express be relevant, Rule 702 requires that the opinions be reliable. *In re Scrap Metal,* 527 F.3d at 529. District courts consider the basis of an expert's opinion by evaluating:

(i) whether the theory or technique can be and has been tested; (ii) whether it has been subjected to peer review and publication; (iii) its known or potential error rate and the existence and maintenance of standards controlling the technique's operation; (iv) whether it has attracted widespread acceptance in a particular field; and (v) whether the experts propose to testify about matters "growing naturally and directly out of the research they have conducted independent of the litigation" or have developed their opinions expressly for trial. *Smelser v. Norfolk Southern R. Co.,* 105 F.3d 299, 303 (6th Cir.1997).

When assessing the reliability of opinions a witness seeks to provide as expert testimony, "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire,* 526 U.S. at 142. Generally, opinions meet the reliability threshold when an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice in the relevant field." *Jahn v. Equine Serv., PSC,* 233 F.3d 382, 388 (6th Cir.2000) (citing *Kumho Tire,* 526 U.S. at 152).

In this case, Konecranes' major criticism of Heath's report—that it lacks any methodology at all—is well-taken. [Record No. 96–1] Without any identifiable method of reasoning, Heath's testimony is facially unreliable. *See Reynolds v. Freightliner LLC,* 2006 U.S. Dist. LEXIS 97244, at *27, 2006 WL 5249744 (E.D. Ky. June 21, 2006). Heath fails to explain how, given the facts and data he relied upon, he reached the conclusions outlined in his report. His report simply concludes, *inter alia:* (i) "either the bridge drive relay in the receiver stuck or the bridge drive contactor fused"; (ii) "[it] is more likely than not that the cause of the incident at issue was a fused contactor"; (iii) "[it] is clear that a sticking relay in the radio control receiver did not initiate the unintended motion of the crane"; (iv) "Konecranes actions and inactions were the major contributing causes of the incident that resulted in the injuries to Mr. Vaughn"; and (v) "[if] Konecranes had followed the guidelines set forth in CMAA [Specifications] it is more likely than not that the bridge drive contactor(s) would have been replaced prior to the incident, the incident would not have occurred, and [Vaughn] would not have been injured." [Record No. 120–1, pp. 12, 15–16]

In determining whether a particular methodology is reliable, this Court is not required to "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *See Kumho Tire Co.,* 526 U.S. at 158. The party seeking to have the testimony admitted bears the burden of showing "that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology," and "the expert's bald assurance of validity is not enough." *Daubert* (on remand), 43 F.3d at 1316. Here, Heath's opinion is simply insufficient. Absent some process or testable principle, the Court is unable to determine whether Heath's conclusions are "the product of reliable principles and methods" or whether he "reliably applied the principles and methods to the facts of the case." Fed.R.Evid. 702. These are the threshold requirements for the admission of expert testimony.

**\*4** Heath's report identifies certain documents that he reviewed in forming his opinions. [Record No. 120–1, pp. 1–2] However, it is unclear which documents were actually used by him in formulating his opinions, and explanation of how his experience informed his conclusions is completely absent. It is the absence that makes Heath's testimony patently unreliable. Without such an explanation, there is simply too great an analytical gap between the facts of the case and the opinion proffered to permit Heath's testimony to go to the jury.

Vaughn attempts to premise Heath's testimony on his extensive training and experience with "lifting heavy things." [Record No. 129–1, p. 3] The plaintiff argues that Heath's experience is sufficient to support his opinions in this case. It is well-established that an expert's experience may be the basis for reliable testimony. The Advisory Committee Notes to Rule 702 specifically contemplate such a situation:

> Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training, or education—may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1636431

Fed.R.Evid. 702 advisory committee's note (2000). However, it is not sufficient for an expert merely to cite to his experience without further explanation. Rather, an expert must be able to articulate the connection between his experience and his conclusions in a particular case:

> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it."

*Id.*

Heath's report describes his credentials and experiences, which include membership in the American Society of Safety Engineers, the Automotive Life Institute, the Society of Automotive Engineers, the Scaffold and Access Industry Association, the Specialized Carriers and Riggers Association, Underwriter's Laboratories, and the Material Handling Industry of America. [Record No. 120–1, p. 3] In addition, Heath serves on the consensus body for Specifications for Cable-less Controls for Electric Overhead Traveling Cranes and committees within the American Society of Mechanical Engineering for Overhead Hoists; Jacks, Industrial Rollers, Air Casters, and Hydraulic Gantries; and Below–the–Hook Lifting Devices. [*Id.*] In the past, Heath has served as chief executive officer of a lift manufacturing company and chief operating officer of a pressure vessel manufacturing company. Regardless, nothing in the record or the expert report describes how his experience led to his conclusions or explains how he reliably applied his experience to the facts of the case. Heath's report does not articulate a reliable connection between his experience and his conclusions in any way, much less to the extent described in the Advisory Committee Notes to Rule 702.

**\*5** Moreover, contrary to the plaintiff's assertion that "Mr. Heath's opinions is [sic] based on published standards that were created to be representative of generally accepted industry custom and practice," [Record No. 129–1, p. 4] the reports do not discuss these standards. Apart from conclusorily stating that, "[there] is no evidence that Konecranes followed the specific instructions of CMAA Specification # 78, Paragraph 4.4.4 and Table 4.4.2 that the Quarterly inspections of the CMWA cranes cover electrical components (including contactors and relays) for pitting or deterioration," [Record No. 120–1, p. 10] the reports do not articulate the proper inspection procedure or apply the industry-accepted specifications to the facts of the case. Although a qualified expert may testify regarding the customs and standards of an industry, Heath has not done so here. *See McGowan v. Cooper Industries, Inc.,* 863 F.2d 1266, 1272–73 (6th Cir.1988). As a result, his testimony is not "the *product of* reliable principles and methods" and Heath has not "*reliably applied* the principles and methods to the facts of the case," as required by Rule 702. [Record No. 1201, p. 16]

### IV.

Heath's conclusions are unreliable because he has failed to explain his reasoning, verify his methods, or point to others who have done so. *See, e.g., Smelser,* 205 F.3d at 304. The reliability of Heath's opinions has not been established by a preponderance of evidence and his opinions do not meet the admissibility requirements of Rule 702. Accordingly, it is hereby

**ORDERED** that Defendant Konecranes' motion to preclude Frederick G. Heath from testifying as an expert witness during trial [Record No. 96] is **GRANTED.**

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1636431

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.