**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| | ) | |
| PECO PALLET, INC., | ) | Case No. 1:15-cv-06811 |
| | ) | |
| Plaintiff, | ) | Honorable Andrea R. Wood |
| v. | ) | Magistrate Judge Michael T. Mason |
| | ) | |
| NORTHWEST PALLET SUPPLY CO., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NORTHWEST PALLET SUPPLY CO., | ) | |
| | ) | Case No.: 3:15-cv-50182 |
| Plaintiff, | ) | |
| | ) | Honorable Andrea R. Wood |
| v. | ) | Magistrate Judge Michael T. Mason |
| | ) | |
| PECO PALLET, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**PECO PALLET, INC.'S CONSOLIDATED OPPOSITION
TO NORTHWEST PALLET SUPPLY CO.'S MOTION TO
EXCLUDE THE TESTIMONY OF JONATHAN GURYAN AND
<u>MOTION TO EXCLUDE THE TESTIMONY OF HENRY J. QUESADA</u>**

Daniel D. Rubinstein
William C. O'Neil
Thomas G. Weber
WINSTON & STRAWN LLP
35 West Wacker Dr.
Chicago, IL 60601
(312) 558-5600

*Attorneys for PECO Pallet, Inc.*

July 16, 2018

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

OPPOSITION TO NORTHWEST'S MOTION TO  EXCLUDE THE TESTIMONY OF JONATHAN GURYAN ................................................................................................. 3

BACKGROUND ........................................................................................................... 3

      A.     Dr. Guryan Is an Economics Expert ............................................................ 3

      B.     Dr. Guryan's Reports ................................................................................... 4

ARGUMENT ................................................................................................................. 9

   I.     Dr. Guryan's Qualifications as an Economist Are Outstanding, and He Is Well Qualified to Opine in This Case .................................................... 9

   II.    Dr. Guryan's Opinions Are Based on a Reliable and Well-Accepted Methodology ................................................................................................ 10

      A.     Dr. Guryan's Application of Economic Principles to Use Market Prices to Estimate Northwest's Cost for Providing SS&L Services Is Proper ................................................................................................... 10

      B.     Northwest's Criticisms of Dr. Guryan's Analysis Are Subjects for Cross-Examination and Do Not Provide Any Basis to Exclude .............. 12

   III.   Dr. Guryan Relied on Proper Documents and Data ................................. 15

   IV.   Dr. Guryan's Testimony Will Assist the Trier of Fact ............................. 17

OPPOSITION TO NORTHWEST'S MOTION TO EXCLUDE THE TESTIMONY OF HENRY J. QUESADA ................................................................................................. 18

BACKGROUND ......................................................................................................... 18

      A.     Dr. Quesada Has Expertise in Performing Time Study Analysis ............ 18

      B.     Dr. Quesada's Report ................................................................................ 19

ARGUMENT ............................................................................................................... 21

   I.     Dr. Quesada Is Qualified as an Expert ..................................................... 21

   II.    Dr. Quesada's Methodology Based on Time Study Analysis Is Reliable ........... 21

   III.   Dr. Quesada's Testimony Will Assist the Trier of Fact ........................... 24

CONCLUSION ............................................................................................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baugh v. Cuprum S.A. de C.V.*,
  845 F.3d 838 (7th Cir. 2017) ...................................................9

*Blue Dane Simmental Corp. v. Am. Simmental Ass'n*,
  178 F.3d 1035 (8th Cir. 1999) ................................................16

*In re Brand Name Prescription Drugs Antitrust Litig.*,
  No. 94 C 897, 1994 WL 663590 (N.D. Ill. Nov. 18, 1994)....................24

*Broussard v. Maples*,
  535 F. App'x 825 (11th Cir. 2013) ...........................................14

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
  363 F.3d 761 (8th Cir. 2004) ................................................16

*Daubert v. Merrill Dow Pharms., Inc.*,
  509 U.S. 579 (1993).................................................... *passim*

*Felder's Collision Parts, Inc. v. All Star Advert. Agency, Inc.*,
  777 F.3d 756 (5th Cir. 2015) .............................................10, 17

*General Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)..........................................................16

*Goldenberg v. Indel, Inc.*,
  No. 09-5202, 2012 WL 3780555 (D.N.J. Aug. 30, 2012) ......................12

*Hernandez v. Crown Equip. Corp.*,
  92 F. Supp. 3d 1325 (M.D. Ga. 2015) ......................................22

*In re High Fructose Corn Syrup Antitrust Litig.*,
  295 F.3d 651 (7th Cir. 2002) ................................................10

*Matter of the Complaint of Ingram Barge Co.*,
  No. 13 C 3453, 2016 WL 3763423 (N.D. Ill. July 14, 2016) .................13

*Janich Bros. v. Am. Distilling Co.*,
  570 F.2d 848 (9th Cir. 1977) .............................................11, 17

*Kleen Products LLC v. Int'l Paper*,
  No. 10 C 5711, 2017 WL 2362567 (N.D. Ill. May 31, 2017) ..................9

*Lapsley v. Xtek, Inc.*,
689 F.3d 802 (7th Cir. 2012) ...................................................................11, 15, 17

*Lees v. Carthage Coll.*,
714 F.3d 516 (7th Cir. 2013) ...................................................................15

*Lugo v. Farmer's Pride Inc.*,
No. 07-0749, 2011 WL 2550376 (E.D. Pa. June 23, 2011)...................22

*Manpower, Inc. v. Ins. Co. of Penn.*,
732 F.3d 796 (7th Cir. 2013) ...................................................13, 15, 22, 23

*Midcoast Aviation, Inc. v. Gen. Elec. Credit Corp.*,
907 F.2d 732 (7th Cir. 1990) ...................................................................18, 25

*Phillips v. Raymond Corp.*,
364 F. Supp. 2d 730 (N.D. Ill. 2005) .......................................................10

*Smith v. Ford Motor Co.*,
215 F.3d 713 (7th Cir. 2000) .............................................................9, 15, 21, 24

*In re Steel Antitrust Litig.*,
No. 08 C 5214, 2015 WL 5304629 (N.D. Ill. Sept. 9, 2015).................24

*Stollings v. Ryobi Techs., Inc.*,
725 F.3d 753 (7th Cir. 2013) ...................................................................15

*Suchanek v. Sturm Foods, Inc.*,
No. 11-CV-565, 2017 WL 3704206 (S.D. Ill. Aug. 28, 2017)...............11

*Tilstra v. BouMatic LLC*,
791 F.3d 749 (7th Cir. 2015) ...................................................................23

*Traharne v. Wayne/Scott Fetzer Co.*,
156 F. Supp. 2d 697 (N.D. Ill. 2001) .......................................................12

*United States v. Borden Co.*,
370 U.S. 460 (1962)...................................................................................22

*United States v. Mitchell*,
365 F.3d 215 (3d Cir. 2004)......................................................................18

*Verizon Commc'ns, Inc. v. FCC*,
535 U.S. 467 (2002)...................................................................................10

