IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PECO PALLET, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 15 CV 6811 |
| v. | ) Cons. w/ 15 CV 50182 |
| | ) |
| NORTHWEST PALLET SUPPLY CO., | ) Magistrate Judge Michael T. Mason |
| | ) |
| Defendant. | ) |

## ORDER

For the reasons set forth below, Northwest's motion to exclude the testimony of Jonathan Guryan [221] is denied, except that Dr. Guryan's rebuttal report as it relates to Dr. Judd Michael will be stricken as moot. Northwest's motion to exclude the testimony of Henry Quesada [219] is denied.

## STATEMENT

This matter is now before the Court on two of the five *Daubert* motions filed in advance of the trial set to begin on November 5, 2018.[1] The Court dispenses with a detailed background of facts. In short, PECO Pallet, Inc. ("PECO") manufactures and supplies wood shipping pallets to consumer goods manufacturers that use the pallets to ship their goods to retailers' distribution centers. PECO operates within the market for "pooled pallets" – an alternative to the single use white wood pallets traditionally used to ship goods throughout the supply chain. Northwest Pallet Supply Co. ("Northwest") is a supply management company specializing in recycling, manufacturing and repairing wood pallets that are collected from its network of retail customers. As part of its Total Pallet Management ("TPM") services, Northwest collects pallets from its retail customers, sorts them by type of pallet (*i.e.* PECO's red pallets, CHEP's blue pallets, standard white pallets, etc.), keeps the white wood pallets for recycling and resale, and returns the red pallets to PECO. Northwest also contracts with subcontractors, known as recycling partners, to assist in providing its TPM services.

For several years, Northwest returned PECO's pallets under PECO's general Asset Recovery Program ("ARP"), and generally received $2.25 for each pallet returned to PECO or $1.25 for each pallet loaded onto a PECO truck. However, in May 2015, PECO informed Northwest that it would only pay $0.20 per pallet. Ultimately, this litigation followed.

---

[1] The Court has already issued rulings on PECO's motion to exclude Judd Michael (Dkt. No. 313) and PECO's motion to exclude Dr. Charles Ray (Dkt. No. 315).

1

The claims remaining for trial are PECO's claims for conversion and civil conspiracy, and Northwest's claim for unjust enrichment, which is most relevant to the pending *Daubert* motions. According to Northwest, PECO has been unjustly enriched to Northwest's detriment for the return of pallets to PECO from May 12, 2015 through the present.

During discovery, both parties disclosed a number of expert witnesses pursuant to Rule 26(a)(2). Although their opinions vary, *all* of the experts purport to offer opinions regarding damages for Northwest's unjust enrichment claim. In the pending motions, Northwest seeks to exclude both of PECO's experts, Dr. Jonathan Guryan and Dr. Henry Quesada. Using the standard that follows, the Court will address each motion in turn below.

**Standard of Admissibility Under Rule 702 and *Daubert***

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

"In short, the rule requires that the trial judge ensure that any and all expert testimony or evidence admitted 'is not only relevant, but reliable.' " *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013) (citing *Daubert*, 509 U.S. at 589, 113 S. Ct. 2786); s*ee also*, *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778 (7th Cir. 2017) (noting that Rule 702 requires "the district court to act as an evidentiary gatekeeper, ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand") (citations omitted). Rule 702 applies to both scientific and non-scientific fields. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147-49, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

In determining whether to admit expert testimony under Rule 702 and *Daubert*, district courts employ a three-part framework by inquiring whether (1) the expert is qualified by knowledge, skill, experience, training or education; (2) the reasoning or methodology underlying the expert's testimony is reliable; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a factual issue. *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). *Daubert* provides a list of guideposts for determining reliability that is neither exhaustive nor mandatory, including (1) whether the scientific theory has been or can be tested; (2)

whether the theory has been subjected to peer-review and/or academic publication; (3) whether the theory has a known rate of error; and (4) whether the theory is generally accepted in the relevant scientific community. *C.W. ex rel. Wood v. Textron*, Inc., 807 F.3d 827, 835 (7th Cir. 2015).

The party presenting the expert bears the burden of demonstrating that the expert's testimony satisfies the *Daubert* standard. *Lewis*, 561 F.3d at 705. Ultimately, the district court has broad discretion in determining the admissibility of expert testimony. *See Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012) ("[W]e give the district court wide latitude in performing its gatekeeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable.") (internal quotations omitted).