## Other Authorities

Perloff, Jeffrey M., *Microeconomics* 233 (2d ed. 2001).................................11

Northwest Pallet Supply Co.'s ("Northwest") motions to exclude the testimony of PECO Pallet, Inc.'s ("PECO") experts Dr. Jonathan Guryan and Dr. Henry Quesada are without merit and should be denied. Northwest fails to offer any legitimate reason to exclude either expert's opinions. Instead, Northwest's *Daubert* challenges serve a more strategic purpose—to distract the Court from the fatal deficiencies of Northwest's own experts. PECO has retained two experts: (1) Dr. Guryan, an renowned economist, who applied fundamental economic principles that have been endorsed by the U.S. Supreme Court, the Seventh Circuit, other courts across the country, and leading economics scholars—specifically, that in a competitive market, prices will tend to be at least as high as marginal cost—to analyze market prices to opine on the cost incurred by Northwest to stack, sort, and load PECO pallets (the "SS&L Services"); and (2) Dr. Quesada, a Ph.D. industrial engineer who used a well-established time study methodology—in which he personally observed and measured the time it takes to perform the particular labor tasks performed in SS&L Services—to calculate a complementary measure of the cost of SS&L Services, which corroborates Dr. Guryan's conclusions.

In contrast, Northwest hired three wood products industry specialists to opine on matters involving the unrelated fields of antitrust economics, forensic accounting analysis, and unjust enrichment damages—on which they severely lack qualifications and any reliable methodology. Accordingly, PECO has filed its own *Daubert* motions to exclude Northwest's experts' testimony. *See* Dkt. Nos. 226, 227, 228.[1] But Northwest seeks to muddy the waters—hoping the Court will throw up its hands at the avalanche of motions before it—allowing Northwest's own inadmissible experts to sail through to testify at trial. The Court should not take the bait.

---

[1] This dispute has been litigated in two parallel proceedings under separate case numbers, which have now been consolidated. For clarity, all docket citations in this Opposition refer to Case No. 1:15-cv-06811.

Northwest fails to put forth any basis to challenge the admissibility of Dr. Guryan's opinions. It tries to attack Dr. Guryan's analysis by claiming he never tested his "assumption" that the market price that a seller of a service accepts will be at least as high as its costs. This is no "assumption." It is bedrock economic theory that the market prices of a service reflect the marginal cost of the service to the seller and the value of the service to the buyer. Dr. Guryan applied this economic principle to analyze market prices charged by several categories of market participants who provide the same or similar SS&L Services that Northwest provides, and used this data to calculate the cost to Northwest. Thus, Northwest's challenge to Dr. Guryan's economic methodology should be rejected outright. And Northwest's jumble of other reasons for excluding Dr. Guryan—including that he used "untested assumptions" and "cherry-picked" certain individual pieces of data—are issues for cross-examination and not a basis to exclude any expert.

Northwest's motion to exclude Dr. Quesada's testimony is equally deficient. Like its critiques of Dr. Guryan, Northwest claims to attack Dr. Quesada's established time study methodology, but it only raises complaints about the factual underpinnings of his analysis—that Dr. Quesada should have considered certain cost items like transportation costs, that his data inputs were limited, and that he relied on hearsay statements. None of these is a proper basis for challenging the admissibility of Dr. Quesada's testimony. At best, they are strained cross-examination points.

In sum, Northwest has offered no legally sufficient basis to exclude any of the opinions of Dr. Guryan and Dr. Quesada, and therefore, its motions should be denied.

**OPPOSITION TO NORTHWEST'S MOTION TO
EXCLUDE THE TESTIMONY OF JONATHAN GURYAN**

**BACKGROUND**

**A.      Dr. Guryan Is an Economics Expert**

Dr. Guryan is an accomplished economist.  He holds a B.A. in economics from Princeton University and a Ph.D. in economics from the Massachusetts Institute of Technology.  Ex. A., Report in the Matter of PECO Pallet, Inc. v. Northwest Pallet Supply Co. by Jonathan Guryan, Ph.D. ("Guryan Rep.") at 4, App. A.  Since 2010 he has served as a professor at Northwestern University, with appointments in the Department of Economics, the Kellogg School of Management, the School of Education and Social Policy, and the Institute for Policy Research.  *Id*. at 4, App. A.  Before that, for ten years he was a professor of economics at the University of Chicago Booth School of Business.  *Id*. at App. A.  He currently serves as an editor of the leading field journal in labor economics—the Journal of Labor Economics—and is a reviewer for other prominent professional economics journals.  *Id*. at 4.  He has taught graduate courses on microeconomics—including the economics of costs and determination of market prices—as well as labor economics, statistical methods, and regression analysis.  *Id*. at 5.  He has published numerous articles relating to economics matters, and he has presented his research to the Office of Management and Budget and to the U.S. Secretary of Education, where his work was cited in a regulation issued by the U.S. Department of Education.  *Id*.  In 2009, he was awarded the John T. Dunlop Outstanding Scholar Award for producing the best research on domestic labor economics by a scholar within ten years of completing a Ph.D.  *Id*.  Also, he previously testified as an expert in dozens of cases in state and federal courts around the country.  *Id*. at App. A.  In sum, Dr. Guryan has the expertise to opine broadly on economic matters and apply economic principles to a range of industries.

3

### B.    Dr. Guryan's Reports

Dr. Guryan was retained to opine on the cost incurred by Northwest to stack, sort, and load PECO pallets.  Guryan Rep. at 1, 6.  He based his assessment of this cost on "the standard economic theory of costs."  *Id*. at 1.  Further, the Court in this case invited PECO to submit the opinions that Dr. Guryan has offered.  Specifically, on November 18, 2016, Judge Wood issued an Order on the proper measure of recovery for Northwest's unjust enrichment claim.  *See* Dkt. No. 118.  In this ruling, Judge Wood found that "the value of the services provided by Northwest may be a reasonable way to measure the benefit conferred on PECO," that "the cost of such services is roughly equivalent to the value of the benefit conferred," and that this "would be an appropriate consideration for an expert."  *Id*. at 3.  Dr. Guryan noted that the Court's Order was consistent with economic theory, as detailed in his report.  Guryan Rep. at 6.

All of Dr. Guryan's opinions in this case are contained in two reports: his initial report (*see* Ex. A), and his rebuttal report (*see* Ex. B), where he responded to the expert reports prepared by Dr. Charles Ray and Dr. Judd Michael on behalf of Northwest.[2]  Northwest took Dr. Guryan's deposition on April 26, 2018.  *See* Ex. C, Guryan Deposition Transcript.  Dr. Guryan based his economic opinions—relating to the cost incurred by Northwest to provide SS&L Services to PECO—on documents and data produced by the parties in this case, transcripts of depositions taken in this case, conversations with PECO personnel, and his expertise in economics.  Guryan Rep. at 6.