**Dr. Guryan's Report and Rebuttal Report (Dkt. No. 258 at Exs. D and H)[2]**

Dr. Jonathan Guryan is a labor economist who holds a bachelor's in economics from Princeton and a Ph.D in economics from MIT. Currently, he is a professor of "Human Development and Social Policy and Economics in the School of Education and Social Policy at Northwestern University." (Guryan Report at 4.) Prior to his time at Northwestern, Dr. Guryan was a professor of economics at the University of Chicago Booth School of Business, where he taught graduate-level courses on microeconomics and labor economics. The courses on microeconomics related to "various forms of market competition, the economics of costs, determination of market prices, and consumer and firm behavior." (*Id.* at 5.)

PECO retained Dr. Guryan to "calculate the cost to [Northwest] to handle PECO pallets." (Guryan Report at 1.) To do so, Dr. Guryan reviewed and relied on the parties' complaints and counterclaims, Judge Wood's previous discovery ruling (Dkt. No. 118), data and documents produced by both parties, his conversations with PECO personnel, and the deposition testimony in this litigation. Ultimately, Dr. Guryan determined that "market prices charged for handling pooled pallets provide a reasonable estimate for the cost of providing those services, and of the value PECO receives from [Northwest] providing those services." (Guryan Report at 2.) Dr. Guryan's conclusion was grounded in the "standard economic theory that [in a competitive market], market prices reflect both the marginal costs to the seller of providing a good/service, as well as the value that the good/service provides to the buyer." (*Id.* at 32.)

With market prices from what he viewed as "proxies" as his guidepost, Dr. Guryan then set out to estimate the cost to Northwest to provide stack, sort, and load ("SS&L") services both on-site (such as at Target) and off-site. Dr. Guryan's calculation for on-site costs was based on two sources of information: (1) contracts between Northwest and CHEP to provide SS&L services; and (2) contracts between PECO and

---

[2] As the parties explain, Dr. Guryan has actually disclosed four reports in this matter because he amended his initial reports after counsel for Northwest raised concerns regarding his use of duplicate documents. As PECO intended Dr. Guryan's amended reports to replace his initial reports, the Court's references are to those amended reports, both dated April 24, 2018.

3

retailers for SS&L services.  Based on three contracts between Northwest and CHEP and nine contracts between PECO and various retailers (among other factors), Dr. Guryan estimated the cost to Northwest of providing on-site SS&L services for PECO to be $0.13 per pallet.

To estimate off-site costs, Dr. Guryan used four sources of information: (1) the market price PECO pays its subcontractors to handle PECO pallets; (2) the market price Northwest pays subcontractors to handle PECO pallets; (3) the average cost PECO has incurred to recover nearly 35 million pallets per year over six years; and (4) the calculations of Northwest's cost to perform SS&L services based on the time and motion study of PECO's other expert, Dr. Henry Quesada.  Using this information, Dr. Guryan estimated that the cost to Northwest for providing off-site SS&L services for PECO to be $0.51 per pallet.

Dr. Guryan has also provided a rebuttal report to the expert reports of Dr. Judd Michael and Dr. Charles Ray, in which he responds to their theories and provides his objections thereto.  Northwest now asks the Court to exclude both of Dr. Guryan's reports.

## Analysis

Northwest first argues (albeit halfheartedly), that Dr. Guryan is not qualified because he is a self-described "labor economist who conducts research primarily on the causes and consequences of racial inequality in labor markets and in education, on the economics of discrimination, and on the economics of education and human capital." (Northwest's Mot. at 3 (citing Guryan Dep. at 7)).  Northwest seems to imply that because Dr. Guryan's teachings and research is tailored to a specific portion of economics unrelated to the pallet industry, he is not qualified to serve as an expert here. The Court disagrees.

Through education and experience, Dr. Guryan is well-trained in economics and its general principles, which he purports to apply to the facts of this case.  As PECO accurately points out, there is no hard and fast rule requiring that an expert, such as an economist, have specialized knowledge regarding the industry on which he offers his opinions.  Instead, "[w]hether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 723 (7th Cir. 1999).  Here, Dr. Guryan's experience and knowledge about economics qualifies him to apply economic principles to the pallet industry, even if he is not an expert on wood products.  *See e.g.*, *Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838, 845-46 (7th Cir. 2017) (engineer not required to be an expert on ladders to apply general engineering principles to the ladder industry); *cf. Doe v. Cutter Biological, Inc.*, 971 F.2d 375, 385 (9th Cir. 1992) ("Ordinarily, courts impose no requirement that an expert be a specialist in a given field, although there may be a requirement that he or she be of a certain profession, such as a doctor.").