---

[2] Dr. Guryan submitted his initial report on March 7, 2018, and his rebuttal report on April 4, 2018.  In advance of his deposition, on April 24, 2018, Dr. Guryan submitted amended versions of both his initial report and his rebuttal report.  He did this in order to correct certain citations to duplicate documents and the corresponding calculations.  These two amended reports replaced the prior reports, and are attached to this Memorandum as Exhibits A and B.  Although Northwest challenges these reports under *Daubert*, it does not argue that it was improper for PECO to submit the amended reports.

In his initial report, Dr. Guryan opined that "[m]arket prices charged for handling pooled pallets provide a reasonable estimate for the cost of providing those services, and of the value PECO receives from [Northwest] for providing those services." *Id*. at 2. Applying this principle, he also offered an opinion estimating the cost to Northwest of providing SS&L Services to PECO. Based on his calculations of several independent categories of market prices, he estimated "the cost to [Northwest] of providing on-site SS&L Services to be ████████████, and the cost to [Northwest] of providing off-site SS&L Services to be ████████████." *Id*.

Dr. Guryan based these opinions on (1) economic principles that provide that market prices for services provide a good measure of the cost of providing those services, and (2) an analysis of numerous categories of market prices to calculate Northwest's cost of providing SS&L Services. First, Dr. Guryan explained the economic principles that serve as the foundation for his opinions. Specifically, he explained that "[e]conomic theory holds that the market price of … services—the price at which those services can be purchased in the market—is a good measure of their value." *Id*. at 16. And "[e]conomic theory also holds" that in a competitive market for services, the price of the services will be "equal to the marginal cost of providing the services"—with marginal cost being costs that are incremental to performing the services. *Id*. This occurs because competing firms that are selling services will charge lower prices to win business, pushing prices down to their marginal costs. *Id*. But they will not do the work for less than their marginal costs because it would reduce their profits, and would not be sustainable. *Id*. And if the market were less than perfectly competitive, the market price can be greater than the marginal cost of performing the work—meaning that Dr. Guryan's cost estimates based on such market prices would be overestimated to the benefit of Northwest. *Id*. Based on these economic principles, Dr. Guryan opined that market price is a good measure of the cost of providing the SS&L Services—and

5

should not be higher than the cost of providing the SS&L Services—and market price is also a good measure of the value of those services received by PECO. *Id*. at 16-17.

Then, Dr. Guryan applied his economic expertise and used market prices to estimate Northwest's cost for providing SS&L Services to PECO. To calculate this cost, Dr. Guryan analyzed several different categories of market prices and produced a cost estimate for each category. He estimated costs separately for on-site SS&L Services and off-site SS&L Services. SS&L Services are performed on-site when they are performed at the distribution center of a retailer, such as Target or Wal-Mart. In other instances, pallets are moved from the distribution center to an off-site location, where the SS&L Services are then performed.

First, Dr. Guryan calculated market prices for on-site SS&L Services. He analyzed contracts between Northwest and CHEP—PECO's main competitor—including a contract for services that Northwest provided CHEP at Target distribution centers. *Id*. at 17. PECO and CHEP pallets are nearly the same—the main difference is that PECO pallets are red and CHEP pallets are blue. *Id*. at 18. He also reviewed agreements where PECO agreed to pay retailers (such as Target) to provide SS&L Services, typically at the retailer's distribution center. *Id*. at 20. These services are identical to those that Northwest performs for PECO. *Id*. at 20-21. Dr. Guryan calculated that PECO pays these retailers an average of ████████. *Id*. at 21. Then, because Northwest only provides on-site SS&L Services to PECO at Target distribution centers, and Target compensates Northwest for these services in the amount of ████ Dr. Guryan subtracted this amount from Northwest's cost, and concluded that the cost to Northwest of providing on-site SS&L Services is ████. *Id*.

Second, Dr. Guryan calculated market prices for off-site SS&L Services. To do this, he looked at Northwest's competitors—pallet recyclers that are performing "the same, or nearly

identical, services for PECO as [Northwest] provides to PECO." *Id*. at 3. He found that this was the "most reasonable market proxy" for Northwest's cost to perform the same services. *Id*. This is because, as explained above, "economic theory indicates" that these recyclers would not agree to perform SS&L Services below their marginal costs. *Id*. Dr. Guryan analyzed 15 agreements that describe the amount that PECO pays such recyclers to perform SS&L Services. *Id*. at 23. Based on these documents, he calculated that PECO pays ███ on average to recyclers to perform SS&L Services. *Id*. He concluded that this is a reasonable estimate of the cost to Northwest to provide SS&L Services to PECO and of the value of the services to PECO. *Id*. at 23-24.

Dr. Guryan did not end his analysis there. He checked this conclusion by analyzing several additional sources of market prices that provided estimates for off-site SS&L Services. His estimates from these additional sources supported and strengthened his conclusion that the cost to Northwest for providing off-site SS&L Services to PECO is ███.

Specifically, Dr. Guryan analyzed 38 contracts and agreements between PECO and recyclers it hired to operate PECO depots to calculate the market prices. *Id*. at 24-25. All of these documents covered SS&L Services and involved certain additional work—a quality sort, in which pallets are assessed to determine whether they need repairs—that Northwest does not provide for PECO. *Id*. at 24. Based on these documents, Dr. Guryan calculated that PECO pays ███ on average to depot operators to perform SS&L Services. *Id*. at 25. He concluded that this price is comparable to the ███ price that PECO pays recyclers for SS&L Services. *Id*.

Next, Dr. Guryan calculated the market prices that Northwest paid to third party recyclers that it hired as sub-contractors to perform off-site SS&L Services. *Id*. Using data produced by Northwest that contains 39 data points for the rates that Northwest paid to perform SS&L Services for PECO pallets. *Id*. at 26. Based on these documents, Dr. Guryan calculated that Northwest

paid third party recyclers an average of $0.49 per pallet to perform SS&L Services. *Id*. at 26. Dr. Guryan then analyzed data related to the prices that Northwest paid third party recyclers for specific orders of SS&L Services. *Id*. at 27. He analyzed nearly 10,000 such orders, and found that these prices—including an average of $0.57 for PECO pallets—were comparable to his estimate of ███ that he obtained by analyzing PECO's contracts with recyclers. *Id*. at 28.

Further, Dr. Guryan estimated the cost to PECO for recovering its pallets. *Id*. at 28. He analyzed PECO's income statement showing the number of PECO pallets returned each year and the cost of recovery per pallet returned, and for the 2011-2016 time period calculated an average recovery cost of ███ per pallet. *Id*. at 29.

Also, Dr. Guryan noted that his conclusions were similar to the cost estimates that PECO's other expert, Dr. Quesada, calculated by using a completely different method—time studies based on observing the amount of time taken to perform each task done in the course of providing SS&L Services, and calculating the cost for each task. *Id*. at 31; *see also* Ex. D. Dr. Quesada estimated the cost for SS&L Services to be between $0.17 and $0.33. Guryan Rep. at 32.