Next, Northwest argues that Dr. Guryan relies on a number of assumptions that are "untested and untestable." Those assumptions are (1) that the prices market participants accept are at least as high as their costs; (2) that the prices Dr. Guryan considered were not impacted by other aspects of the parties' relationship; (3) that the prices market participants accept must also be at least as high as Northwest's costs to SS&L PECO pallets; and (4) that the averages of the proxy pricing categories he used are close enough to one another to support his assumptions. Northwest also generally attacks the data set used by Dr. Guryan, arguing, among other things, that he "cherry-picked" his data by ignoring higher per pallet prices, and failed to truly investigate the terms of certain agreements. Lastly, Northwest argues that Dr. Guryan's testimony must be excluded under Rule 403 because it will complicate an otherwise straightforward issue.

First, the Court disagrees that the main assumption underlying Dr. Guryan's methodology – that in a competitive market, prices of services tend to reflect the marginal cost of providing the services – is untested or unreliable. Indeed, courts have recognized this assumption as a recognizable economic principle. *See e.g., Verizon Commc'ns, Inc. v. F.C.C.*, 535 U.S. 467, 505, 122 S. Ct. 1646, 1669, 152 L. Ed. 2d 701 (2002) ("In a perfectly competitive market, retail prices drop instantly to the marginal cost of the most efficient company."); *Felder's Collision Parts, Inc. v. All Star Advert. Agency, Inc.*, 777 F.3d 756, 761 n.7 (5th Cir. 2015) ("Under conditions of perfect competition, a firm always maximizes profits (or minimizes losses) by producing that output at which its marginal cost equals the market price."). By relying on this recognized principle to dictate his analysis of the data at issue, his methodology was sound. *Bielskis*, 663 F.3d at 894 (the expert's opinion "must be reasoned and founded on data…[and] must also utilize the methods of the relevant discipline.").

Of course, this is not to say that the jury will ultimately find Dr. Guryan's data set or his results reliable. *See Manpower*, 732 F.3d at 806 ("Reliability ... is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced."). In its motion, Northwest rightfully raises a number of potential shortcomings in Dr. Guryan's analysis, such as whether we are dealing with a truly competitive market, whether the prices he relied on were impacted by other factors, whether the proxies he used involved similar enough services, or whether he improperly excluded higher per pallet rates. But these are topics more appropriately left for cross-examination, and the Court will not usurp the factfinding role of the jury.

Further, Northwest's contention that Dr. Guryan's expert testimony will not assist the finder of fact is without merit. The jury members, who will likely have little to no familiarity with the SS&L services at the heart of this case, will undoubtedly benefit from testimony regarding prices paid for similar such services in the market place. The Court fails to see how such evidence would otherwise be confusing, misleading, or a waste of time under Rule 403. As such, Northwest's motion to exclude Dr. Guryan's testimony is denied.

Of note, because the Court has granted PECO's motion to exclude Dr. Judd Michael's report and testimony, the portions of Dr. Guryan's rebuttal report related to Dr. Michael will obviously be stricken as moot. However, the Court will not strike the remainder of Dr. Guryan's rebuttal report. Though Northwest feebly attacks this rebuttal report as lacking in support, it is clearly grounded in and builds upon his initial report, which the Court has otherwise found admissible.

**Dr. Henry Quesada's Report (Dkt. No. 257 at A)**

Dr. Henry Quesada received a bachelor's degree in production industrial engineering from Costa Rica Institute of Technology and a Ph.D in wood products technology from Purdue University. Currently, he is an associate professor in the Department of Sustainable Biomaterials at Virginia Tech University. He teaches undergraduate and graduate courses that focus on business, manufacturing, and marketing strategies, as well as financial and costs analysis.

PECO retained Dr. Quesada to "create a cost model and perform a cost study related to SS&L services performed by [Northwest] with respect to PECO pallets." (Quesada Report at 2.) To do so, along with reviewing documents produced by the parties and deposition transcripts, Dr. Quesada performed a time study at four different pallet-sorting sites. According to Dr. Quesada, a "time study is used to determine the time that it takes to complete a specific process, activity, tasks or steps." (*Id*. at 8.) Here, Dr. Quesada used a time study to gather data he then extrapolated to estimate costs of SS&L services.