Adding even greater corroboration, Dr. Guryan's conclusions also are very similar to Northwest expert Dr. Ray's "direct cost" conclusion of $0.53 per pallet. This "direct cost" is the conclusion that Dr. Ray reached before padding his total—to artificially inflate Northwest's damages—with additional, unsupported costs consisting mostly of improper opportunity costs. *See* PECO's Motion to Exclude Dr. Charles Ray's Report and Related Testimony, Dkt. No. 232 at 10; Ray Report, Dkt. No. 232-1 at 22.

Therefore, Dr. Guryan had an extensive foundation to offer an economic opinion on Northwest's cost for providing SS&L Services to PECO, and none of Northwest's criticisms of Dr. Guryan's opinions provide any basis to exclude.

8

## ARGUMENT

**I.      Dr. Guryan's Qualifications as an Economist Are Outstanding, and He Is Well Qualified to Opine in This Case**

Dr. Guryan is more than qualified to offer the opinions he submitted in this case. To serve as an expert witness, the witness "may be qualified by knowledge, skill, experience, training, or education." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). "[A] court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Id*. Dr. Guryan passes this test with flying colors. As a Princeton and MIT-educated economist and professor at Northwestern University, the author and editor of numerous publications on economic matters, and an expert whose research has been relied on by the U.S. Government, he is well qualified to opine on the economic matters presented here. *See* Guryan Rep. at 4-5.

Northwest does not directly challenge Dr. Guryan's qualifications. Instead, it half-heartedly tries to discredit Dr. Guryan by pointing out that he does not have a background in the pallet industry. *See* Guryan Mot. at 3, 7, 9. This is no basis to exclude. Dr. Guryan never claimed to be a pallet industry expert. And more importantly, he does not need to be an expert in the pallet industry to opine on the economic matters contained in his reports. It is well-established that an economics expert need not be an expert in the particular subject or industry to which he applies his economic analysis. *See, e.g.*, *Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838, 845 (7th Cir. 2017) (finding that expert's "lack of experience within the ladder industry" did not preclude his "opin[ing] about PSI thresholds using well-established mathematical principles"); *Kleen Products LLC v. Int'l Paper*, No. 10 C 5711, 2017 WL 2362567, at *18 (N.D. Ill. May 31, 2017) (finding that economics expert was qualified to offer opinions on conduct during bankruptcy, and the fact that he was "not a bankruptcy expert is immaterial to his ability or qualifications to give …

testimony" on the "economic reasons" that formed the basis of his opinions); *Phillips v. Raymond Corp.*, 364 F. Supp. 2d 730, 740 (N.D. Ill. 2005) (expert "need not be an expert in the specific machine involved if … he uses an appropriate methodology"). As an accomplished economist applying economic principles to the facts of PECO and Northwest's conduct in the pallet industry, and opining on the cost to Northwest for providing SS&L Services, Dr. Guryan does not need expertise in the pallet industry.

## II. Dr. Guryan's Opinions Are Based on a Reliable and Well-Accepted Methodology

### A. Dr. Guryan's Application of Economic Principles to Use Market Prices to Estimate Northwest's Cost for Providing SS&L Services Is Proper

Northwest criticizes Dr. Guryan's opinions because he supposedly relied on an "untested assumption" that "the prices the participants accept are at least as high as their costs." Guryan Mot. at 7. This is false. Dr. Guryan used the fundamental and well-established economic principle that the market price for a service reflects the marginal cost to the seller of the service. He performed several independent calculations based on the market prices of the same or similar services to project the cost to Northwest of providing SS&L Services to PECO.

Courts have recognized that this methodology of using market prices to estimate marginal cost is grounded in bedrock economic principles. The U.S. Supreme Court has stated that "[i]n a perfectly competitive market, retail prices drop instantly to the marginal cost of the most efficient company." *Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467, 505 (2002). The Seventh Circuit has explained that this principle is established as a matter of "economic logic." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 658 (7th Cir. 2002). For example, "[i]f sellers are competing in the sale of an identical product which costs each of them $1 to produce," then "the competitive price, which is the market price because the sellers are competing, is $1." *Id. See also Felder's Collision Parts, Inc. v. All Star Advert. Agency, Inc.*, 777 F.3d 756, 761 n.7 (5th Cir.

2015) ("Under conditions of perfect competition, a firm always maximizes profits (or minimizes losses) by producing that output at which its marginal cost equals the market price."); *Janich Bros. v. Am. Distilling Co.*, 570 F.2d 848, 857 (9th Cir. 1977) ("[P]ricing at marginal cost is the competitive … result."). Leading economic authority also confirms that a "profit-maximizing competitive firm produces the amount of output at which its marginal cost equals the market price." Perloff, Jeffrey M., *Microeconomics* 233 (2d ed. 2001), Ex. F.[3]

In his report, Dr. Guryan started from this central economic principle—that in a competitive market for services, the price of the services will tend to be equal to the marginal cost of providing the services. Guryan Rep. at 16. Applying this to the facts of the case, he opined that market prices provide a good measure of the cost of providing SS&L Services. *Id.* He then analyzed documents related to several categories of market prices to calculate the cost to Northwest of providing SS&L Services to PECO. *See Suchanek v. Sturm Foods, Inc.*, No. 11-CV-565, 2017 WL 3704206, at *20 (S.D. Ill. Aug. 28, 2017) (endorsing expert's method of analyzing comparable market prices and rejecting *Daubert* challenge).

Specifically, Dr. Guryan analyzed market prices for both on-site and off-site SS&L Services. For on-site SS&L Services, he analyzed contracts between Northwest and PECO's competitor CHEP and also PECO's contracts with retailers that provide the same services to PECO as Northwest. For off-site SS&L Services he formed his opinion by calculating market prices paid

---

[3] The Seventh Circuit rejected an analogous attempt to exclude expert testimony grounded in fundamental scientific methodologies. In *Lapsley v. Xtek, Inc.*, a party claimed that an expert's opinions were untested where the expert relied on "basic equations of classical mechanics" to perform his calculations. 689 F.3d 802, 812 (7th Cir. 2012). The court rejected the *Daubert* challenge, explaining that the expert used principles that were "published centuries ago by some of the most famous names in science, and those principles have been used and tested (i.e., peer reviewed) by physicists and engineers for centuries." *Id.* at 810. Here, Northwest similarly challenges Dr. Guryan's use of fundamental economic principles to calculate the cost to Northwest of providing SS&L Services. This challenge is baseless.

by PECO to pallet recyclers that perform the same services as Northwest. He then confirmed his conclusion by checking it against calculations of several other categories of market prices—prices that PECO pays depot operators, prices that Northwest pays recyclers, and prices based on PECO's recovery cost data. Based on his calculations of these independent categories of market prices, he estimated the cost to Northwest of providing on-site SS&L Services to be $0.13 per pallet, and the cost to Northwest of providing off-site SS&L Services to be $0.51 per pallet. Guryan Rep. at 2. *See Traharne v. Wayne/Scott Fetzer Co*., 156 F. Supp. 2d 697, 712 (N.D. Ill. 2001) ("Whether [the expert's] methodology was the most reliable or the best, we think is best left to the trier of fact to decide. Where, as here, an expert is highly qualified, a trial court should be especially reluctant to exclude a disputed methodology.").[4]