Specifically, Dr. Quesada visited four locations to conduct time studies: Northwest's Belvidere location, a PECO facility in Chicago, Pallet Industries (a third-party recycler in Pompano Beach, FL), and a Schnucks distribution center in Kinnloch, Missouri. At these locations, he observed and collected various data related to the loading, stacking, sorting, and storage of pallets. He also talked with facility personnel to confirm that the types of activities he observed were representative of the activities performed on any given day. As explained in his report, Dr. Quesada did not include the cost of inbound transportation to the recycler's facility or the outbound transportation costs to the pooled pallet company in his calculations.[3]

---

[3] Dr. Quesada's reasoning for excluding these costs is as follows:

> In an onsite operation, there are no costs for inbound transportation as the pallets are handled at the retailer. In an off-site operation, I understand that the inbound transportation costs are borne by the recycler company regardless of the number of PECO pallets that are included on a truck. In other words, [Northwest] has contracted with its retailer customers to sweep their docks of all pallets regardless of color or type. For the outbound costs, I understand that this is a cost that is borne directly by the pooled pallet company and not by the recycler. In most instances, I understand that the pooled pallet company leaves a "drop" trailer at the recycler that is loaded by the recycler and then the pooled pallet company retrieves that trailer once it is full.

(Quesada Report at 9.)

6

Ultimately, Dr. Quesada concluded that (1) the cost of SS&L services at Northwest is approximately $0.33 per pallet; (2) the cost of SS&L services at PECO's depot is approximately $0.25 per pallet using the semi-automatic line and $0.37 per pallet using manual sorting; (3) the cost of SS&L services at Pallet Industries is approximately $0.19 per pallet; and (4) the cost of SS&L services at the Schnucks distribution center is approximately $0.18 per pallet. (Quesada Report at 9.)

Northwest now asks the court to exclude Dr. Quesada's report and testimony as unreliable and unhelpful to the jury.

**Analysis**

At the outset, Northwest has not raised any issues regarding Dr. Quesada's qualifications. Given his experience and education described above, as well as his previous time studies, he will be considered qualified. Northwest does, however, argue that Dr. Quesada's methodology is unreliable because he excluded various costs, had a very small sample size, and (with respect to Pallet Industries and the Schnucks distribution center), wholly relied on the hearsay statements of personnel instead of collecting proper data. The Court disagrees.

First, as PECO points out, courts have certainly allowed experts to present evidence from time studies, and experts are not limited to using the same method or test in a specific case. *See* Fed. R. Evid. 702, Advisory Committee Note ("Expert testimony cannot be excluded simply because the expert uses one test rather than another, when both tests are accepted in the field and both reach reliable results."). Of course, it does not follow that Dr. Quesada's time study methodology must be found reliable. But, here the Court finds that it is.

At the four various locations, Dr. Quesada observed, timed and measured various SS&L activities. Along with data he personally collected, Dr. Quesada gathered and analyzed information regarding the cost of equipment and labor performed, depreciation and overhead costs, as well as carrying costs of inventory. Where he was unable to observe certain activities or data was not available, he relied on his conversations with facility personnel or with counsel. He then calculated a total per pallet cost for performing SS&L services at each facility. These estimates will be helpful to the jury in assessing the value of SS&L services, and Northwest has not persuasively argued why a time study to extrapolate costs is innately unreliable.

Instead, just like with Dr. Guryan's report above, Northwest has pointed out a number of potential holes in Dr. Quesada's report that can, and should, be presented to the jury through cross-examination. For example, at Belvidere, Dr. Quesada only observed the unloading of 25% of a truck, an indisputably small sample size that resulted in a wide range of data. He also failed to collect specific data on loading, instead assuming that times he observed for unloading could be used as estimates for loading. Similarly, Dr. Quesada's reasoning for excluding certain costs, or for not relying more on actual financial statements that were available to him will be fair game

7

for questioning. Though these potential shortcomings are well taken, because they go to the weight of the testimony, they are best left to the finder of fact. *See Manpower*, 732 F.3d at 806. For these reasons, Northwest's motion to exclude Dr. Quesada is denied.

**DATED: October 25, 2018** /s/ Michael T. Mason