### B. Northwest's Criticisms of Dr. Guryan's Analysis Are Subjects for Cross-Examination and Do Not Provide Any Basis to Exclude

Northwest claims that Dr. Guryan relied on three additional "untested assumptions" that warrant exclusion of his opinions—(1) that prices he selected for his analysis were "part of a larger exchange" that included more than SS&L Services; (2) that he assumed that the services provided by proxy recyclers were similar to the services Northwest provides; and (3) that he assumed that the averages of five categories of market prices are "close enough to one another." Guryan Mot. at 8-10. Northwest is mistaken on each of these contentions. Setting aside their substantive

---

[4] Northwest also claims that Dr. Guryan "has not previously used this methodology." Guryan Mot. at 10. Not true. At his deposition, he explained that he commonly has used this very methodology—using "prices to infer something about value or cost"—in his work as an economist. Ex. C at 59:21-22. He "use[s] prices to measure the costs of things a lot of time … in the context of a labor market." *Id*. at 58:16-23. Northwest's related criticism that Dr. Guryan's previous applications of economic principles to labor markets is "not similar" to this case also falls flat. Guryan Mot. at 10. As a veteran economist, Dr. Guryan is equipped to apply his expertise to a variety of factual scenarios, including to analyzing the cost of services sold in the pallet industry. *See Goldenberg v. Indel, Inc*., No. 09-5202, 2012 WL 3780555, at *17 (D.N.J. Aug. 30, 2012) (expert's "training and experience in the field of economics permits her to recognize logical fallacies and insufficiently supported statements, even if she is not particularly familiar with the extremely narrowly defined subfield of asset allocation itself").

defects, each of these critiques fails at the outset on procedural grounds because they focus on the assumptions and the particular documents Dr. Guryan selected for his analysis. "The reliability of data and assumptions used in applying a methodology is tested by the adversarial process and determined by the jury; the court's role is generally limited to assessing the reliability of the methodology—the framework—of the expert's analysis." *Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 808 (7th Cir. 2013); *see also Matter of the Compl. of Ingram Barge Co*., No. 13 C 3453, 2016 WL 3763423, at *7 (N.D. Ill. July 14, 2016) ("[T]he presence of conflicting underlying evidence speaks to the weight of the proffered opinion, not its admissibility."). Therefore, these criticisms, at best, go to the weight of Dr. Guryan's opinions and provide no basis to challenge their admissibility.

In addition to being improper grounds for a *Daubert* challenge, Northwest's criticisms of Dr. Guryan's so-called "assumptions" are unfounded. Northwest complains that "virtually every price" Dr. Guryan used was "part of a larger exchange" that included more than SS&L Services, which could have affected these prices. Guryan Mot. at 8. This is false—Northwest is misrepresenting Dr. Guryan's analysis. The truth is that Dr. Guryan calculated his conclusion that Northwest's cost was $0.51 based on his analysis of market prices that PECO paid recyclers for the *exact same* services that Northwest provides. Guryan Rep. at 3. Contrary to Northwest's claims, these services did not include any "larger exchange," as these arrangements with recyclers included only SS&L Services and no whitewood pallets. Ex. C at 196:23-197:4. To corroborate his conclusion, Dr. Guryan then analyzed additional categories of data for similar services—such as prices by services provided by recyclers who operate PECO depots—but he did this to check his conclusion. When questioned about these other categories at his deposition, he confirmed: "I don't base my main opinion on that." Ex. C at 213:9-10.

Northwest similarly fails when it claims that Dr. Guryan "assumes" that the services that other recyclers provide are similar to the services that Northwest provides.[5]  *See* Guryan Mot. at 9.  This is far from "untested."  *Id*.  Dr. Guryan reviewed the specific contracts that PECO entered into with other recyclers and found that they provided the same services as Northwest.  *See* Guryan Rep. at 23-24.  Further, Judge Wood specifically found that recycler contracts were an appropriate for expert analysis: "[T]he amount Northwest pays to its recycler partners (essentially its sub-contractors) for the collection and return of PECO, CHEP, and iGPS pallets would be an appropriate consideration for an expert opining on the fair market value of the services for which Northwest seeks compensation from PECO."  Dkt. No. 118 at 3.

Northwest also complains that Dr. Guryan "assumes that the averages of the five proxy categories are close enough to one another."  Guryan Mot. at 10.  Northwest again misrepresents what Dr. Guryan did.  He did not "assume" anything.  Instead, as explained above, he measured Northwest's costs by analyzing five different categories.  *See* Guryan Rep. at 30-31.  He used one of these categories—documents from recyclers that provide services to PECO identical to those that Northwest provides—as the basis of his opinion.  *Id*. at 3.  He used the other four categories—depot operator documents, Northwest's recycler data, Northwest's order data, and PECO's recovery costs—as a check on his conclusion.  *Id*.  He reported the numbers he calculated for all of these categories.  *Id*. at 31.

---

[5] Northwest's reliance on *Broussard v. Maples*, 535 F. App'x 825 (11th Cir. 2013) (*see* Guryan Mot. at 9) is misplaced because in that case the court took issue with an expert's methodology where the expert used a certain kind of data (Hispanic student enrollment) and as the sole basis for his estimate of the completely different kind of data (total number of immigrants in the local workforce).  *Id*. at 829.  Here, however, Dr. Guryan looked at data on the market prices for recyclers that perform the same SS&L Services for PECO as Northwest and used that to produce an estimate for Northwest's cost to provide that same service.  Then, he used several other market proxies as a check.

In any event, Northwest's criticisms fail because they all are disputes over Dr. Guryan's assumptions and the conclusions he draws from the documents, and do not go to his methodology. Accordingly, they are, at best, points for cross-examination and not a basis to exclude. *See Smith*, 215 F.3d at 718 ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment."); *Lapsley*, 689 F.3d at 805 (district court does not "take the place of the jury to decide ultimate issues of credibility and accuracy").[6]

## III.    Dr. Guryan Relied on Proper Documents and Data

Northwest complains that Dr. Guryan "ignores" certain facts that it believes he should have considered because he "cherry-picked" the prices he used for his analysis. Guryan Mot. at 10-11. Northwest is wrong and misstates the law. It is well-established that "arguments about how the selection of data inputs affect the merits of the conclusions produced by an accepted methodology should normally be left to the jury." *Manpower*, 732 F.3d at 808. *See also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766-67 (7th Cir. 2013) (where the data at issue "was undoubtedly a rough estimate," it was not proper to exclude the expert but instead "let the jury determine how the uncertainty about the [data issue] affected the weight of [the expert's] testimony"); *Lees v. Carthage Coll.*, 714 F.3d 516, 524-25 (7th Cir. 2013) ("Rule 702 … does not condition

---

[6] Northwest's criticism that Dr. Guryan's analysis "lacks intellectual rigor" similarly fails. Guryan Mot. at 12. Here, Northwest suggests that Dr. Guryan should have assessed PECO's market power. But market power is irrelevant to Dr. Guryan's analysis because regardless of market power, a profit-maximizing firm will sell its service when the marginal revenue it receives is greater than or equal to its marginal cost. *See* Ex. C at 88:23-90:10 (regardless of whether PECO has market power, "if Northwest were not to provide the service, PECO would have to go out and purchase those services on the market").

admissibility on … a complete and flaw-free set of data.").[7]  Therefore, Northwest's complaints

based on particular documents and data he selected for his analysis are not any basis to exclude.

      Dr. Guryan did not "cherry-pick" any data.  *See* Guryan Mot. at 11.  Instead, as described

above, he selected many independent categories of data—related to services most similar to the

services that Northwest provides to PECO—to formulate and then confirm his opinions.

Northwest criticizes Dr. Guryan because the price averages he calculated do not include certain

individual pieces of prices data, such as a retailer that PECO paid ████████, and recyclers

that PECO paid ███ and ███.  Guryan Mot. at 11.  But Dr. Guryan did not "ignore" these prices

(*id*.)—he deliberately chose not to include them because they are not prices for substitute services

to those provided by Northwest.  Specifically, these prices are for the recovery of low-volume and

stray pallets—not SS&L Services—so the prices Northwest cites are for a very different labor task

than the SS&L Services that Northwest provides to PECO.  *See* Ex. C at 250:18-22 (Guryan

testifying that "the reason I make that exclusion and include these is because that work is a different

type of work that has a different cost" and "I'm trying to provide information about the cost to do

the services that Northwest is doing").  Northwest also references contracts that it claims have

higher prices, but again ignores that these prices are not for SS&L Services.

---

[7] Northwest relies on *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), to claim that there is an "analytical gap" between Dr. Guryan's opinions and the data he relied on.  *See* Guryan Mot. at 12.  But *Joiner* does not help Northwest because it is nothing like this case.  In *Joiner*, the experts "extrapolated their opinions" about humans based on "far removed animal studies," 522 U.S. at 144, whereas here, Dr. Guryan looked at various categories of market participants that provide the same or very similar services that Northwest provides.  Northwest's other citations to inapposite, out-of-circuit authorities are of no avail. *See* Guryan Mot. at 10-11.  Its reliance on *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 777 (8th Cir. 2004), is misplaced because that expert was excluded because he performed the wrong analysis by evaluating the case as a *per se* antitrust violation instead of a rule of reason case—a far cry from the factual gripes that Northwest has here.  Similarly, *Blue Dane Simmental Corp. v. Am. Simmental Ass'n*, 178 F.3d 1035, 1040-41 (8th Cir. 1999) does not help Northwest because that case was determined by a failure in the expert's use of his methodology (a "before-and-after" model that required the expert to consider certain independent variables), not based on disagreements about individual data points.

Northwest also criticizes Dr. Guryan because he did not use Northwest's own cost data from its accounting statements in his analysis. Guryan Mot. at 2. But Northwest ignores that "a firm's marginal costs cannot be ascertained from conventional business records." *Janich Bros.*, 570 F.2d at 859; *see also Felder's*, 777 F.3d at 761 ("Businesses rarely account for marginal cost on their books."). As Dr. Guryan stated as his deposition, "all the components" of marginal cost "might not be included in the accounting statement." Ex. C at 111:11-20. Therefore, it was entirely proper for Dr. Guryan not to use the cost from Northwest's accounting statements. And Dr. Guryan did rely on certain data provided by Northwest that was appropriate for his analysis— the prices Northwest paid subcontractors to perform SS&L Services. *See* Guryan Rep. at 25-26.

In short, as Northwest takes issue with the documents and data that Dr. Guryan selected for his analysis, the evidence should "be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley*, 689 F.3d at 805 (quoting *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993)).

## IV.   Dr. Guryan's Testimony Will Assist the Trier of Fact

Northwest claims that Dr. Guryan's analysis "adds an unnecessary level of complexity" and because of this should be excluded. Guryan Mot. at 13. The opposite is true. The jury will need to value the task of providing SS&L Services—a niche labor task unfamiliar to them. Dr. Guryan's opinions explain how to value this service using the tools of economics—that marginal cost is fundamental to the value of the service, and market prices provide a reasonable estimate for this cost. Indeed, Judge Wood already recognized that an expert analysis like Dr. Guryan's would be useful. In considering "[t]he question [of] what benefit PECO received from Northwest's services," the Court stated, "it appears that the fair market value of Northwest's services may be the proper measure of recovery." Dkt. No. 118, at 2-3. And "a reasonable way to value the benefit

17

conferred on the defendant is to value the services provided by the plaintiff because the cost of such services is roughly equivalent to the value of the benefit conferred and is susceptible to proof at trial, whereas the value conferred is not." *Id*. at 3 (citing *Midcoast Aviation, Inc. v. Gen. Elec. Credit Corp*., 907 F.2d 732, 737 (7th Cir. 1990)).[8]

## OPPOSITION TO NORTHWEST'S MOTION TO EXCLUDE THE TESTIMONY OF HENRY J. QUESADA

### BACKGROUND

**A.    Dr. Quesada Has Expertise in Performing Time Study Analysis**

Dr. Quesada is an industrial engineer with expertise and experience in performing time studies. He has a Ph.D. in Wood Products Technology from Purdue University. Ex. D, Expert Report of Henry J. Quesada ("Quesada Rep.") at 52. He specializes in manufacturing, supply chain management, and marketing for wood products industries. *Id*. at ¶ 1. Since 2008, he has served as a professor and extension specialist at the Virginia Polytechnic Institute and State University, commonly known as Virginia Tech, in the Department of Sustainable Biomaterials. *Id*. at 57. The Department's mission is "to educate and prepare the next generation of experts" in, among other areas, wood composites and wood-based manufacturing and marketing. *Id*. at ¶ 9. He has taught undergraduate and graduate courses on business, manufacturing, and marketing strategies, and also financial and cost analysis. *Id*. at ¶ 10. At Virginia Tech, he is responsible for extension activities centered on the wood products industry. *Id*. He has published dozens of

---

[8] Northwest also makes the spurious claim that Dr. Guryan's rebuttal report should not be admitted because he supposedly only considered the reports of Northwest's experts and relied on nothing else. Guryan Mot. at 14. This makes no sense. Northwest's experts Dr. Ray and Dr. Michael submitted reports addressing many of the same matters that Dr. Guryan analyzed in his initial report. Dr. Guryan's rebuttal clearly built on his initial report, referenced his initial report and all the materials he relied on there (*see, e.g.*, Ex. B at 2, 5), and used the initial report as a foundation for demonstrating Northwest's experts' flaws. He had every right to rebut Northwest's experts. *See United States v. Mitchell*, 365 F.3d 215, 247 (3d Cir. 2004) ("If one side can offer expert testimony, the other side may offer expert testimony on the same subject to undermine it."). There is no basis to exclude Dr. Guryan's rebuttal opinions.

articles in peer-reviewed journals, typically addressing issues in the wood products industry. *Id.* at 65-68. For example, in 2012, he published an article discussing a quantitative study performed on the U.S. wood pallet industry based on supply chain management practices. *Id.* at 67. He has also published articles on the wood pallet industry in trade journals. *Id.* at 82.

Further, he has conducted numerous time studies—i.e., a measurement of "the time that it takes to complete a specific process, activity, tasks, or steps"—in order to measure costs. *Id.* at ¶ 33. For example, his federally funded research projects have required him to conduct time studies "to determine and allocate costs." *Id.* In short, Dr. Quesada has the expertise to perform a time study to opine on the costs incurred by Northwest to perform SS&L Services for PECO pallets.

**B.      Dr. Quesada's Report**

Like Dr. Guryan, Dr. Quesada opined on the cost incurred by Northwest to perform SS&L Services with respect to PECO pallets. *Id.* at ¶ 8. He used a different method than Dr. Guryan— Dr. Quesada performed time studies and based his cost assessment on data he personally collected. His approach both complements Dr. Guryan's economic analysis and corroborates Dr. Guryan's conclusions.

Specifically, Dr. Quesada performed time studies based on data he collected at four different pallet sorting facilities to estimate the cost to Northwest of providing SS&L Services to PECO. A time study involves measuring the duration of specific labor tasks—such as by using a stopwatch, as Dr. Quesada did here. *Id.* at ¶ 33. Time studies are used to measure performance metrics based on time—such as throughput, cycle times, and cost allocation. *Id.*

Dr. Quesada got on a plane four times to travel across the country to different pallet sorting facilities. He spent hours personally observing SS&L Services being performed and made on-site measurements at four separate pallet sorting locations: (1) Northwest's primary facility in Belvidere, IL; (2) PECO's facility in South Chicago, IL; (3) the facility of third party recycler

19

Pallet Industries in Pompano Beach, FL; and (4) a retailer distribution center owned by grocery chain Schnucks in Kinnloch, MO. *Id*. at ¶ 16. At all of these locations, he collected data and analyzed the data to calculate the cost of providing SS&L Services. *Id*. Dr. Quesada collected data using a stopwatch and tape measure. He measured the time it took for employees to perform the various tasks of the SS&L process. Then he analyzed the time data in conjunction with the type and price of the equipment and labor used in order to produce cost estimates. For example, at the Northwest facility in Belvidere, IL, he started by measuring the amount of time it took for a forklift to unload pallets from a truck. *Id*. at ¶ 41. He then calculated the cost of depreciation, fuel, wages and overhead for that time period. *Id*. at ¶¶ 41-52. He performed similar measurements, including the time and distance traveled by the forklift, for the subsequent tasks in the SS&L process, including the sorting of the pallets and temporary storage of the sorted pallets. *Id*. at ¶¶ 53-76. He did not observe the loading of the pallets into a truck at this location, but he used the previously calculated unloading cost as a conservative estimate for this task. *Id*. at ¶ 77. He then added up the cost of each task, and lastly added carrying costs of inventory, to produce a total cost calculation for performing SS&L Services at the facility. *Id*. at ¶ 79. He repeated this process in a similar way at each facility, measuring the cost of the various tasks based on the time used to perform them.

Dr. Quesada ultimately determined that (1) the cost of SS&L Services at Northwest is approximately $0.33 per pallet; (2) the cost of SS&L Services at PECO's depot is approximately $0.25 per pallet using the semi-automatic line and $0.37 per pallet using manual sorting; (3) the cost of SS&L Services at Pallet Industries is approximately $0.19 per pallet; and (4) the cost of SS&L Services at Schnucks Distribution Center is approximately $0.18 per pallet. *Id*. at ¶ 3.

Dr. Quesada based his opinions on the data he collected and analyzed from four different pallet sorting sites, documents produced by the parties in this case, transcripts of depositions taken in this case, and his expertise and experience. *Id*. at ¶ 36. Dr. Quesada submitted his report in this action on March 7, 2018. Northwest took Dr. Quesada's deposition on April 25, 2018. *See* Ex. E.

Therefore, Dr. Quesada has an extensive foundation to opine on the costs Northwest incurred in providing SS&L Services to PECO based on the time studies he performed. None of Northwest's critiques of Dr. Quesada's opinions provide any grounds to exclude his testimony.

## ARGUMENT

### I.   Dr. Quesada Is Qualified as an Expert

Northwest does not claim that Dr. Quesada lacks qualifications to offer his opinions. Indeed, there is no basis to do so. Dr. Quesada is qualified by his "extensive academic and practical expertise." *Smith*, 215 F.3d at 718 (court considers "a proposed expert's full range of practical experience as well as academic or technical training"). As described above, Dr. Quesada is a Ph.D. industrial engineer who serves as a professor at Virginia Tech, has authored numerous professional articles, and serves as an extension specialist to support the wood product industry of Virginia. Ex. D at ¶¶ 9-12; Ex. E at 10:10-13, 63:13-64:13. He has applied his expertise across a variety of industries, including the wood products industry, where he has conducted numerous time studies at companies to measure cost. Ex. E at 22:3-20, 63:13-64:13. He is well qualified to offer his opinions.

### II.   Dr. Quesada's Methodology Based on Time Study Analysis Is Reliable

Northwest does not dispute that a time study is a proper approach for calculating the cost to Northwest for performing SS&L Services. Instead, Northwest complains that particular features of the time studies that Dr. Quesada conducted make his methodology unreliable. Quesada Mot. at 7. But all of Northwest's gripes—that Dr. Quesada chose not to include particular cost items,

that he relied on "hearsay" conversations with facility managers, and that his data set was not "statistically significant" (*id*. at 7-9)—are at best quibbles about the particular data that Dr. Quesada used or did not use, and do not attack his time study methodology. Thus, none of them is a proper basis to exclude Dr. Quesada's testimony. *See Manpower*, 732 F.3d at 807-08 ("[T]he selection of data inputs to employ in a model is a question separate from the reliability of the methodology reflected in the model itself," and "should normally be left to the jury.").

"District courts routinely admit expert opinions based on … time study methodology." *Lugo v. Farmer's Pride Inc.*, No. 07-0749, 2011 WL 2550376, at *3 (E.D. Pa. June 23, 2011) (finding that expert's "time study methodology, which entails breaking an activity down into its essential parts and measuring how long employees spend on each element," was admissible); *see also United States v. Borden Co*., 370 U.S. 460, 465 (1962) (discussing expert's time study to calculate cost and not questioning its admissibility); *Hernandez v. Crown Equip. Corp.*, 92 F. Supp. 3d 1325, 1346 (M.D. Ga. 2015) (admitting expert's testimony based on time studies where he "timed how long it took an operator to grab onto the handholds, exit the forklift with the door closed, or exit with the door open"). As described above, Dr. Quesada traveled to four pallet sorting facilities across the country to observe SS&L Services and measured with a stopwatch the time for the various tasks in the SS&L process to be performed—such as unloading, sorting, and loading. He combined his time measurements with information on the prices for the inputs involved—such as fuel and depreciation of forklifts, and wages for workers—and calculated the costs involved for each task. Dr. Quesada's time studies were an appropriate way to measure cost here.

Northwest criticizes Dr. Quesada for not including in his analysis certain cost items, such as transportation costs. Quesada Mot. at 7. This is not a basis to exclude his testimony. Concerns

like this about an expert's selection of particular data inputs are material for cross-examination—
not grounds for a *Daubert* motion. *Manpower*, 732 F.3d at 808. Further, Dr. Quesada excluded
these costs so his conclusions would be accurate. Dr. Quesada purposefully did not include
transportation costs because, for on-site services (approximately 70% of the services Northwest
provides for PECO), there are no transportation costs. Quesada Rep. at ¶ 37. And, for off-site
services, transportation costs are either borne by the recycler regardless of the type of pallets
collected or not borne by the recycler at all. *Id.* He also relied on Dr. Guryan's analysis that
explained that as an economic matter, transportation costs are not marginal costs. *Id.* at ¶ 37 n.4;
Guryan Rep. at 13. And Northwest's critique that Dr. Quesada did not rely on Northwest's "actual
financial data" (Quesada Mot. at 7) similarly fails because these are not the proper inputs for a
time study. *See* Ex. E at 216:14-217:19.

Northwest claims that Dr. Quesada "did not actually make any personal observations or
the timing of any process" at two of the facilities and relied only on "hearsay statements from site
managers." Quesada Mot. at 3, 8. This is false. In fact, he personally observed SS&L tasks being
performed at each of the four facilities, collected data at each facility by timing the tasks with his
stopwatch, and then calculated cost. *See* Quesada Rep. at ¶¶ 41, 59, 83, 84, 99, 107, 135, 162,
170. When on occasion a particular task—such as unloading—was not performed during his visit,
he spoke with facility managers to obtain information to complete his cost calculations. *See, e.g.*,
Quesada Rep. at ¶ 124. But Dr. Quesada's reliance on these conversations is not improper reliance
on "hearsay," as Northwest claims. Quesada Mot. at 8. *See Tilstra v. BouMatic LLC*, 791 F.3d
749, 753 (7th Cir. 2015) ("[A]n expert witness is not required to verify all the facts on which he
relies; he can rely on hearsay."). Where Dr. Quesada was not able to personally observe a

particular task, he collected the data from the manager who oversees the task—the perfect source to obtain the information.

Northwest's critique that Dr. Quesada's analysis was "limited" and not "statistically significant" also fails. Quesada Mot. at 7-8. Northwest does not explain what statistical significance is, what else Dr. Quesada supposedly should have done, or how his study could be changed to be statistically significant. Northwest offers no expert of its own to opine on the statistical significance of Dr. Quesada's analysis. This criticism is just empty rhetoric, with no authority cited to back it up. Indeed, Northwest does not cite a single case in its entire argument section to support any of its critiques that Dr. Quesada's methodology was not "scientifically reliable." *See* Quesada Mot. at Argument Sec. A, 7-9.

In short, Northwest does not really address the time study methodology that Dr. Quesada conducted. Instead, its various criticisms are simply claiming that Dr. Quesada is incorrect, which is a decision for the jury. *See Smith*, 215 F.3d at 719 ("The question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert.").

**III.   Dr. Quesada's Testimony Will Assist the Trier of Fact**

Northwest summarily complains that Dr. Quesada's opinions will not assist the trier of fact because his time study method analyzes "only one aspect of the pallet return process." Quesada Mot. at 9. This is misguided. Courts have recognized that "a number of different methodologies … can be used" by a party's various experts to address the same issue. *In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94 C 897, 1994 WL 663590, at *5 (N.D. Ill. Nov. 18, 1994); *see also In re Steel Antitrust Litig.*, No. 08 C 5214, 2015 WL 5304629, at *11 (N.D. Ill. Sept. 9, 2015) (permitting the use of "different accepted methods" and quoting Fed. R. Evid. 702

24

Advisory Committee Note that "expert testimony cannot be excluded simply because the expert uses one test rather than another, when both tests are accepted in the field and both reach reliable results"). Here, Dr. Guryan used his economic expertise to analyze several categories of market prices to estimate Northwest's cost to provide SS&L Services. Dr. Quesada used an alternative approach—time studies that measure the amount of time particular labor tasks take to be performed—that provides a useful complement to Dr. Guryan's economic approach to estimate the same cost. And Dr. Quesada's findings corroborate Dr. Guryan's conclusions because their cost estimates are not far apart.[9]

## CONCLUSION

For the foregoing reasons, PECO respectfully requests (1) that the Court deny Northwest's motion to exclude the testimony of Jonathan Guryan, and (2) that the Court deny Northwest's motion to exclude the testimony of Henry J. Quesada.

Respectfully submitted,

PECO Pallet, Inc.

By: /s/ William C. O'Neil
Daniel D. Rubinstein
William C. O'Neil
Thomas G. Weber
WINSTON & STRAWN LLP
35 West Wacker Dr.
Chicago, IL 60601
(312) 558-5600

*Attorneys for PECO Pallet, Inc.*

---

[9] Northwest is also wrong to claim that Dr. Quesada's analysis would confuse the jury because the proper measure of "damages in an unjust enrichment case is not the cost to Northwest Pallet, but the value of the benefit conferred to PECO." Quesada Mot. at 9. As noted previously, Judge Wood already found in this case that "a reasonable way to value the benefit conferred on the defendant is to value the services provided by the plaintiff because the cost of such services is roughly equivalent to the value of the benefit conferred and is susceptible to proof at trial, whereas the value conferred is not." Dkt. No. 118 at 3 (citing *Midcoast Aviation*, 907 F.2d at 737).

## CERTIFICATE OF SERVICE

The undersigned attorney, upon oath, hereby certifies that a copy of the PECO Pallet Inc.'s Combined Opposition to Northwest Pallet Supply Co.'s Motion to Exclude the Testimony of Jonathan Guryan and Motion to Exclude the Testimony of Henry J. Quesada was served via CM/ECF upon the parties listed below on July 16, 2018:

> Daniel W. Tarpey
> David G. Wix
> Matthew Showel
> TARPEY WIX LLC
> 225. W. Wacker Dr., Suite 1515
> Chicago, IL 60606
> (312) 948-9090
>
> *Attorneys for Northwest Pallet Supply Co.*

By: /s/ William C. O'Neil